JS 44 (Rev. 09/19)

# CIVIL COVER SHEET

20-cv-924

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
ROBERT NICHOLS FLINT DILLE and
LORRAINE DILLE WILLIAMS

### DEFENDANTS
Louise A. Geer, Daniel I. Herman, David Kloss, Brian McDevitt, Diane McDevitt, John O'Malley, Henry M. Sneath, Geer and Herman, P.C., Kloss Stenger & LoTempio, the Buck Rogers Company and The Nowlan Family Trust

**(b)** County of Residence of First Listed Plaintiff   Los Angeles Co., CA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Indiana Co., PA
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Aurelius Robleto, ROBLETO KURUCE, PLLC, 6101
Penn Ave., Ste. 201, Pittsburgh, PA 1520

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government Plaintiff

☐ 2  U.S. Government Defendant

☐ 3  Federal Question *(U.S. Government Not a Party)*

☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | | **LABOR** | ☐ 840 Trademark | ☐ 460 Deportation |
| | | **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☒ 370 Other Fraud | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | | ☐ 862 Black Lung (923) | |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 891 Agricultural Acts |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from Another District *(specify)*   ☐ 6 Multidistrict Litigation - Transfer   ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $
$10 million

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE   Honorable Wendy Beetlestone   DOCKET NUMBER   15-cv-06231-WB

DATE
February 14, 2020

SIGNATURE OF ATTORNEY OF RECORD

FEB 18 2020

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**20    9924**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: Robert Nichols Flint Dille, 10966 Strathmore #4, Los Angeles, CA 90024-2426

Address of Defendant: Louise A. Geer, 2100 Wilmington Road, New Castle, PA 16105

Place of Accident, Incident or Transaction: Philadelphia, PA

---

**RELATED CASE, IF ANY:**

Case Number: 15-cv-06231-WB    Judge: Beetlestone    Date Terminated: December 9, 2019

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?    Yes ☑    No ☐

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?    Yes ☑    No ☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?    Yes ☐    No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?    Yes ☐    No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: February 14, 2020

94633

*Attorney-at-Law / Pro Se Plaintiff*    *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.    *Federal Question Cases:***

☐ 1.  Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2.  FELA
☐ 3.  Jones Act-Personal Injury
☐ 4.  Antitrust
☐ 5.  Patent
☐ 6.  Labor-Management Relations
☐ 7.  Civil Rights
☐ 8.  Habeas Corpus
☐ 9.  Securities Act(s) Cases
☐ 10. Social Security Review Cases
☐ 11. All other Federal Question Cases
       *(Please specify):*

**B.    *Diversity Jurisdiction Cases:***

☐ 1.  Insurance Contract and Other Contracts
☐ 2.  Airplane Personal Injury
☐ 3.  Assault, Defamation
☐ 4.  Marine Personal Injury
☐ 5.  Motor Vehicle Personal Injury
☐ 6.  Other Personal Injury *(Please specify):*
☐ 7.  Products Liability
☐ 8.  Products Liability – Asbestos
☑ 9.  All other Diversity Cases
       *(Please specify):* Fraud Upon the Court

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, Aurelius Robleto, counsel of record or pro se plaintiff, do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought.

FEB 18 2020

DATE: February 14, 2020

94633

*Signature if applicable*

*Attorney-at-Law / Pro Se Plaintiff*    *Attorney I.D. # if applicable*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5 2018)



# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## CASE MANAGEMENT TRACK DESIGNATION FORM

ROBERT NICHOLS FLINT DILLE and              :          CIVIL ACTION
LORRAINE DILLE WILLIAMS,                     :
                    v.                       :
                                             :
LOUISE A. GEER, *et al.*                     :          NO. **20      924**

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.          ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.          ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.          ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.          ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)          (✗)

(f) Standard Management – Cases that do not fall into any one of the other tracks.          ( )


| February 14, 2020 | Aurelius Robleto | Plaintiffs, Mr. Dille and Ms. Dille Williams |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| (412) 925-8194 | (412) 346-1035 | apr@robletolaw.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

FEB 18 2020



*February 14, 2020*

Kate Barkman, Clerk of Court
United States District Court
    for the Eastern District of Pennsylvania
U.S. Courthouse
601 Market Street, Room 2609
Philadelphia, PA 19106-1797

Re:  <em>Dille v. Geer, et al.</em>

Dear Ms. Barkman,

    Kindly find the within Civil Complaint for filing, together with a CD-ROM containing PDF images of the same. Accompanying the Complaint are (i) a Civil Cover Sheet; (ii) two copies of the Designation Form; (iii) a Case Management Track Form; (iv) payment of the required filing fee; and (v) a Summons form for each Defendant.

    If you have any questions or concerns, please do not hesitate to contact me to discuss them.

        Truly,

        Aure Robleto

encl.

FEB 18 2020

**ROBLETO KURUCE, PLLC**
6101 Penn Avenue, Suite 201
Pittsburgh, PA 15206

**AURELIUS ROBLETO**
Tel: (412) 925-8194
Fax: (412) 346-1035
apr@robletolaw.com



*February 14, 2020*

Kate Barkman, Clerk of Court
United States District Court
        for the Eastern District of Pennsylvania
U.S. Courthouse
601 Market Street, Room 2609
Philadelphia, PA 19106-1797

                            Re:   *Dille v. Geer, et al.*

Dear Ms. Barkman,

        Kindly find the within Civil Complaint for filing, together with a CD-ROM containing
PDF images of the same.  Accompanying the Complaint are (i) a Civil Cover Sheet; (ii) two copies
of the Designation Form; (iii) a Case Management Track Form; and (iv) payment of the required
filing fee.

        If you have any questions or concerns, please do not hesitate to contact me to discuss
them.


                        Truly,


                        Aure Robleto



encl.




FEB 18 2020

**ROBLETO KURUCE, PLLC**
6101 Penn Avenue, Suite 201
Pittsburgh, PA 15206

**AURELIUS ROBLETO**
Tel:  (412) 925-8194
Fax:  (412) 346-1035
apr@robletolaw.com

$400

WB

20    924

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROBERT NICHOLS FLINT DILLE, a
California resident, and LORRAINE DILLE
WILLIAMS, a Florida resident,

      Plaintiffs,

        v.

LOUISE A. GEER, as Claimed Trustee of
the Dille Family Trust and Pennsylvania
resident, DANIEL I. HERMAN, a
Pennsylvania resident DAVID KLOSS, a
New York resident, BRIAN McDEVITT, a
Trustee of the Nowlan Family Trust and
Pennsylvania resident, DIANE McDEVITT,
a Trustee of the Nowlan Family Trust, a
Member of the Buck Rogers Company and
Pennsylvania resident, JOHN O' MALLEY,
a Pennsylvania resident, HENRY M.
SNEATH, a Pennsylvania resident, GEER
AND HERMAN, P.C., a Pennsylvania
Professional Corporation, KLOSS
STENGER & LoTEMPIO, a New York
Law Practice, the BUCK ROGERS
COMPANY, a Pennsylvania limited
liability company, and THE NOWLAN
FAMILY TRUST, a Pennsylvania Business
Trust,

      Defendants.

Civil Action No. 20-

(Related to Case No. 15-cv-06231-WB)

## COMPLAINT FOR RELIEF FROM
## JUDGMENT TO REMEDY FRAUD UPON THE COURT

The Plaintiffs and sole beneficiaries of the Dille Family Trust, Robert Nichols Flint Dille

and Lorraine Dille Williams, by and through their undersigned counsel, hereby submit this

Complaint against the referenced Defendants, for their participation in a fraud upon the Court.

## I.   PRELIMINARY STATEMENT

Because the Defendants have improperly interfered with the administration of justice, in order to protect this Court's integrity, it must employ the extraordinary remedy of vacating a judgment dismissing a case with prejudice. The Defendants committed a fraud upon the Court by concealing and affirmatively misrepresenting critical facts to the Court in order to obtain that judgment.

The Plaintiffs are the only two beneficiaries of the Dille Family Trust (the "***Beneficiaries***"), a California family trust that the Beneficiaries' now-deceased parents formed more than 40 years ago. Assets held by the Dille Family Trust before the Beneficiaries elected to withdraw them in accordance with their right to do so upon the age of 35 and before the Defendants' fraud upon the court, included certain intellectual property rights from the fictional world of "Buck Rogers." Defendants Louise A. Geer and the Nowlan Family Trust, through their respective attorneys and co-Defendants, presented a sham settlement to this Court on February 28, 2019. As admitted by his law partner, the attorney presenting the sham settlement for the Dille Family Trust *and his entire law firm* held a disqualifying conflicting interest. Moreover, the attorney who hurriedly moved for his admission had already withdrawn as counsel to the Dille Family Trust, citing his own unresolvable conflict.

Those conflicting interests would prove consequential. Despite having had actual knowledge of the Beneficiaries' opposition to any such settlement, Geer and the Nowlan Family Trust declined to involve or advise the Beneficiaries. In fact, their purported settlement documents *anticipated* that the Beneficiaries would take legal action when they discovered the fraud, providing a one-way indemnification of the Nowlan Family Trust's defense costs—and the

dissolution of the Dille Family Trust. Of course, the Defendants disclosed none of that to Judge Beetlestone or the District Court.

The "settlement" had not been the first improper scheme of Geer and the Nowlan Family Trust to misappropriate these "Buck Rogers" assets. In fact, the "settlement" arose only days after their failed attempt to jointly acquire such assets over the objections of the Beneficiaries, through the unauthorized and invalid chapter 11 bankruptcy petition that Geer had signed on behalf of the Dille Family Trust (without notice or approval from the Beneficiaries). In another botched effort, Geer had essentially attempted to secure the assets for herself alone, also over the objections of the Beneficiaries.

But the presentation of the "settlement" would not involve the disclosure of any of those details. Instead, the lawyer for the Nowlan Family Trust sought to solicit the District Court's approval of the terms of the settlement, while assuring Judge Beetlestone that the settlement had *not* been confidential. But after Judge Beetlestone refused to grant the Court's imprimatur to the deal, that same attorney indicated in a colloquy with another court that the settlement details were *so* confidential that he could not so much as describe the arrangement. With such tactics, the Defendants prevented the Beneficiaries from seeing the fraudulent settlement documents for nearly an entire year—and then, only after a court order compelling their disclosure.

The injustice resulting from the Defendants' fraud upon the Court is grievous. For example, the Defendants claim that a payment of $300,000 from the so-called settlement is in "safekeeping" in New York with the same law firm whose principal admitted that it held an "impossible to resolve" conflict of interests with the Dille Family Trust. Meanwhile, the Nowlan Family Trust and its counsel contend that it now controls the disposition of the Dille Family Trust's intellectual property—and the exclusive right to bring any and all claims and causes of action of

3

the Dille Family Trust. For her part, Geer now claims that the Dille Family Trust owes her more than the entire "settlement fund" because she claims to have lent cash to pay the fees of the attorneys responsible for conducting the fraud upon the Court. As for the Beneficiaries, the Defendants contend that they are entitled to <u>nothing</u>—not even an explanation. On the other hand, they have been saddled with liabilities only.

Through this action, the Beneficiaries seek a remedy from the harm resulting from the Defendants' concerted and egregious misconduct and fraud upon the Court.

## II.    JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction on several grounds, including (i) diversity jurisdiction pursuant to 28 U.S.C. § 1332, since the citizenship of the parties is completely diverse and the amount in controversy exceeds $75,000.00; and (ii) supplemental jurisdiction under 28 U.S.C. § 1367, because the Complaint seeks to redress a fraud committed upon this Court.

2.    Venue is proper in this judicial district under 28 U.S.C. §§ 1391 and 1400(a), as a substantial part of the events or omissions giving rise to the claims herein occurred in the United States District Court for the Eastern District of Pennsylvania located in Philadelphia, Pennsylvania.

## III.    THE PARTIES

3.    Plaintiff, Robert Nichols Flint Dille ("*Mr. Dille*" or "*Beneficiary*") is a California resident domiciled in Los Angeles, California, residing at 10966 Strathmore #4, Los Angeles, CA 90024-2426. Mr. Dille is one of the two sole beneficiaries of the Dille Family Trust.

4.    Plaintiff, Lorraine Dille Williams ("*Ms. Williams*" or "*Beneficiary*") is a Florida resident and a domiciliary of Florida and Illinois, with addresses at 186 Shelter Lane, Jupiter Inlet Colony, FL 33469, and 1187 Hawkweed Lane, Lake Forest, IL 60045. Ms. Williams is one of two sole beneficiaries of the Dille Family Trust, with her brother Mr. Dille being the other.

5.      Upon information and belief, Defendant, Louise A. Geer ("*Geer*") is a resident and domiciliary of Pennsylvania, with a business office at 2100 Wilmington Road, New Castle, PA 16105.  Geer is a Pennsylvania attorney, a partner in the law firm Geer and Herman, P.C., who continues to claim, without authority, that she is the trustee of the Dille Family Trust.

6.      Upon information and belief, Defendant, Daniel I. Herman ("*Herman*") is a resident and domiciliary of Pennsylvania, with a business office at 2100 Wilmington Road, New Castle, PA 16105.  Herman is a Pennsylvania attorney, a partner in the law firm Geer and Herman, P.C., and is Geer's spouse, law partner and, from time to time, Geer's attorney.

7.      Upon information and belief, Defendant, David Kloss ("*David Kloss*") is an individual and a licensed attorney, residing and domiciled in the vicinity of Buffalo, New York, with a business office at 69 Delaware Avenue, No. 1003, Buffalo, NY 14202.

8.      Upon information and belief, Defendant, Brian McDevitt ("*Mr. McDevitt*") is an individual and a licensed attorney, and residing and domiciled in Bryn Mawr, Pennsylvania and receiving mail at 115 Airdale Road, Bryn Mawr, PA 19010. Upon information and belief, Mr. McDevitt is (i) a trustee of the Nowlan Family Trust, allegedly a business trust with its situs in Pennsylvania; and (i) a member and manager of Defendant, the Buck Rogers Company, LLC.

9.      Upon information and belief, Defendant, Diane McDevitt ("*Ms. McDevitt*") is an individual, and residing and domiciled in Bryn Mawr, Pennsylvania and receiving mail at 115 Airdale Road, Bryn Mawr, PA 19010. Upon information and belief, Ms. McDevitt is (i) a trustee of the Nowlan Family Trust, allegedly a business trust with its situs in Pennsylvania; and (i) a member of Defendant, the Buck Rogers Company, LLC.

10.      Upon information and belief, Defendant, John O'Malley ("*O'Malley*") is an individual, and residing and domiciled in the vicinity of Philadelphia, Pennsylvania, with a

business office at 30 South 17th Street, Philadelphia, PA 19103-4009.    Upon information and belief, O'Malley is a shareholder in Volpe & Koenig, P.C.

11.    Upon information and belief, Defendant, Henry M. Sneath ("***Sneath***") is a resident and domiciliary of Pennsylvania.  Sneath is a Pennsylvania attorney, a partner in the law firm Houston Harbaugh, P.C., and has variously purported to serve as counsel to Geer, Herman and the Dille Family Trust.  Sneath maintains a business office at 401 Liberty Avenue, 22nd Floor, Pittsburgh, PA 15222-1005.

12.    Upon information and belief, Defendant, Geer and Herman, P.C. ("***GH***") is a Pennsylvania restricted professional corporation, with a business office at 2100 Wilmington Road, New Castle, PA 16105.  Upon further information and belief, Defendant Geer and Defendant Herman are shareholders in GH.

13.    Upon information and belief, Defendant, Kloss Stenger & LoTempio ("***KSL***") is a New York law practice, with a business office at 69 Delaware Avenue, No. 1003, Buffalo, NY 14202.  Upon further information and belief, Defendant David Kloss is a shareholder in KSL.

14.    Upon information and belief, Defendant, the Buck Rogers Company ("***BRC***") is a limited liability company recently formed under Pennsylvania law, with its registered place of business in Bryn Mawr, Pennsylvania, receiving mail at 115 Airdale Road, Bryn Mawr, PA 19010.

15.    Upon information and belief, Defendant, the Nowlan Family Trust ("***NFT***") is allegedly a business trust, formed under Pennsylvania law, with its registered place of business in Bryn Mawr, Pennsylvania, receiving mail at 115 Airdale Road, Bryn Mawr, PA 19010.

## IV.   FACTS

### Formation and Status of the Dille Family Trust

16.    The Dille Family Trust ("**DFT**") was formed under California law on August 16, 1979, by the Plaintiffs' parents Robert C. Dille and Virginia N. Dille.  A true and correct copy of the 1979 trust instrument is attached hereto as *Exhibit A*.

17.    The DFT trust instrument was amended on January 5, 1982.  A true and correct copy of the 1982 amendment is attached hereto as *Exhibit B*.

18.    At all times, the DFT has remained an ordinary estate planning trust (*i.e.*, a fiduciary relationship).

19.    The DFT is expressly governed by the laws of the State of California.  *Exh. A*, § 2.F.

20.    The original situs of the DFT was California, but its beneficiaries changed the situs to Illinois on February 1, 1989.  A true and correct copy of the instrument transferring situs is attached hereto as *Exhibit C*.

21.    The DFT trust instrument defines the term "corporate trustee," which must be:

```
a   bank,   corporation   or   other   financial
institution… authorized  by  law  to  administer
trusts, maintaining a full-time trust department,
and having a combined capital and surplus of at
least ten million dollars ($10,000,000.00).
```

*Exh. A*, § 3.B.

22.    Geer does not qualify as a "corporate trustee" within the meaning of the DFT trust.

23.    After the death of the settlors of the DFT, the trust does not provide a mechanism for replacement or appointment of a trustee other than a "corporate trustee."

24.    Thus, under the DFT's governing statutory law, court approval would have been required for Geer to have been appointed trustee of the DFT.  *See* Cal. Prob. Code § 15660(d).

25.     Geer has admitted that no court has appointed her trustee of the Dille Family Trust.

26.     On June 6, 2011, the Plaintiffs each signed a one-page document, styled "Dille Family Trust: Appointment of Successor Trustee," which Geer had drafted. Geer did not advise the Plaintiffs to seek advice from separate counsel before signing the one-page document.

27.     Under the terms of the Dille Family Trust instrument and controlling California statute, Geer's documents styled, "Dille Family Trust: Appointment of Successor Trustee," are legal nullities.

### Relevant Related Cases

28.     **The "*DFT/NFT Litigation*."** This action for fraud upon the court arises from the Defendants' February 28, 2019 so-called "settlement" of the long-pending litigation between the DFT and the Nowlan Family Trust, initiated at the behest of Geer and/or Herman. *The Dille Family Trust v. The Nowlan Family Trust*, (E.D. Pa., case no. 15-cv-06231-WB).

29.     As articulated with greater particularity, *infra*, the Defendants' purported settlement of the DFT/NFT Litigation was procured through a fraud upon the Court.

30.     **The "*Chapter 11 Case*."** On November 28, 2017, Geer improperly authorized the filing of a voluntary petition under chapter 11 of the Bankruptcy Code—without notice to or approval of either Beneficiary of the DFT (Bankr. Pa. W.B., case no. 17-24771-JAD).

31.     Importantly, the DFT need not have been insolvent. That is because Ms. Williams, in reliance upon Geer and at her urging, lent more than $300,000 to the DFT prior to Geer's then-secret authorization of the filing of the Chapter 11 Case. Those loaned funds would have been sufficient to address DFT's creditors' claims, except that Geer transferred the majority of those borrowed funds to HG—without any invoice, explanation or even disclosure.

32.    Notwithstanding the obvious conflict of interests, on October 22, 2018, Herman entered his appearance in the Chapter 11 Case on behalf of purported *creditors*, (i) Kloss, Stenger & LoTempio; and (ii) Geer. *Chapter 11 Case*, doc. nos. 356-57.

33.    An ordinary trust like the DFT is not eligible for bankruptcy protection under chapter 11, but Geer falsely represented in the voluntary petition that the DFT was a "business trust."

34.    In fact, on September 15, 2015, when seeking dismissal of a federal case against the DFT in California, Geer *admitted* that the DFT was "is not a legal entity that can sue or be sued" instead, it "is merely a fiduciary relationship that is not separate from its trustees." A copy of that pleading is attached hereto as *Exhibit D* and the quoted language appears on page 11. Thus, when it suited her, Geer acknowledged in another federal court that the DFT is "an ordinary express trust [and] is not an entity separate from its trustees." *Id.*

35.    On July 25, 2018, the Bankruptcy Court appointed a chapter 11 trustee to displace Geer, after her "contumacious failure to respond to discovery requests." A copy of the July 25, 2018, Memorandum Opinion appointing a chapter 11 trustee is attached hereto as *Exhibit E.*

36.    On November 1, 2018, Geer, acting through her attorney/spouse, Herman, filed a chapter 11 plan, through which Geer would take ownership of the assets of the Dille Family Trust (the "*Geer Plan*"). A copy of the Disclosure Statement describing the Geer Plan is attached hereto as *Exhibit F.*

37.    In her Disclosure Statement, Geer represented the value of the DFT's assets to have been $1.22 million. *Exh. E*, p. 7.

38.    In her Disclosure Statement, Geer also claimed that the need for the bankruptcy had been anticipated litigation costs of "$500,000 to $750,000... with no source of funds to pay" them. *Exh. E*, p. 2.

39.    However, Geer's Disclosure Statement promised 100% payment of administrative claims, other priority claims, and unsecured claims totaling $1,014,285.27 within one year (*i.e.*, $714,285.27 more than contemplated under the sham settlement she and NFT would later present to this Court in the DFT/NFT Litigation). *Exh. E*, pp. 17-18.

40.    On December 4, 2018, Geer and NFT—acting in concert, over the objections of the Beneficiaries—sought to purchase the DFT's assets (the "*NFT-Geer Plan*"). A copy of the Disclosure Statement describing the NFT-Geer Plan is attached hereto as *Exhibit G*.

41.    Under the NFT-Geer Plan, the "Nowlan Family Trust and Louise Geer... [promised] cash consideration totaling $500,000" (*i.e.*, $200,000 more than contemplated under the sham settlement they would present to this Court only a short time later). *Exh. F*, p. 2.

42.    The Beneficiaries opposed the Geer Plan and the NFT Plan, as evidenced by the declarations of Mr. Dille and Ms. Williams, filed in the Chapter 11 Case on December 11, 2018. Copies of those declarations (with the DFT trust documents omitted for efficiency) are attached hereto as *Exhibit H*.

43.    Upon information and belief, the Defendants deliberately declined to disclose the consideration promised under the Geer Plan (more than $1 million) and the NFT-Geer Plan ($500,000) when they presented their $300,000 sham settlement of the DFT/NFT Litigation.

44.    Upon information and belief, the Defendants deliberately declined to disclose the Beneficiaries' opposition to Geer's prior efforts to transfer DFT assets to NFT and/or Geer, despite

the promise of substantially more consideration than contemplated under the "settlement" that the

Defendants presented to this Court in the DFT/NFT Litigation.

45.    On February 20, 2019, in the course of granting the Beneficiaries' Emergency

Motion to Dismiss the Chapter 11 Case, Judge Deller determined that case must be dismissed

because the DFT is not a business trust.  *Murphy v. Bernstein (In re Dille Family Tr.)*, 598 B.R.

179, 197-98 (Bankr. W.D. Pa. 2019).

46.    In that same published decision, Judge Deller found that:

   a.  Geer had previously "stated that a 'trust is not a legal entity' but rather is a
       fiduciary relationship.'" *Murphy v. Bernstein (In re Dille Family Tr.)*, 598
       B.R. 179, 197 (Bankr. W.D. Pa. 2019);

   b.  Geer "admitted that 'the Trust has no independent legal existence and
       therefore jurisdiction must exist over the Trustee [Ms. Geer] personally.'"
       *Id. citing Motion to Dismiss Complaint* at p. 5 (filed at ECF No. 15 at Case
       No. CV 15-05880-R (C.D. Cal. 2015)); and

   c.  Geer had further acknowledged that "the Dille Family Trust 'lacks the
       capacity to sue and be sued…" *Id.* at 197.

47.    The "*First OC Case*."   On February 20, 2019, *immediately after* Judge Deller

issued the decision dismissing the Chapter 11 Case, Geer retaining HG once again averred that the

DFT is a "business trust," in her Complaint in Declaratory Judgment in the Orphans' Court

Division of the Court of Common Pleas of Lawrence County, Pennsylvania (case no. 18 of 2019,

O.C.).  A true and correct copy of the Complaint from the First OC Case is attached hereto as

*Exhibit I*.

48.    On March 13, 2019, the Beneficiaries removed the First OC Case to the United

States District Court for the Western District of Pennsylvania (case no. 19-cv-00274-MRH).

49.    On April 10, 2019, the Beneficiaries served a Motion for Sanctions Pursuant to

Federal Rule of Civil Procedure 11(c)(2) because Geer's counsel's (in that case, Herman) had

alleged claims and legal contentions in the Complaint in the First OC Case, which were entirely

unsupported by law or any nonfrivolous argument for extending, modifying or reversing existing law or establishing new law. For instance:

    d.  In spite of Judge Deller's contrary determination, Geer/Herman contended that the DFT was a business trust. *Exh I,* ¶ 9;

    e.  Despite Judge Deller's contrary determination, Geer/Herman contended that the situs of the DFT was Pennsylvania. *Exh I,* ¶ 4; and

    f.  Without any legal basis, Geer/Herman contended that the Beneficiaries owed a fiduciary duty to the DFT. *Exh I,* ¶¶ 10, 14.

50.    On April 12, 2019—*only two days* after receiving the Beneficiaries' Rule 11 Motion—Geer voluntarily dismissed the First OC Case.

51.    **The *"Second OC Case."*** Then, on April 17, 2019—*only five days* after her voluntary dismissal of the First OC Case—Geer authorized through Sneath as her counsel, filed a second action in Orphans' Court, this time on behalf of the Dille Family Trust (O.C., Lawrence, case no. 43 of 2019).

52.    The Beneficiaries believe and therefore aver that the Defendants expected that the Second OC Case would be a vehicle to distribute funds from their sham settlement and dissolve the DFT, thus closing the final chapter of their scheme.

53.    Geer and certain of her co-defendants contended that the Beneficiaries had not been entitled to receive a copy of their sham settlement agreement. However, on December 18, 2019, Judge Acker of the Orphans' Court of Lawrence County, Pennsylvania in the Second OC Case—after *in camera* review of the settlement agreement and related documents—issued an Order on December 17, 2019, directing that unredacted copies thereof be provided to the Beneficiaries. A copy of that Order is attached hereto as *Exhibit J.*

54.    After that, Sneath argued that the Beneficiaries should be subject to a restrictive protective order. However, Judge Acker once again disagreed and, on January 23, 2020, entered an Order denying the Motion.

55.    Thus, the Beneficiaries only learned in late December 2019 of the terms of the fraudulent settlement, its accompanying Asset Purchase Agreement, the assignment of DFT's copyright(s) and Geer's purported, albeit illegal, authorization of an assignment of all DFT causes of action, choses in action and all of its books and records to its nemesis, NFT.

56.    Importantly, Geer produced those materials only in response to an Order of Court, after losing a protracted legal dispute. *Exh. E.*

57.    On February 7, 2020, Judge Acker entered an Order scheduling a hearing on April 1, 2020, "to determine whether or not Attorney Louise Geer is the legitimate and lawful Trustee of the Dille Family Trust." A copy of that Order is attached hereto as *Exhibit K.*

**B.    Geer Has Never Been Appointed Trustee of the DFT.**

58.    Geer has never properly, formally or effectively been appointed as trustee of the DFT.

59.    Because the DFT trust instrument is silent on the method of appointment of a trustee other than a corporate trustee, court approval would have had been required for Geer to become trustee of the DFT. *See* Cal. Prob. Code § 15660(d).

60.    Geer has admitted that no court has ever authorized her appointment, including the courts of California, Illinois or Pennsylvania. A copy of Geer's January 14, 2020, Responses to Requests for Admissions is attached hereto as *Exhibit L.*

**C.    If Geer Had Been Trustee of the DFT, the Beneficiaries Unanimously Removed Her Prior to the Fraudulent Settlement.**

61.    If the Beneficiaries could have appointed Geer as trustee of the DFT without court intervention, then they had been empowered to remove her in the same fashion.

62.    Notwithstanding Geer's non-appointment, on or about August 26, 2018, the Beneficiaries gave written notice to Geer of their unanimous removal of her as trustee of the DFT and demanded that she cease all involvement with DFT. A copy of that August 26, 2019, notice is attached hereto as *Exhibit M.*

63.    Despite the Beneficiaries' issuance of written notice of her removal, Geer illegally continued to purport to act on behalf of the DFT.

64.    The Beneficiaries again issued written notice of her removal as trustee to Geer on February 22, 2019, re-confirmed her unanimously removal and notifying her of a telephonic meeting regarding the DFT on February 25, 2019.

65.    At the February 25, 2019, telephonic meeting, the Beneficiaries, by resolution (again) re-confirmed their unanimous removal of Geer as trustee of the DFT.

**D.    If Geer Had Been Trustee of the DFT, the Beneficiaries Removed All Assets from the DFT Prior to Geer's Purported Fraudulent Settlement.**

66.    Significantly, under the terms of The Dille Family Trust, it accorded its Beneficiaries the unfettered right to remove the entirety of their respective shares of trust property upon attaining the age of 35, and Ms. Williams and Mr. Dille, both being over the age of 35, both exercised that right as of February 20, 2019. Copies of the Beneficiaries' removal notices are attached hereto as *Exhibit N.*

67.    Because the Beneficiaries' interests in the DFT comprise 100% of its beneficial interests, their removal of their interests left the DFT with no assets.

68.    Consequently, neither Geer nor David Kloss or their respective law firms could have conveyed any property of the DFT after February 20, 2019, as there was no property then remaining to convey.

E.    **Presentation of the Fraudulent Settlement of the DFT/NFT Litigation.**

69.    On November 15, 2018, Herman represented to the court in the DFT/NFT Litigation that, as a result of his status as a purported creditor of the DFT,

> ...there exists **a conflict of interests** [and] it is **absolutely impossible,** pursuant to the Rules of Professional Responsibility **for Daniel I. Herman, Esquire and the law firm of Geer and Herman, P.C. to be involved in the instant litigation.**

*NFT Litigation*, doc. no. 177, p. 3 (emphasis added).

70.    On November 21, 2018, Justin Kloss, Esq. (*i.e.*, a partner in the same law firm as David Kloss) moved to withdraw his appearance from the DFT/NFT Litigation, as well as the appearances of his law partner, Vincent LoTempio, Esq. and their law firm, Kloss, Stenger & LoTempio. *DFT/NFT Litigation*, doc. no. 179. In his Motion, Justin Kloss represented that the law firm:

> has a significant monetary claim against the Dille Family Trust for unpaid costs of representation. The movant herein believes this creates **a conflict of interest, of which would be impossible to resolve while still remaining as counsel.**

*Id.* at p. 2, ¶ 7.

71.    On February 26, 2019, just prior to the settlement conference, Herman sponsored the admission of David Kloss, *pro hac vice*, in the DFT/NFT Litigation. *DFT/NFT Litigation*, doc. no. 186. That *pro hac* Motion is deeply disturbing in view of:

a. Herman's prior representation that he held an **absolutely disqualifying conflict of interests** [*NFT Litigation*, doc. no. 177, p. 3]; and

b. Justin Kloss's representation that Kloss, Stenger & LoTempio held a **conflict of interests that was impossible to resolve**. DFT/NFT Litigation, doc. no. 179, p. 2.

72.    Following David Kloss's improper and unethical admission *pro hac vice* into the DFT/NFT Litigation, he and O'Malley reported the sham settlement to Judge Beetlestone during a February 28, 2019, settlement conference. A copy of the transcript of that proceeding is attached hereto as *Exhibit O.*

73.    Kloss, Stenger & LoTempio—with its impossible to resolve conflict with the Dille Family Trust—took receipt of the proceeds from the sham settlement in New York.

74.    On March 4, 2019, having no knowledge of the fraud committed upon it, this Court entered an Order dismissing the DFT/NFT Litigation with prejudice—all without Beneficiaries' knowledge, authorization or approval—and all grounded in a sham settlement that was antithetical to the Beneficiaries' interests.

### Discovery of the Fraud

75.    On May 23, 2019, the Beneficiaries filed a Motion to Set Aside Judgment entered in the DFT/NFT Litigation, based on their suspicion of Geer's fraud upon this Court.

76.    On August 21, 2019, the Court denied the Beneficiaries' Motion to Set Aside Judgment without prejudice, noting that fraud upon the court must be addressed in a new, separate action.

77.    In the course of their continued litigation in other courts, the Beneficiaries have uncovered overwhelming evidence of the Defendants' fraud upon the Court.

78.    Much of that evidence came directly from the Defendants' statements in other courts. For instance, on September 10, 2019, during a hearing upon a Motion to Reopen the

Chapter 11 Case, O'Malley (NFT's counsel) contended that "the **settlement was a confidential settlement**." A copy of the transcript from that hearing is attached hereto as *Exhibit P* and the referenced quote appears at p. 24:2-3 (emphasis added).

79.    It was not until November 15, 2019, when the Beneficiaries obtained a copy of the transcript from the February 28, 2019, settlement conference in the DFT/NFT Litigation that the Beneficiaries would discover that O'Malley's representations to Judge Beetlestone and Judge Deller had been hopelessly inconsistent.    When presenting that same settlement to Judge Beetlestone on February 28, 2019, O'Malley had represented:

> MR. O'MALLEY:        Well, we would like to get the order, I guess since there's been so much back and forth we would like to put it on the record. **It's not a confidential settlement**.

*Exh. M*, p. 3:10-13 (emphasis added).

80.    Sneath, purporting to represent the DFT, also participated in the September 10, 2019 hearing in the Chapter 11 Case, engaging in the following colloquy with Judge Deller:

> THE COURT: What are the terms and conditions of that settlement?
>
> MR. SNEATH: Your Honor, <u>I don't know</u>. I was not involved in the settlement. **I only know what was on the docket**....
>
> THE COURT:    But, you don't know the terms and conditions of that settlement?
>
> MR. SNEATH: <u>I do not</u>.    It was a confidential settlement, Your Honor, and I don't -- <u>all I know</u> is that the case was settled, money was paid, that money is being held by a law firm in a trust account, and they have not, I am told, they have not been served with a writ of execution or interrogatories or anything....

*Exh. N*, pp. 13:10-14; 13:25-14:7 (emphasis added).

81.    But a short time later when his representation was called into doubt, Sneath inconsistently reported

> MR. SNEATH: Your Honor, I can only tell you what I -- by the way, I just want to clear up one thing. Clearly, my client, the Dille Family Trust, is aware of the terms of the settlement. <u>We are not unaware of the terms of the settlement</u>.

*Id.* at p. 29:13-16 (emphasis added).

82.    Ultimately, Sneath would abandon altogether his original claim that he knew nothing of the settlement:

> THE COURT:    Well, Mr. Sneath, you correct me if I'm wrong.  My interpretation of the colloquy that you and I just had here in open court was that you were just explaining to the Court what you understood with respect to what has been made known to you in a public way about what's in the settlement.
>
>      You weren't attempting to characterize all of the settlement because <u>you just simply haven't read the document</u> and you don't know exactly all of the bells and whistles that are contained in the same, <u>is that right</u>?
>
> MR. SNEATH: <u>Essentially</u>. My client was a party to the settlement. I am not unaware as to the terms of the settlement. I don't -- I was not the person who drafted it. It is not just a simple, you know, we release you from everything thing [sic] because there are associated details that I don't want to try to characterize for the Court. I don't see the point of us here today --
>
> THE COURT:    But, <u>have you read the settlement agreement</u>?
>
> MR. SNEATH: <u>Yes</u>.

*Id.* at pp. 32:21-33:14 (emphasis added).

83.    On October 25, 2019, in the Second OC Case, Sneath once again appears to have misrepresented the presentation of the Defendants' sham settlement, contending before the Orphans' Court of Lawrence County (Acker, J.) that:

> MR. SNEATH: ...Those negotiations under the federal rules are -- are confidential, and **the settlement was confidential**. In fact, <u>the judge in Philadelphia</u>, the Eastern District judge, she **doesn't even know the terms** of the settlement....

A copy of the transcript from that hearing is attached hereto as *Exhibit O* and the quoted portion appears at pp. 22:1-4 (emphasis added).

84.    Evidently, Sneath's representation to Judge Acker in the Second OC Case had been false since O'Malley had presented the settlement to Judge Beetlestone, describing its contents. *See Exh. O*, p. 3:10-13.

85.    On December 17, 2019, the court in the Second OC Case ordered Geer to turn over unredacted copies of the settlement documents. However, Geer did not produce those documents until December 31, 2019. Thus, it was not until the final day of 2019 that the Beneficiaries learned of the Defendants written misrepresentations in the settlement documents, their post-hoc efforts to conceal the settlement and its terms from the Beneficiaries and that the Defendants committed a fraud upon this Court—which extended into other courts—attended by misrepresentations to judges in open court and failures to disclose material facts unknown to those courts.

86.    On November 27, 2019, Geer filed her (i) Petition for Adjudication/Statement of Proposed Distribution; and (ii) First and Partial Account in the Second OC Case. From those filings the Beneficiaries learned for the first time that Geer claimed to have lent $301,500 to the DFT sometime after the dismissal of the Chapter 11 Case on February 20, 2019 (*i.e.*, $1,500 more than the amount of the purported settlement proceeds from NFT).

87.    On January 23, 2020 in the Second OC Case, Judge Acker further ordered that Geer respond to key interrogatories and requests for production of documents on or before March 4, 2020.

88.    Consequently, the Beneficiaries did not learn many of the major components of the Defendants' fraud upon the court until very recently—and they are continuing to discover more evidence of that fraud as the litigation continues.

89.    This action would be timely under Rule 60(b), since it has been filed within one year from the date on which the fraudulent judgment constituting fraud on the court was entered.

90.    However, a remedy for fraud upon the court is not based on Rule 60(b) but, instead, upon the inherent power of all federal courts to vacate judgments obtained by fraud.

91.    Moreover, the doctrine of *laches* is inapplicable since this case has been filed within a reasonable time from when the Beneficiaries discovered or could have discovered the specific terms of the fraudulent settlement upon which the judgment was based, which first occurred in late December 2019, in the Second OC Case after Judge Acker directed Geer to turn over the settlement documents and denied her repeated requests for a protective order.

## V.    COUNT I – FRAUD UPON THE COURT.

92.    The preceding paragraphs are incorporated by reference.

93.    Upon information and belief, the Defendants have acted in concert to commit an intentional fraud upon the Beneficiaries and this Court. Two of the instruments of the Defendants' apparent fraud, the Settlement Agreement (the "*SA*") and Asset Purchase Agreement (the "*APA*") that the Defendants presented in the DFT-NFT Litigation, are attached hereto as *Exhibits Q* and *R*, respectively.

94.    Under the APA, NFT agreed to pay only a fraction of the amounts contemplated under the Geer Plan (more than $1,000,000) or the NFT-Geer Plan ($500,000).

95.    Despite the drastically reduced consideration of $300,000, NFT would receive considerably more than it could have through a chapter 11 plan. It also received the benefits of

dismissal of the DFT/NFT Litigation and DFT's objections to its trademark claims, as well as generous indemnification provisions and the purported right to bring any and all causes of action of the DFT.

96.    Furthermore, upon information and belief, Ms. McDevitt has granted herself a $300,000 lien upon the assets NFT claims to have acquired through the Defendants' fraud upon the court.

97.    There can be no question that the DFT would have been in a considerably better position had the litigation not been settled through the Defendants' fraud upon the court. NFT had no claims against the DFT and the "settlement" would result in far greater harm to the DFT and its Beneficiaries than the $300,000 now held in trust by KSL (despite its admitted conflict of interests with the DFT).

98.    Upon information and belief, the Defendants hurriedly sought court approval of the SA and APA because of the Defendants *knew* that Geer lacked authority to bind the DFT.

99.    Upon further information and belief, the Defendants hurriedly sought court approval of the SA and APA because of the Defendants *knew* that the DFT lacked the capacity to sue or be sued, after Judge Deller had just written of Geer's prior admission "the Trust has no independent legal existence and therefore jurisdiction must exist over the Trustee" *Murphy v. Bernstein (In re Dille Family Tr.)*, 598 B.R. 179, 197-98 (Bankr. W.D. Pa. 2019) *citing Reply Memorandum in Support of Motion to Dismiss Plaintiff's Complaint* at pp. 6, 9, and 11 (filed at ECF No. 23 at Case No. CV 15-05880-R (C.D. Cal. 2015)).

100.    Upon further information and belief, all of the Defendants committed fraud upon the Court by representing, expressly or impliedly, that the DFT had appropriately been a party to this law suit when all of the Defendants *knew* that the DFT lacked the capacity to sue or be sued,

since Judge Deller had just written of Geer's prior admission "the Trust has no independent legal existence and therefore jurisdiction must exist over the Trustee." *Id.*

101.    Upon further information and belief, all of the Defendants committed fraud upon the Court by failing to disclose the material fact that the DFT had *not* appropriately been a party to this law suit, when all of the Defendants *knew* that the DFT lacked the capacity to sue or be sued. *See Id.*

102.    Geer and Herman purported throughout the DFT/NFT Litigation—which they voluntarily and improperly commenced in the name of the DFT, as a purported "business trust" plaintiff against NFT—that it had been entitled to a favorable ruling on all of its claims, the SA includes an acknowledgment by the DFT that "NFT's intellectual property rights are superior to those of DFT." *Exh. Q*, pp. 1, 3.

103.    Upon information and belief, the Defendants incorporated that false "acknowledgment" of NFT's superior rights into the SA to intentionally mislead the Court, in furtherance of their fraud upon the Court.

104.    That conclusion is supported by the Beneficiaries' written notices removing Geer as trustee (if she had ever been trustee) and their removal of all of the assets of the DFT.

105.    Moreover, NFT cannot deny its actual knowledge that Geer lacked authority to bind the DFT, since it argued long ago that "Louise Geer Does Not Have Standing To Assert A Claim On Behalf Of The Dille Family Trust Because She Was Improperly Appointed As Successor Trustee." *DFT/NFT Litigation*, doc. no. 106-3, p. 2.

106.    Upon information and belief, on or about April 25, 2019, the Defendants reacted to this Court's refusal in the DFT/NFT Litigation to affirmatively approve the Defendants'

"settlement," by attempting to conceal their misconduct from the Beneficiaries and various courts, including this one.

107.    Upon information and belief, for that improper purpose, Geer (purporting to act on behalf of the DFT), NFT and BRC entered into a Confidentiality and Non-Disclosure Agreement (the "*NDA*"). A copy the NDA is attached hereto as *Exhibit S.*

108.    After the Defendants' representation to this Court that the "settlement" had *not been confidential*, this Court should regard the NDA with suspicion. That suspicion should be elevated since the NDA came nearly *two months after execution* of the "settlement" documents, and without any additional consideration.

109.    The SA incorporates an exhaustive release of the Defendants and related parties, including the beneficiaries of NFT—however, the SA provides no similar release for the DFT's Beneficiaries. *Exh. Q*, p. 2.

110.    Upon information and belief, the Defendants *anticipated* that the Beneficiaries would seek redress for the Defendants' fraud upon the Court in the DFT/NFT Litigation, as evidenced by at least three provisions of the SA and APA.

111.    First, the APA provided for indemnification from DFT for the Beneficiaries' claims against NFT, Ms. McDevitt, Mr. McDevitt, the beneficiaries of the NFT and their attorneys against the Beneficiaries' claims. *Exh. R*, pp. 5-6.

112.    Second, the APA provided for the dissolution of DFT through a proceeding in Orphans' Court. *Exh. R*, p. 6.

113.    Third, the Defendants attempted to assign the Beneficiaries' right to bring their claims to NFT itself through the SA:

> With this settlement agreement no other party
> than the Nowlan Family Trust shall have any
> right to bring or asset any cause of action

```
against any party for any reason except the
parties released herein.
```

*Exh. Q*, p. 2.

114.    Notably, the Defendants did not mince their words on the issue of whether NFT

would indemnify the DFT if the Beneficiaries discovered their sham—it expressly rejects any

interpretation that would lead to that outcome. *Exh. Q*, p. 3, § 2(b).

115.    Upon information and belief, Defendant David Kloss, an attorney and officer of the

court, acting for himself, KSL, and his co-Defendants, committed intentional fraud directed at the

Court itself by, *inter alia*:

      a.  Representing that the parties had validly settled their disputes when, in fact, no one had advised the Beneficiaries of the purported settlement, the terms of which were substantially similar to the sale transaction that Geer and NFT had unsuccessfully attempted together during the Chapter 11 Case;

      b.  Representing, through his presentation of the SA that NFT's intellectual property rights were superior to those of DFT, despite consistent arguments to the contrary throughout the litigation;

      c.  Representing that the SA had been in the interests of the DFT and its Beneficiaries, despite that it would leave nothing for the DFT and generate new expenses in excess of the settlement amount—all the while NFT had *no claims* against the DFT and, thus the DFT had no litigation risk;

      d.  Failing to disclose that he held an *admitted* conflict of interests with the DFT that was impossible to resolve;

      e.  Failing to disclose that his *pro hac* sponsor, Herman held an *admitted* conflict of interests with the DFT that made it impossible for him to represent it;

      f.  Failing to disclose that the Beneficiaries had objected to the terms of the sham settlement in an earlier iteration;

      g.  Failing to disclose that the Beneficiaries had terminated Geer as trustee of the DFT, if she had ever held that position;

      h.  Failing to disclose that the Beneficiaries had already removed 100% of their interests in the DFT, together comprising 100% of the DFT's assets;

    i.   Failing to disclose that Geer had never been properly appointed trustee of the DFT; and

    j.   Failing to disclose that his law firm—which had admitted that it held a conflict of interests with the DFT—would take possession of the proceeds of the sham settlement, while continuing to claim that the DFT was indebted to it.

116.    Upon information and belief, Defendant David Kloss and KSL actually deceived the Court.

117.    Upon information and belief, Defendant O'Malley, an attorney and officer of the court, acting for himself, NFT, BRC, Mr. McDevitt, Ms. McDevitt, and his co-Defendants, committed intentional fraud directed at the Court itself by, *inter alia*:

    a.   Representing that the parties had validly settled their disputes when, in fact, no one had advised the Beneficiaries of the purported settlement, the terms of which were substantially similar to the sale transaction that Geer and NFT had unsuccessfully attempted together during the Chapter 11 Case;

    b.   Representing through the APA that no actions, suits, claims, investigations, hearings or proceedings of any time existed that might affect NFT's ability to close the transactions contemplated under the APA, despite his actual knowledge that

        i.   of his own prior representation in the same case that "Louise Geer Does Not Have Standing To Assert A Claim On Behalf Of The Dille Family Trust Because She Was Improperly Appointed As Successor Trustee" [*NFT Litigation*, doc. no. 106-3, p. 2]

        ii.   that the Beneficiaries had terminated Geer as trustee of the DFT, if she had ever been trustee; and

        iii.   that the Beneficiaries had removed all of the assets from the DFT;

    c.   Representing, through his presentation of the settlement agreement that NFT's intellectual property rights were superior to those of DFT, despite substantial evidence to the contrary;

    d.   Representing that the settlement agreement had been in the interests of the parties, despite that it would leave nothing for the DFT and generate new expenses in excess of the settlement amount—all the while NFT had *no claims* against the DFT and, thus the DFT had no litigation risk;

e.  Representing that the reason for seeking court approval of the settlement had been because "there had been so much back and forth" when the actual reason had been to extend the Court's imprimatur to a fraudulent settlement, in an effort to further impair the rights of the Beneficiaries;

f.  Failing to disclose that the Beneficiaries had objected to the terms of the sham settlement in an earlier iteration;

g.  Failing to disclose that the Beneficiaries had terminated Geer as trustee of the DFT, if she had ever held that position;

h.  Failing to disclose that the Beneficiaries had removed 100% of their interests in the DFT, together comprising 100% of the DFT's assets; and

i.  Misrepresenting to Judge Acker and Judge Deller that the SA had been confidential, despite his contrary representation to Judge Beetlestone.

118.  Upon information and belief, Defendant O'Malley acting for himself, NFT, BRC, Mr. McDevitt, Ms. McDevitt, actually deceived the Court.

119.  Upon information and belief, Defendant Sneath, an attorney and officer of the court, acting for himself and his co-Defendants, committed intentional fraud directed at the Court itself by, *inter alia*

a.  Representing to Judge Deller that he did not know the terms of the SA;

b.  Representing to Judge Deller that the SA had been confidential;

c.  Representing to Judge Acker that the terms of the SA had been kept secret from Judge Beetlestone; and

d.  Preventing the Beneficiaries from obtaining documents and information relevant to the Defendants' fraud upon the Court.

120.  Upon information and belief, Defendant Sneath actually deceived the Court.

121.  Upon information and belief, Defendant Herman, an attorney and officer of the court, acting for himself, GH and his co-Defendants, committed intentional fraud directed at the Court itself.

a.  Failing to disclose that he held an *admitted* conflict of interests with the DFT that disqualified him from moving to admit another attorney *pro hac vice*;

    b. Failing to disclose that his *pro hac* sponsee, David Kloss held an *admitted* conflict of interests with the DFT that made it impossible for him to represent it;

    c. Failing to disclose that the Beneficiaries had objected to the terms of the sham settlement in an earlier iteration;

    d. Failing to disclose that the Beneficiaries had terminated Geer as trustee of the DFT, if she had ever held that position;

    e. Failing to disclose that the Beneficiaries had removed 100% of their interests in the DFT, together comprising 100% of the DFT's assets; and

    f. Failing to disclose that Geer had never been properly appointed trustee of the DFT.

122.    Upon information and belief, Defendant Herman and GH actually deceived the Court.

123.    Upon information and belief, Defendant Geer, an attorney and officer of the court, acting for herself, GH and her co-Defendants, committed intentional fraud directed at the Court itself.

    a. Representing that the parties had validly settled their disputes when, in fact, no one had advised the Beneficiaries of the purported settlement, the terms of which were substantially similar to the sale transaction she and NFT had unsuccessfully attempted together during the Chapter 11 Case;

    b. Representing, through her execution and presentation of the SA that NFT's intellectual property rights were superior to those of DFT, despite her fiduciary duty to the DFT and consistent arguments to the contrary throughout the litigation;

    c. Representing that the SA had been in the interests of the DFT and its Beneficiaries, despite that it would leave nothing for the DFT and generate new expenses in excess of the settlement amount—all the while NFT had *no claims* against the DFT and, thus the DFT had no litigation risk;

    d. Failing to disclose that she had failed to keep the Beneficiaries apprised of her settlement efforts;

    e. Failing to disclose that Herman had *admitted* that Geer and Herman, P.C. held conflict of interests with the DFT that made it impossible for Geer to serve as its trustee;

    f.  Failing to disclose that the Beneficiaries had objected to the terms of the sham settlement;

    g.  Failing to disclose that the Beneficiaries had terminated her as trustee of the DFT, if she had ever held that position;

    h.  Failing to disclose that the Beneficiaries had removed 100% of their interests in the DFT, together comprising 100% of the DFT's assets;

    i.  Failing to disclose that she had never been properly appointed trustee of the DFT;

    j.  Failing to disclose that she had, or intended to extend loans to the DFT, the proceeds of which she would provide no information on, and that she would seek repayment of her alleged loans ahead of other creditors of the DFT; and

    k.  Failing to disclose that she would retain a benefit from the DFT in the forms of continuing beneficial interests in its assets, including but not limited to a license agreement for the benefit of an entity or entities in which she has an interest.

124.    Upon information and belief, Defendant Geer and GH actually deceived the Court.

125.    As a direct and proximate consequence of the Defendants' fraud upon the Court, the Beneficiaries have incurred considerable monetary and non-monetary damages, including but not limited to lost opportunities, lost profits, reputational harm, and potential impairment of the value of their assets of at least $10 million, and attorneys' fees and expenses.

126.    Considering the Defendants' abject, egregious nature of the Defendants' misconduct, the Court should exercise its discretion to award exemplary damages to the Beneficiaries, as punishment for the Defendants' fraud upon the Court and to deter future misconduct.

WHEREFORE, the Beneficiaries respectfully request that this Court enter judgment against the Defendants and in favor the Beneficiaries, (i) vacating the March 4, 2019, Order dismissing the DFT/NFT Litigation; (ii) determining the APA, SA and related agreements and instruments *void ab initio* for fraud upon the Court; (iii) granting a monetary award to the

Beneficiaries in the amount of $10 million, plus attorneys fees' and costs; (iv) granting a further award of exemplary damages to the Beneficiaries, in an amount as the Court deems sufficient to punish the Defendants and deter future abuse, and (v) such other relief as this Court may deem just and appropriate.

Dated:  February 14, 2020

Aurelius P. Robleto
PA I.D. No. 94633
ROBLETO KURUCE, PLLC
6101 Penn Avenue, Suite 1306
Pittsburgh, PA 15206
Tel: (412) 925-8194
Fax: (412) 346-1035
apr@robletolaw.com

4

1       (Laughter)

2              MR. O'MALLEY:  I can explain it.  There's a lot of

3    documents there but it's not as bad as it looks.

4              THE COURT:  Okay, so I have a stipulation of

5    dismissal which is a Rule 41.  But you want me to approve the

6    stipulation and agreement, okay.  So --

7              MR. O'MALLEY:  And then the exhibits, Your Honor,

8    are the settlement agreement and then as part of the

9    settlement, Your Honor, there's a transfer of assets from the

10   Dille Family Trust in consideration fo $300,000.  So there's

11   an asset purchase agreement.  And the majority of what I

12   handed to you is just the schedules of the intellectual

13   property that's being transferred, Your Honor.

14             THE COURT:  Okay.  Why is it that I have -- you've

15   drafted this thing to say that I approve the stipulation and

16   agreement?  Because generally, I don't do that --

17             MR. O'MALLEY:  Okay.

18             THE COURT:  -- that's not what I do.  I just, you

19   tell me that settled and I sign off.  I'm happy to do that.

20   I'm not going to sign this order --

21             MR. O'MALLEY:  Okay.

22             THE COURT:  -- because it suggests that I should

23   have continued engagement when I'm not going to.  So, if you

24   want to file the agreement, that's fine.  And you can even in

25   the Rule 41(b) say, "In light of the parties agreement which

5

1    was filed, the parties seek to dismiss this case with each

2    party to bear their own costs, expenses and attorney's fees."

3    I'm happy to do that.

4              MR. KLOSS:  And we --

5              MR. O'MALLEY:  Okay.  And with respect to the order

6    language, is there anything I should strike out there or?

7              THE COURT:  Well, "I hereby approve.  It is hereby

8    ordered and decreed this February 28, 2019, that this case is

9    dismissed with prejudice with each party to bear their own

10   costs, expenses and attorney's fees."  That's it.

11             MR. O'MALLEY:  Okay.

12             THE COURT:  So, take out the language, "The

13   stipulation and agreement attached hereto are hereby

14   approved."  And you should also mention, "pursuant to Rule

15   41," in there somewhere.

16             MR. O'MALLEY:  In the order language?

17             THE COURT:  In the order language, yes.  Okay,

18   that's it.

19             MR. O'MALLEY:  I will file that when I get back --

20             THE COURT:  Okay.

21             MR. O'MALLEY:  -- to the office, Your Honor.

22             THE COURT:  Anything else?

23             MR. KLOSS:  No --

24             MR. O'MALLEY:  Not from our side, Your Honor.

25             THE COURT:  Okay, well I'm very pleased that this

6

1    resolved.  I think that it was hard fought and obviously

2    everyone here has worked tremendously long and hard to get it

3    done, and I appreciate everything you've done.  And I see Ms.

4    Lipschutz smiling, so I assume that she was deep up to her

5    neck --

6                 MR. O'MALLEY:  She was a big help, Your Honor.

7                 THE COURT:  Yes.  Okay, well thank you very much.

8    Okay.

9                 ALL:  Thank you, Judge.

10               THE COURT:  Bye-bye.

11               MR. O'MALLEY:  Thank you, Your Honor.

12               THE CLERK:  All rise.

13         (Court adjourned)

14

15                       CERTIFICATION

16    I certify that the foregoing is a correct transcript from the

17    electronic sound recording of the proceedings in the above-

18    entitled matter.

19

20

21    _Lewis Parham_                    11/15/19

22

23

24    _____       _____

25    Signature of Transcriber              Date

# EXHIBIT P

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF PENNSYLVANIA

IN RE:                          .       Case No. 17-24771-JAD
                                .
                                .
DILLE FAMILY TRUST,             .       5414 U.S. Steel Tower
                                .       600 Grant Street
                                .       Pittsburgh, PA 15219
                                .
        Debtor.                 .       September 10, 2019
                                .       10:28 a.m.
. . . . . . . . . . . ..

TRANSCRIPT OF EXPEDITED MOTION TO REOPEN BANKRUPTCY CASE FOR
LIMITED PURPOSE PURSUANT TO 11 U.S.C. SECTION 350(b) FILED BY
     ROBERT S. BERNSTEIN, FORMER CHAPTER 11 TRUSTEE
          BEFORE HONORABLE JEFFERY A. DELLER
          UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:             Houston Harbaugh
                            By:  HENRY M. SNEATH, ESQ.
                            Three Gateway Center
                            401 Liberty Avenue, 22nd Floor
                            Pittsburgh, PA 15222


For Lorraine                Robleto Law, PLLC
Dille-Williams, Robert      By:  AURELIUS P. ROBLETO, ESQ.
Nichols Flint Dille         6101 Penn Avenue, Suite 201
Team Angry Filmworks,       Pittsburgh, PA 15206
Inc.:



Audio Operator:             Adriane Alampi


Proceedings recorded by electronic sound recording, transcript
          produced by transcription service.

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@jjcourt.com

(609)586-2311    Fax No. (609) 587-3599

2

APPEARANCES (Cont'd):

For Robert S. Bernstein:   Bernstein Burkley
                           By:  MARK A. LINDSAY, ESQ.
                                RAYMOND P. WENDOLOWSKI, ESQ.
                           707 Grant Street
                           Suite 2200, Gulf Tower
                           Pittsburgh, PA 15219


For the Mediator,         Tucker Arensberg
Judith K. Fitzgerald:     By:  ALLISON L. CARR, ESQ.
                          One PPG Place
                          Suite 1500
                          Pittsburgh, PA 15222


TELEPHONIC APPEARANCES:

For Team Angry            Abrams Coate, LLP
Filmworks, Inc.:          By:  CHARLES M. COATE, ESQ.
                          12400 Wilshire Boulevard, Suite 1060
                          Los Angeles, CA  90025


For the Nowlan            Volpe and Koenig, P.C.
Family Trust:             By:  JOHN J. O'MALLEY, ESQ.
                          30 South 17th Street, Suite 1800
                          Philadelphia, PA  19103

                          - - -

3

1      THE COURT:  Dille Family Trust, 17-24771.  We're here

2  on an expedited motion to reopen.

3      Let's have appearances.  Let's start with who is on

4  the phone.

5      MR. COATE:  Yes, good morning, Your Honor.  Charles

6  Coate for Team Angry Filmworks, Inc.

7      MR. O'MALLEY:  Good morning, Your Honor.  John

8  O'Malley for the Nowlan Family Trust.

9      THE COURT:  Anybody else on the phone?

10                  (No audible response)

11      THE COURT:  Let's have appearances in the courtroom.

12  We'll start with Mr. Robleto and work our way over.

13      MR. ROBLETO:  Thank you and good morning, Your Honor.

14  Aurelius Robleto on behalf of Lorraine Dille-Williams, Robert

15  Nichols Flint Dille-Williams [sic], both beneficiaries of the

16  Dille Family Trust, and Team Angry Filmworks, Inc.

17      MR. LINDSAY:  Good morning, Your Honor.  Mark Lindsay

18  and my partner Ray Wendolowski for the movant.

19      THE COURT:  Good morning.

20      MR. WENDOLOWSKI:  Good morning.

21      MS. CARR:  Good morning, Your Honor.  Allison Carr on

22  behalf of the mediator, Judith K. Fitzgerald.

23      MR. SNEATH:  Good morning, Your Honor.  Henry Sneath

24  for the Dille Family Trust.  And I think I'm on the wrong side

25  of the room, but that's okay.

4

1          THE COURT:  It's Bankruptcy Court.

2          MR. SNEATH:  Yes.

3          THE COURT:  I've seen folks move their chairs

4    mid-hearing.  Well, I saw that we received, and when I say we,

5    I'm talking about the Court received, from Mr. Robleto a motion

6    to disqualify Mr. Sneath.

7          My preference, presently, is to schedule that or hear

8    that motion, really only if I grant this motion to reopen.  If

9    I don't grant the motion to reopen, then there's no need for

10   this Court to address the motion to disqualify.  That relief

11   being sought would have to be addressed in some other court

12   somewhere else.

13         Any objection to that?

14         MR. ROBLETO:  No, Your Honor.  In fact, I anticipated

15   that that would likely be the way matters would proceed, that

16   if the Court denies the motion to reopen, the disqualification

17   issue becomes moot.  At least before this Court, I think.  So,

18   thank you for that, Your Honor.

19         THE COURT:  I assume you have no opposition to that,

20   Mr. Sneath?

21         MR. SNEATH:  I do not and, oddly, Mr. Robleto and I

22   are arguing the same side, that's why I said I'm on the wrong

23   side of the room.

24         MR. ROBLETO:  I was surprised to see him move over.

25         THE COURT:  All right.  Mr. Lindsay?

5

1          MR. LINDSAY:  Thank you, Your Honor.  First of all,

2    thank you, Your Honor, for scheduling this on an expedited

3    basis.

4          THE COURT:  What's --

5          MR. LINDSAY:  I can --

6          THE COURT:  What's the hurry on it?

7          MR. LINDSAY:  Your Honor, if you've --

8          THE COURT:  I mean, to be --

9          MR. LINDSAY:  If you've seen the pleadings, there are

10   a lot of moving parts that we were --

11         THE COURT:  Well, there's a lot of moving parts.

12   But, to be candid, when I read it I said, well, what's the

13   hurry?

14         MR. LINDSAY:  We, upon information and belief, had

15   reason to believe that the potential assets that may or may not

16   be -- that the estate may or may not have any rights in could

17   be subject to dissipation --

18         THE COURT:  When you say the "estate", there is no

19   bankruptcy estate.

20         MR. LINDSAY:  Not the bankruptcy estate, the Dille

21   Family Trust, to the extent it's an estate because it's

22   subject, which we've learned, subject to the jurisdiction of

23   the Orphans' Court.

24         But, prior to that, we eventually learned that there

25   were funds in an escrow account, outside of this jurisdiction,

6

1    for whatever reason, and --

2              THE COURT:  When you say "outside of this

3    jurisdiction", what do you mean?

4              MR. LINDSAY:  The state of New York which, clearly,

5    they could have been held in Pennsylvania, but they're not

6    being.

7              THE COURT:  When you say "in the state of New York",

8    what do you mean by "in the state of New York"?

9              MR. LINDSAY:  By a law firm.

10             THE COURT:  What law firm is that?

11             MR. LINDSAY:  The Kloss, Stenger, LoTempio law firm.

12   This is -- and I haven't received this information formally

13   because, frankly, no one was willing to provide that

14   information formally.  But, that is upon --

15             THE COURT:  Did you serve a --

16             MR. LINDSAY:  Again, upon information and belief --

17             THE COURT:  Did you serve a -- did you domesticate

18   your judgment and serve a writ of execution on that firm?

19             MR. LINDSAY:  We have domesticated our judgment, or

20   at least began that process.  I think, without being an expert

21   in the process in New York, we've been advised by our local

22   counsel in New York that it is a somewhat long and tortuous

23   process.  Not --

24             THE COURT:  What --

25             MR. LINDSAY:  Not what it would be like in

7

1  Pennsylvania.

2      THE COURT:  I don't understand.  I mean, judgments

3  get enforced all the time.

4      MR. LINDSAY:  They do, Your Honor.

5      THE COURT:  I'm not aware of judgments not being

6  enforced in New York.

7      MR. LINDSAY:  I think they will be.  I think it will

8  be enforced, but not expeditiously.

9      THE COURT:  What does that mean?

10     MR. LINDSAY:  And in the interim, we had a reason to

11  believe that those funds would be dissipated.

12     THE COURT:  When you say "not expeditiously", what

13  does that mean?

14     MR. LINDSAY:  From a number of days?  I don't know

15  that I can pinpoint a number of days, but it certainly was not

16  in the 30- to 60- to necessarily even 90-day range.  And,

17  again, we have reason to believe that those funds --

18     THE COURT:  So, you --

19     MR. LINDSAY:  -- would be dissipated in the interim.

20     THE COURT:  So, you have a judgment, you've

21  domesticated in New York.  What's the process in New York?

22     MR. LINDSAY:  Again, not an expert, Your Honor.

23     THE COURT:  Well, I know, but that's --

24     MR. LINDSAY:  I could have my partner talk about it.

25  He's a --

8

1      THE COURT:  Let's hear from whoever is handling it.

2      MR. LINDSAY:  And, Your Honor, if I could back up one

3 second.  I think that if you could hear me out, I could

4 probably make this easy for the Court and we wouldn't have to

5 have these discussions, but that's if you want to --

6      THE COURT:  All right.

7      MR. LINDSAY:  But, we're happy to answer these

8 questions as well.

9      THE COURT:  All right.  Go ahead.

10     MR. LINDSAY:  So, I can say that, again, I found this

11 process, and let me first say, I'm not talking about Mr.

12 Robleto, because I haven't requested anything from him, or his

13 clients, throughout this process, but others I have requested

14 information from, both informally and formally.

15         And it's my opinion that I haven't gotten that

16 information, or at least, fully gotten that information, and

17 that a lot of the responses that I got were vague and things of

18 that nature.

19         Regardless, after having filed this motion --

20     THE COURT:  Have you served formal discovery, like

21 interrogatories --

22     MR. LINDSAY:  Yes.

23     THE COURT:  -- that needed execution?

24     MR. LINDSAY:  Yes, Your Honor.  After having filed

25 this motion --

9

1          THE COURT:  Have you gotten answers to the

2    interrogatories that needed execution?

3          MR. LINDSAY:  Yes, Your Honor.

4          THE COURT:  So, you have gotten information then,

5    because you just said you didn't get information.

6          MR. LINDSAY:  Well, I guess it's a matter --

7          THE COURT:  And you talked about informal --

8          MR. LINDSAY:  -- of opinion as to whether or not --

9          THE COURT:  You talked about informally; but, you

10   know, there's a process.  You know --

11         MR. LINDSAY:  I guess it's a matter of opinion as to

12   whether or not an answer to an interrogatory is actually

13   information and that's --

14         THE COURT:  They're supposed to be under penalty of

15   perjury, so I would think that that certainly is information.

16         MR. LINDSAY:  Well, and we've all seen answers to

17   interrogatories that are simply objections and, you know, claim

18   confidential information, and things of that nature.

19   Regardless, it's been problematic.

20         With that said, the answers and responses that were

21   filed to our motion to reopen, as vehement as they were,

22   provided more information than we have gotten throughout this

23   entire process, information that if it would have been

24   voluntarily provided, we probably wouldn't be here today.

25         With that said, where I'm going with this, Your

10

1  Honor, is I think, at the end of the day, at the end of this
2  process, quite frankly, we're willing to withdraw our motion.
3  Because, through this, we've gained the information that we
4  really needed and that we were asking for.
5          Why it required the filing of pleadings in this court
6  to do that, that's not for me to say.  But, the fact of the
7  matter is, that's what it took.  It wasn't my intention.  That
8  was not, certainly not the primary intent in filing this
9  motion.  We had every intention of proceeding to try to reopen
10 this case because we thought it was a reasonable avenue, and a
11 legitimate avenue, to try to seek to enforce a judgment that
12 issued from this Court.
13         But, regardless, after having read everything that's
14 been filed, discussing with Mr. Robleto, I haven't had a chance
15 to speak with Mr. Sneath about it, we think we have reasonable
16 assurances now and have been provided with information that we
17 need to proceed elsewhere, and we're willing to withdraw this
18 motion to reopen, Your Honor.
19         THE COURT:  All right.  Does anybody else wish to be
20 heard?
21         MR. SNEATH:  I would, Your Honor, just for one
22 second, if I may?
23         THE COURT:  Yes, sir.
24         MR. SNEATH:  Again, Henry Sneath on behalf of the
25 Dille Family Trust.

11

1    Because pleadings and things and records in this case

2 keep appearing in other places, on websites and in other cases,

3 I just need to address one thing.

4    Ms. Geer and Mr. Herman were served, they are the --

5 Ms. Geer is the trustee of the Dille Family Trust, they did

6 answer interrogatories. They do not, and the trust does not,

7 have the money in its possession.

8    It was made very clear, both in my verbal discussions

9 with Mr. Lindsay and in writing and in our response to the

10 motion, that the money that we're talking about is a settlement

11 of a case in the Eastern District of Pennsylvania. The money

12 was paid from Mr. Nowlan's client.

13    THE COURT: Is that the case that's in front of Judge

14 Beetlestone?

15    MR. LINDSAY: Well, it's over, Your Honor. And there

16 was an attempt to reopen it, but that was denied.

17    Mr. Nowlan's firm conveyed the settlement funds to

18 the lawyer who was representing the Dille Family Trust at that

19 time, that's Mr. Kloss (phonetic) who Mr. Lindsay just

20 referenced, he is a lawyer in New York.

21    At or about the same time, Judge Acker issued an

22 order freezing those funds saying that there was a preliminary

23 injunction. Judge Acker in Lawrence County. It's made an

24 exhibit to our filings. That there is a preliminary injunction

25 enjoining anybody from doing anything with the funds. The

12

1  trust has, and will continue to honor that.  Mr. Kloss' firm

2  has --

3              THE COURT:  Kloss' firm serves as counsel to whom?

4              MR. SNEATH:  They were counsel to the trust, the

5  Dille Family Trust, in the Eastern District case at the time of

6  the settlement.

7              THE COURT:  And they've agreed to subject themselves

8  to the jurisdiction of the Court of Common Pleas of Lawrence

9  County as it relates to those funds?

10             MR. SNEATH:  They will disburse them however ordered

11 whenever some Court orders them to disburse them.

12             THE COURT:  So, they have agreed to subject

13 themselves to the jurisdiction of the Lawrence County Court of

14 Common Pleas?

15             MR. SNEATH:  That I don't know and I don't represent

16 that law firm and I was not involved in that settlement.  But,

17 what I do know --

18             THE COURT:  Who do you represent?

19             MR. SNEATH:  I represent the Dille Family Trust.

20             THE COURT:  So, you represent the trust.  And they

21 are also counsel to the trust, or at least insofar as that

22 Eastern District litigation.

23             MR. SNEATH:  They were in the Eastern District

24 litigation.  And, so, the funds, not surprisingly, were paid to

25 them.  They are being maintained in an IOLTA account.  I have

13

1    explained that previously, both to Mr. Lindsay and to anybody

2    that would ask.  But, they can't be moved because of the State

3    Court order.  This is now a State Court Probate action.  The

4    funds can't be moved.  At some point Mr. Bernstein's firm and

5    others will be able to adjudicate their claims in that court,

6    however the Probate Court sees fit.

7            But, the bottom line is, I wanted to reassure the

8    Court that the funds are safe, sound, not going anywhere, not

9    being disbursed, not paying the legal fees.

10            THE COURT:  What are the terms and conditions of that

11    settlement?

12            MR. SNEATH:  Your Honor, I don't know.  I was not

13    involved in the settlement.  I only know what was on the

14    docket.  I know --

15            THE COURT:  Well, you're representing the Dille

16    Family Trust with respect to what?

17            MR. SNEATH:  At the moment, I'm here representing

18    them in this bankruptcy as a responding party.

19            THE COURT:  Do you represent them in any other

20    capacity?

21            MR. SNEATH:  Yes, I represent them in the Lawrence

22    County action.  I've represented them now in two or three other

23    actions.  But, I was not the settling attorney or the attorney

24    of record at the time of that settlement.

25            THE COURT:  But, you don't know the terms and

14

1 conditions of that settlement?

2        MR. SNEATH: I do not. It was a confidential

3 settlement, Your Honor, and I don't -- all I know is that the

4 case was settled, money was paid, that money is being held by a

5 law firm in a trust account, and they have not, I am told, they

6 have not been served with a writ of execution or

7 interrogatories, or anything.

8        THE COURT: Are there any other assets in the Dille

9 Family Trust, other than the intellectual property that was

10 subject to that litigation in the Eastern District and whatever

11 rights the Dille Family Trust has under the settlement

12 agreement?

13        MR. SNEATH: Well, I can't speak to what intellectual

14 property rights still exist or don't exist. That was part of

15 the settlement, as I understand it. The only liquid assets

16 that I'm aware of is the $300,000 settlement proceeds.

17        THE COURT: And, who filed the injunction action in

18 the Court of Common Pleas of Lawrence County?

19        MR. SNEATH: Well, currently it's not -- well, that

20 was Mr. -- the original injunction action was filed by Mr.

21 Herman, Dan Herman, on behalf of Louise Geer as trustee of the

22 estate. That case was removed to Federal Court. I voluntarily

23 -- I was hired, I voluntarily dismissed it, refiled a petition

24 for citation in Lawrence County which is really the proper way

25 you're supposed to propose. But, that order is still in place

15

1 and in effect and so.

2          THE COURT:  Who sought injunctive relief?

3          MR. SNEATH:  The trustee to prevent anybody from

4 dissipating any of the funds.

5          THE COURT:  And you were legal counsel in prosecuting

6 that?

7          MR. SNEATH:  No, I was not.  That was Dan Herman, Mr.

8 Herman.  But, the point was to preserve the money.

9          THE COURT:  No, but I'm confused, though.  If Mr.

10 Herman brought the action in the Court of Common Pleas of

11 Lawrence County, then the action was removed to the District

12 Court, and then voluntarily dismissed --

13          MR. SNEATH:  Because it didn't belong in the District

14 Court, Your Honor.

15          THE COURT:  No, I hear you.  But, then another action

16 was filed in the Orphans' Court in Lawrence County.  You did

17 not file that Orphans' Court matter?

18          MR. SNEATH:  I did.  I filed what is now the current

19 pending action.

20          THE COURT:  And, in that action, injunctive relief

21 was sought, correct?

22          MR. SNEATH:  No, that -- no.  There is a prior

23 injunction order from the same judge, Judge Acker, and

24 everybody --

25          THE COURT:  In what action?

16

1          MR. SNEATH:  The action that was originally filed

2     there by Mr. Herman.

3          THE COURT:  In the removed action?

4          MR. SNEATH:  Correct.

5          THE COURT:  I'm confused at how a removed action can

6     be voluntarily dismissed as opposed to remanded back to State

7     Court, procedurally.

8          MR. SNEATH:  It did not -- first of all, it did not

9     belong there and it was --

10          THE COURT:  No, I understand that.  If --

11          MR. SNEATH:  It was an action that could not

12     accomplish all the purposes that needed to be accomplished at

13     that time.

14          THE COURT:  No, I understand that.  What I'm confused

15     about, is if an action is dismissed, it's dismissed.  How is it

16     still pending in the -- how is it still pending in Lawrence

17     County if there was a voluntary dismissal in the District

18     Court?

19          MR. SNEATH:  Well, there's been a whole new action

20     filed that asks for various kinds of relief and --

21          THE COURT:  I know.  I understand that.

22          MR. SNEATH:  So --

23          THE COURT:  You removed an action from Lawrence

24     County to the Federal District Court.

25          MR. SNEATH:  I did not remove it.

17

1      THE COURT:  Somebody did.

2      MR. SNEATH:  Yes, Mr. Robleto.

3      THE COURT:  And, in the Federal District Court, the

4  matter was voluntarily dismissed.

5      MR. SNEATH:  Yes.

6      THE COURT:  What's left to be done in that litigation

7  then, if it was dismissed?

8      MR. SNEATH:  There is nothing left to be done in that

9  litigation, but out of the --

10     THE COURT:  Then how do you have an injunction in

11  that litigation if that litigation has been dismissed?

12     MR. SNEATH:  Well, there's a Court order, that we

13  have attached and we can show it to Your Honor, there is a

14  Court order that directs the parties, until further order from

15  that Court, not to dispose of the funds.

16     And, so, we're not going -- no one -- I don't think

17  anybody is willing to test that and no one has been willing to

18  test that.

19     THE COURT:  All right.  So, you represented, in that

20  State Court litigation, you represented the Dille Family Trust

21  or the trustee, at least in the component that was removed to

22  the Federal District Court, correct?

23     MR. SNEATH:  I was hired when it was removed -- after

24  it was removed to Federal Court.

25     THE COURT:  Right.  And, so, since you were hired at

18

1    that point in time, presumably you had understanding as to what

2    the substantive bases for relief was in the State Court

3    litigation.

4              And, since that injunction was issued in that State

5    Court litigation, one of the components of issuing an

6    injunction is the Court making a determination of the

7    likelihood of success on the merits, what was the underlying

8    merits that was being sought in that litigation?

9              MR. SNEATH:  The trustee was trying to preserve the

10   assets of the trust.  This was going on contemporaneous with

11   the settlement of the action in the Eastern District of

12   Pennsylvania.

13             THE COURT:  When you say "trying to preserve", what

14   assets were -- was a preservation order being sought and in

15   what way were they being threatened?

16             MR. SNEATH:  Preservation of whatever assets the

17   trust owned at that time.

18             THE COURT:  And what were they?

19             MR. SNEATH:  I don't know because, again, I was not

20   involved in the administration of the trust at that time.

21             THE COURT:  Yes, but you were involved at some point

22   in time.  I mean, I assume you don't take a case blindly, that,

23   you know, you don't just step in and not know what's going on.

24             MR. SNEATH:  No, Your Honor, that's correct.

25             THE COURT:  So, I'm trying to find out what was going

19

1  on.

2       MR. SNEATH:  At that time, the Eastern District case

3  was being settled by lawyers other than me.  And, as a result

4  of that settlement, this money was paid and the action that was

5  filed in Lawrence County was to enjoin any parties from doing

6  anything to dissipate the assets of the trust at that time,

7  which were presumably intellectual property, and/or to preserve

8  settlement funds when they were paid.

9       I don't remember the exact timing of those things,

10  but that was the intent of the action, was to try to get this

11  into State Court so that the estate could be administered by a

12  State Court.  And, unfortunately, it got removed and --

13       THE COURT:  So, are those funds in custodial legis of

14  the State Court?

15       MR. SNEATH:  Well, they are in the custody of the

16  Kloss firm, that I know, because they were counsel in the

17  Federal action.  The trust considers them to be preserved and

18  secured.  The trust considers them to be subject --

19       THE COURT:  Have bonds been put in place securing the

20  injunction?  Has any type of bonding been put in place?

21       MR. SNEATH:  No, I don't believe there was any.  No,

22  I'm certain there was no bond required.  It was simply Judge

23  Acker, who is still the presiding judge on this in the Orphans'

24  Court or their Probate Court.

25       THE COURT:  Is a hearing set on the preliminary

20

1    injunction?

2    MR. SNEATH:  No, it said it will exist until further

3    order of this Court.

4    THE COURT:  So, it may not very well be a preliminary

5    injunction.  Is that what you're saying?

6    MR. SNEATH:  Well, no, a preliminary injunction can

7    last all the way up to the time a permanent injunction is

8    issued, and that hasn't been done.  But, the --

9    THE COURT:  If the action is dismissed, how does one

10    go in and have the injunction lifted?

11    MR. SNEATH:  I'm not sure I understand the question,

12    Your Honor.

13    THE COURT:  If the action has been dismissed, how

14    does one have the injunction lifted?

15    MR. SNEATH:  I don't know how one has the -- one has

16    to go to Judge Acker and say would you lift this injunction, I

17    suspect.  At this point, that proceeding is --

18    THE COURT:  Did you let Judge Acker know that you are

19    seeking dismissal?  That you are voluntarily dismissing the

20    underlying action?

21    MR. SNEATH:  It's in our -- our pleadings, I believe,

22    explain the whole history of what --

23    THE COURT:  Pleadings in that action or in some

24    separate action?

25    MR. SNEATH:  No, the pleading in the action --

21

1  pleadings in the action that are now present in Lawrence

2  County.

3          THE COURT:  So, not in the prior action that was

4  dismissed?

5          MR. SNEATH:  Well, that's correct.  I withdrew it and

6  the next day or two days later filed a new one that includes

7  both equitable and legal relief so.

8          THE COURT:  And the second action that's in Lawrence

9  County, what is the nature of that?

10         MR. SNEATH:  That is in the nature of trying to do

11 essentially what was tried to have been done in the Bankruptcy

12 Court, which is to administer the estate, determine its assets

13 and its liabilities.

14         Clearly, one of the liabilities is the trustee

15 obligation, there are many others, and including potentially

16 the IRS, including, you know, I mean, this is an operating

17 trust, so the intent is to have the Court, essentially, either

18 liquidate the trust if that's what's needed or determine what

19 happens.  Mr. Robleto and his clients have their thoughts on

20 what should happen.  But, that process is underway.  The

21 pleadings have been or, you know, down the road a ways.

22         THE COURT:  Were all creditors provided notice and

23 opportunity to be heard with respect to that injunction that

24 was entered in the Court of Common Pleas of Lawrence County?

25         MR. SNEATH:  I don't know who was given notice.  I do

22

1  know that originally it was done ex parte, I believe, because

2  there was this imminent settlement in the Federal Court, I

3  guess.  I don't remember the timing, again, I wasn't,

4  unfortunately, wasn't involved in that.

5          But, at this point, there will be an accounting filed

6  in that court.  It's been prepared and is being reviewed.

7          THE COURT:  Who's looking out for the interests of

8  all constituencies as it relates to the assets of the Dille

9  Family Trust?  I mean, it sounds like what you're looking to do

10  is to essentially liquidate the trust.

11          MR. SNEATH:  Well --

12          THE COURT:  And the Court of Common Pleas of Lawrence

13  County.

14          MR. SNEATH:  If a Court determines that liquidation,

15  I use that word loosely, but in the Probate sense, that will be

16  up to the Court to decide and to the parties who are arguing as

17  to what happens.

18          There will be an accounting.  That will trigger an

19  audit under that process.  So, there will be a complete audit.

20  And that's what will happen.  And then from there the Court

21  will hear all the parties' positions and will determine what

22  should happen with the trust.

23          One of the questions, Your Honor, the petition asks

24  for a determination as to who the legal trustee is.  That's

25  issue number one, as to whether it's Louise Geer or someone

23

1 else.  So, all the parties are weighing in on that.

2         Then there are questions about the assets, the

3 liabilities, and so on.  They will be dealt with through an

4 accounting, through an audit.  And our statement -- so, there

5 is a process there.

6         But, as you pointed out, Mr. Lindsay would also have

7 an ability to, theoretically I guess, try to collect on a

8 judgment in New York or, yeah, collect on a judgment in New

9 York if he so moved it.

10        My understanding is nobody's made an attempt to do

11 that and I'm, you know, I guess in my position, hoping they

12 wouldn't be successful because I want it all dealt with in

13 Lawrence County but.

14        The money is not going anywhere, but that's the

15 extent of the money that everybody agrees is all the money

16 there is, and it's not going anywhere.

17        THE COURT:  All right.  Thank you very much.

18 Appreciate you answering my questions.

19        MR. SNEATH:  My pleasure.  Thank you.

20        THE COURT:  All right.  Anything else?

21        MR. COATE:  Your Honor, this is Mr. Coate.  Because

22 Mr. O'Malley was counsel in that case before Judge Beetlestone,

23 certainly he would know the terms of the settlement agreement.

24 And thus far the Dilles have never been provided a copy of it.

25        THE COURT:  Mr. O'Malley?  Are you still on the

24

1 phone, Mr. O'Malley?

2           MR. O'MALLEY: Yes, Your Honor, I'm sorry, I had you

3 on mute. As Mr. Sneath indicated, that settlement was a

4 confidential settlement.

5           THE COURT: So, let me see if I understand this

6 right. We have a settlement which, allegedly, is confidential.

7 But, we have the Dille Family Trust that, whatever it is,

8 fiduciary relationship, it's gone back before the Court of

9 Common Pleas of Lawrence County looking to prevent assets of

10 the Dille Family Trust from being dissipated and administered

11 in that court and creditors and other parties-in-interest have

12 at least an interest in the outcome of that.

13           But, the exact contours of what the Dille Family

14 Trust is entitled to under the settlement is something that is

15 just secret.

16           MR. O'MALLEY: Well, Your Honor --

17           THE COURT: Is that right?

18           MR. O'MALLEY: I mean, there's a -- well,

19 technically, yes. There's a procedure in Lawrence County for

20 the parties to request copies of the settlement agreement.

21           THE COURT: What procedure is that?

22           MR. O'MALLEY: I assume that once they are through

23 the pleading stage, discovery will be taken and interrogatories

24 and document requests will be issued.

25           MR. SNEATH: I think part of the problem, Your Honor,

25

1  this was a Federal Court settlement, and so by its very nature

2  it's confidential.  But, I'm told that it was made confidential

3  the only --

4          THE COURT:  Well, in Federal Court, I mean, the Third

5  Circuit has recently opined on sealing things and keeping them

6  secret.

7          MR. SNEATH:  Well, the sealing part I understand and

8  I'm -- I do -- I'm over in Federal District Court all the time

9  and I realize sealing is a big issue.

10         But, the amount of money that was paid as

11 consideration has been -- everybody's been told about it

12 because the Court had to be told about it in order to preserve

13 the assets.

14         THE COURT:  But, if items are being conveyed and

15 items are being retained, if there are agreements in terms of

16 who owns what, when, and where, and if there is right to

17 dollars, I mean, I don't know.  I mean, you folks, you're going

18 back to Lawrence County so I -- my work here is limited.  Mr.

19 Robleto?

20         MR. ROBLETO:  Thank you, Your Honor.  I do have to

21 echo Mr. Lindsay's remarks about the dearth of information and

22 the secrecy surrounding all of this, particularly with respect

23 to the beneficiaries who have more of an interest than anyone

24 in the universe when it comes to the disposition of the assets

25 of the Dille Family Trust.

26

1     Now, this Court is keenly aware of just how hard

2 fought the disagreement over whether those assets should be

3 sold in this court was, both with respect to Team Angry

4 Filmworks, Don Murphy, and the beneficiaries of the Dille

5 Family Trust, so much so that it eventually spelled the end of

6 this case.

7     But, in the category of be careful what you wish for,

8 immediately after the case was dismissed, a number of things

9 happened, and one of those was that Ms. Geer and her attorneys

10 evidently presented the same transaction to Judge Beetlestone

11 in the Eastern District of Pennsylvania, this time as a

12 settlement to the Dille Family Trust action against the Nowlan

13 Family Trust, and sold, purportedly, sold these very same

14 assets for $300,000.

15     Your Honor, we did not find out about this until we

16 received an order from the Orphans' Court in Lawrence County.

17 That order required the petitioner to serve the beneficiaries,

18 which one would think would have been obvious, obviously you

19 serve that.

20     The reason that a order freezing funds was entered at

21 all, was because the petitioner hadn't served anyone, sought an

22 injunction ex parte.  And that injunction, by the way, was

23 actually to prevent the beneficiaries from exercising their

24 rights under the trust instrument to change the situs of the

25 trust.  Which, as this Court recognized, in its well reasoned

27

1  opinion, it was actually Illinois.  The claim of course now is

2  that it -- Ms. Geer's claim rather, is that the situs is in

3  Pennsylvania.

4          Your Honor, we've never seen a copy of the settlement

5  agreement.  And we heard responses from Mr. Sneath who has

6  represented to the Court that he's never seen it and is not

7  aware of its material terms, which I found rather shocking.

8          And then we've also heard from Mr. O'Malley who

9  responded with little more than this is a confidential

10  settlement agreement and that we'll eventually have a mechanism

11  to receive a copy.  That strikes me as fundamentally wrong,

12  and particularly with regard to the beneficiaries of the Dille

13  Family Trust.

14          As I said, we sought dismissal and we're opposing

15  reopening.  But, it is indeed an unfortunate thing that there

16  is no oversight to what's been happening here.

17          And to correct one of Mr. Sneath's characterizations

18  of what happened.  In the East District of Philadelphia, while

19  the case had been closed before we even learned of the

20  settlement, and we only learned of the settlement by

21  happenstance through an order that was entered, and certainly

22  by nothing intentionally done by Louise Geer.

23          The information or rather the instruction that Judge

24  Beetlestone left us with is plainly readable in the final

25  footnote of her memorandum opinion, which is that a separate

28

1  action needs to be filed to adjudicate the issue of whether Ms.

2  Geer and her attorneys and others may have committed a fraud on

3  the Court representing a fraudulent settlement.

4          THE COURT:  What opinion is that?

5          MR. ROBLETO:  Judge Beetlestone's opinion entered,

6  actually, it may have just been a memorandum order, entered in

7  the case in the Eastern District of Pennsylvania, I believe

8  it's the <u>Dille Family Trust v. The Nowlan Family Trust</u>.

9          THE COURT:  When did she issue that?

10         MR. ROBLETO:  It may have been approximately a month

11 ago, at this point.  Glad to file a copy on the docket of this

12 case if the Court --

13         MR. O'MALLEY:  It was a few weeks ago, Your Honor.

14         THE COURT:  All right.  Anything else?

15         MR. LINDSAY:  Your Honor, briefly.  Because I stated

16 before on the record that we'd be willing to withdraw our

17 motion to reopen based on what we had received in terms of

18 responses.

19         I have to -- I feel the need to say that, you know,

20 that is substantially based on statements that were made in

21 those responses, specifically that, for instance, very

22 authoritatively stated that an injunction is in place

23 protecting those funds and that those assets are subject to the

24 jurisdiction of the Lawrence County Court of Common Pleas or

25 the Orphans' Court.

29

1    Again, it's stated in the responses very

2  authoritatively as bases on which to deny our motion.  Again,

3  they're saying what they need to say in order to get the relief

4  that they want.  But. now it sounds like, after hearing Mr.

5  Sneath speak, that they're somewhat, they're not quite sure

6  about those issues and they can't entirely speak to those

7  issues, although it's stated in their pleadings, and that gives

8  me pause.

9    I said what I said at the beginning of this hearing,

10 based on what I was reading.  And then after hearing Mr. Sneath

11 speak, I'm a little concerned, and I don't know that I feel the

12 same way that I did 20 minutes ago, quite frankly.

13    MR. SNEATH:  Your Honor, I can only tell you what I

14 -- by the way, I just want to clear up one thing.  Clearly, my

15 client, the Dille Family Trust, is aware of the terms of the

16 settlement.  We are not unaware of the terms of the settlement.

17 The settlement is confidential and I was not counsel who did

18 it, so I don't want to characterize it or discuss it for both

19 of those reasons.

20    THE COURT:  Has the Kloss firm been paid?

21    MR. SNEATH:  I don't believe so.  In fact, no, I --

22    THE COURT:  How much are they owed?

23    MR. SNEATH:  I don't know.  But, I know that they --

24    THE COURT:  Are they asserting a charging lien or

25 some type of lien on those funds that they're holding?

1    MR. SNEATH:  I'm not aware.  Nothing's been conveyed

2    to me about that, so I don't know the answer to that.  And, nor

3    to anyone that -- nor to Ms. Geer, the trustee.  Not that I'm

4    aware of, so I don't know.

5        My assumption is that they were owed money.  There

6    were various legal fees that were not able to be paid at the

7    end of the various litigations.  So, I'm not suggesting that

8    we're obviously unaware of what the settlement was.

9        When and how that will be produced, it will, again,

10   up to Judge Acker, so I didn't want the Court to think that I

11   don't know what that is.  I just -- I'm not permitting to talk

12   about it.

13       But, in any event, for any number of reasons, I mean,

14   the assurance is that the money is there, but there are, you

15   know, creditors of different categories and things.  I mean,

16   that obviously was the reason why Don Calaiaro brought this

17   bankruptcy here.

18       And, by the way, he had surgery at the end of last

19   week.  I don't know if Your Honor knows.

20       THE COURT:  No, I didn't know that.

21       MR. SNEATH:  Yeah.  Yeah, he did.  I hope it will

22   help with various things.  But, in any event, you know, that's

23   why he did this bankruptcy and we don't have to re-litigate and

24   all that.  But, that was the theory, that it was not a liquid

25   trust.  I mean, that it didn't have assets to cover its

1  liabilities so.  And, all the creditors will be noticed.

2          THE COURT:  There's no reason why this case should

3  not have been settled.  There's no reason.  But, sometimes

4  folks want to litigate to the end and sometimes there's

5  winners, sometimes there's losers, sometimes everybody loses.

6  I don't know the outcome of this because I'm not involved in

7  the other aspects of the case.

8          But, Mr. Lindsay, what do you want to do?  Are you

9  pressing your motion today or are you withdrawing it?  Because

10 if you're pressing it, let's get to the merits.

11         MR. LINDSAY:  Could I have one moment, Your Honor?

12         THE COURT:  Sure.

13         MR. LINDSAY:  Thank you.

14                        (Pause)

15         MR. LINDSAY:  Your Honor, based, specifically, on the

16 representations that are made in the pleadings by the parties

17 that have filed responses to our motion and the representations

18 that are made in court on the record today, we will withdraw

19 our motion.

20         THE COURT:  All right.  I'll mark it withdrawn

21 without prejudice.

22         MR. LINDSAY:  Thank you, Your Honor.

23         MR. ROBLETO:  Your Honor, may I be heard before the

24 Court closes the record?

25         THE COURT:  Yes, sir.

32

1      MR. ROBLETO:  On the issue of the representations

2  made here today on the record.  Just for clarification.  It

3  seemed to me that Mr. Sneath represented to the Court that he

4  had not received a copy of the settlement agreement, hadn't

5  read it?

6      THE COURT:  That's what he said.

7      MR. ROBLETO:  That's what I -- but, then it also

8  seemed in his more recent testimony that he said --

9      THE COURT:  He hasn't testified.  He --

10      MR. ROBLETO:  I apologize.

11      THE COURT:  We had a colloquy with the Court and he

12  made representations to the Court.

13      MR. ROBLETO:  Your correction is well taken, Your

14  Honor.  But, it seemed within that last colloquy that Mr.

15  Sneath was instead saying that he didn't want to characterize

16  the settlement agreement, not that he hadn't read it now, but

17  that he didn't want to characterize it because of its

18  confidential nature.  So, if it's possible --

19      THE COURT:  Well, he wasn't --

20      MR. ROBLETO:  -- I'd like some clarification on that.

21      THE COURT:  Well, Mr. Sneath, you correct me if I'm

22  wrong.  My interpretation of the colloquy that you and I just

23  had here in open court was that you were just explaining to the

24  Court what you understood with respect to what has been made

25  known to you in a public way about what's in the settlement.

1          You weren't attempting to characterize all of the

2   settlement because you just simply haven't read the document

3   and you don't know exactly all of the bells and whistles that

4   are contained in the same, is that right?

5          MR. SNEATH:  Essentially.  My client was a party to

6   the settlement.  I am not unaware as to the terms of the

7   settlement.  I don't -- I was not the person who drafted it.

8   It is not just a simple, you know, we release you from

9   everything thing because there are associated details that I

10  don't want to try to characterize for the Court.  I don't see

11  the point of us here today --

12         THE COURT:  But, have you read the settlement

13  agreement?

14         MR. SNEATH:  Yes.

15         THE COURT:  Okay.

16         MR. SNEATH:  Yes.  I just -- but, that's not -- I

17  don't want to represent what the totality of the settlement

18  was, I don't want to try to characterize it.  Number one, it's

19  attorney-client privileged; and, number two, we're in the wrong

20  court to be having, I would suggest, to be having a discussion

21  about what is clearly before a State Court at this point and

22  they'll either be entitled to get that information or they

23  won't, depending on whatever Judge Acker decides.

24         So, I don't want to trouble the Court with that, but

25  I also don't want to mischaracterize something that I wasn't a

1 party to.  But, clearly, I'm aware of the terms and what it

2 says, but that's about as far as I can go.

3     THE COURT:  All right.  Thank you.  Anything else?

4     MR. ROBLETO:  No, Your Honor, the transcript will

5 reflect what the transcript reflects of what's happened here

6 today and I thank the Court very much for indulging us once

7 again.

8     MR. SNEATH:  Yeah, thank you, Your Honor.

9     THE COURT:  All right.  Thank you.  Close the record.

           * * * * *

10

11         **C E R T I F I C A T I O N**

12     I, JANET D. PERSONS, court approved transcriber,

13 certify that the foregoing is a correct transcript from the

14 official electronic sound recording of the proceedings in the

15 above-entitled matter, and to the best of my ability.

16

17 /s/ Janet D. Persons

18 JANET D. PERSONS

19 J&J COURT TRANSCRIBERS, INC.      DATE:  September 24, 2019

20

21

22

23

24

25

# EXHIBIT Q

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE DILLE FAMILY TRUST,<br><br>       Plaintiff,<br><br>v.<br><br>THE NOWLAN FAMILY TRUST,<br><br>       Defendant. | CIVIL ACTION NO. 15-6231 |

### SETTLEMENT AGREEMENT

This SETTLEMENT AGREEMENT ("Agreement") dated as of the 28th day of February, 2019, is by and among the Dille Family Trust ("DFT"), and The Nowlan Family Trust ("NFT"). DFT and NFT may hereafter be referred to as a "Party" and, collectively, as the "Parties."

### WITNESSETH

**WHEREAS,** the Dille Family Trust ("DFT") and the Nowlan Family Trust ("NFT") are parties to a certain litigation captioned *Dille Family Trust v. Nowlan Family Trust,* pending in the United States District Court for the Eastern District of Pennsylvania at Case No. 15-06231 (the "NFT Litigation");

**WHEREAS,** the DFT and the NFT are parties to certain trademark oppositions pending before the Trademarks Trial and Appeal Board of the United States Patent and Trademark Office ("DFT Oppositions");

**WHEREAS,** the Parties acknowledge and agree that a settlement is more desirable than further litigation and the Parties desire to compromise and settle the NFT Litigation and the DFT Oppositions and all disputes between them relating to the BUCK ROGERS Intellectual Property (as defined below);

WHEREAS, DFT acknowledges that for the purposes of the NFT Litigation; NFT's intellectual property rights are superior to those of DFT;

Now, THEREFORE, for good and valuable consideration the adequacy and receipt of which are hereby acknowledged, and in consideration of the foregoing and the undertakings set forth in this Agreement, the Parties, intending to be legally bound, agree as follows:

1.    Definitions.

   (a)    "Buck Rogers Intellectual Property" means any and all intellectual property of DFT, including, without limitation, any and all right, title and interest in the intellectual property rights throughout the world in the character of "BUCK ROGERS" and the "BUCK ROGERS" universe, including, but not limited to, all related and associated works, stories, characters, dialogue, drawings, artwork, scenes, translations and plots contained therein, associated with and/or derived therefrom, and any and all translations of such, all copyrights, including registrations, applications for registration, renewals and extensions thereof, all trademarks, common law marks, service marks, domain names, trade dress, logos, trade names, business names, social media accounts and other distinctive source identifiers, including registrations and applications for registration thereof, together with all associated goodwill, and all rights to sue for and collect damages for any past, present or subsequent infringement and all books and business records associated with the use, marketing, sale or licensing of the intellectual property.

2.    Mutual Releases.

   (a) Except for those obligations and liabilities created hereunder, the Parties. hereby mutually release, acquit, and forever discharge each other and Daniel Herman, Esquire, Louise Geer, Esquire (personally and as trustee of the Dille Family Trust), Herman & Geer Communications, Inc., d/b/a Hermes Press, Geer and Herman, P.C. and its attorneys, employees and agents, Diane McDevitt (personally and as trustee of the Nowlan Family Trust), Buck Rogers Company and its attorneys, members, employees and agents, Brian McDevitt (personally and as trustee of the Nowlan Family Trust), the beneficiaries of the Nowlan Family Trust, Armageddon 2419 LLC and its attorneys, members, employees and agents, John O'Malley, Volpe and Koenig, P.C. and its attorneys, employees and agents, Calaiaro and Valencik and its attorneys, employees and agents, Don Calaiaro, Esquire, and Kloss, Stenger and LoTempio and its attorneys, employees, agents and David W. Kloss, Esquire of counsel, from and against any and all claims, demands, damages, actions, causes of action, expenses (including attorney's fees and costs), whether known or unknown, suspected or unsuspected, of any kind or nature whatsoever, whether in contract, tort, intellectual property infringement, law, equity, or otherwise, including but not limited to in any way arising from or related to the operations of the Parties' Trusts, the Dille Family Trust Bankruptcy Proceedings, the NFT Litigation, the DFT Oppositions or the Team Angry Films Litigation (United States District Court for the Western District of Pennsylvania at Case No. 15-1381). This settlement agreement shall vest in the Nowlan Family Trust the right to bring or assert any and all causes of action, choses of action, legal actions in law and equity, currently possessed by the Dille Family Trust, and all right title and interest in any and all causes of action held by the Dille Family Trust in the Nowlan Family Trust, whether such actions are currently anticipated or unanticipated. With this settlement agreement no other party than the Nowlan Family Trust shall have any right to bring or assert any cause of action against any party for any reason except the parties released herein.

5614189-2

(b) Notwithstanding the foregoing, nothing in this Agreement shall be interpreted or construed that the Nowlan Family Trust has indemnified or held any party harmless.

3.    Consideration.

(a)    Concurrently with the execution of this agreement, DFT will execute the Asset Purchase Agreement, attached hereto as **Exhibit A,** which assigns the Buck Rogers Intellectual Property and other assets of DFT.

(b)    Concurrently with the execution of this agreement, the Parties shall execute and file the Stipulated Notices of Dismissal attached hereto as **Exhibit B,** to dismiss, with prejudice, all claims, defenses, and counterclaims in the NFT Litigation that were brought or that could have been brought, with each side to bear its own costs and fees.

(c)    Concurrently with the execution of this agreement, DFT will dismiss the DFT Oppositions and any oppositions to which NFT or Armageddon, LLC are parties.

4.    No Admission of Liability.    It is expressly understood and agreed that this Agreement is made in compromise of disputed and controverted claims, and that nothing contained herein shall constitute or be deemed an admission of any fault, liability or wrongdoing of any kind, or as an admission of the validity of the allegations, claims or contentions of any Party in the Action. Notwithstanding the foregoing, DFT acknowledges that for the purposes of the NFT Litigation, NFT's intellectual property rights are superior to those of DFT.

5.    Fees, Expenses and Costs.    Each Party shall pay its own fees and expenses incurred by it in connection with the NFT Litigation and DFT Oppositions and the negotiation, preparation, execution and performance of this Agreement, including attorneys' fees, expenses and costs.

6.    Entire Agreement.    This Agreement constitutes the entire agreement between the Parties and supersedes any previous agreement between the Parties relating to the subject matter hereof, and all prior writings, letters, contracts or agreements, whether oral or written, between the Parties are null and void and form no part of this Agreement. The exhibits attached hereto are incorporated herein by reference into, and made part of, this Agreement as if set forth herein in full. The Parties shall cooperate fully in the execution of all documents, pleadings and other papers and take such other steps as may be necessary to fully carry out and accomplish the intents and purposes of this Agreement.

7.    Amendment.    This Agreement may be amended, supplemented or otherwise modified only by a dated, written instrument executed by both Parties.

8.    Severability.    If any provision of this Agreement or the application thereof is held invalid, the invalidity shall not affect other provisions or applications of this Agreement that can be given effect without the invalid provision or application and, to this end, the provisions of this Agreement are declared to be severable.

3

5614189-2

9.    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

10.    <u>Binding Authority</u>.    Each Party represents that the individual executing this Agreement on its behalf has full and proper authority to execute this Agreement on its behalf.

11.    <u>Governing Law</u>. To the extent that Federal law is not applicable, this Agreement shall be interpreted and enforced under the laws of the Commonwealth of Pennsylvania, without application of its conflicts or choice of law rules.

12.    <u>Notices</u>. All notices, requests, demands and other communications under this Agreement or in connection therewith shall be given to or be made upon the respective Parties hereto, by e-mail with copy by facsimile or overnight mail, as follows:

    (a)    If to the DFT, addressed to it at:    David Kloss, Esq.
    Kloss, Stenger & LoTempio
    69 Delaware Ave. Suite 1003
    Buffalo, NY 14202
    dkloss@klosslaw.com

    (b)    If to the NFT addressed to it at:    John J. O'Malley, Esq.
    Volpe and Koenig, P.C.
    30 South 17th Street
    Philadelphia, PA 19103
    jomalley@vklaw.com

or to such other address or fax number as either Party shall have specified by notice in writing to the other Party. All such notices, requests, demands and communications shall be deemed to have been received on the date of delivery.

IN WITNESS WHEREOF, each of the Parties, intending to be legally bound hereby, has caused this instrument to be executed by its duly authorized representative as of the date indicated by the respective signature.

5614189-2

**NOWLAN FAMILY TRUST**

By: _____

Name: BRIAN MCDEVITT

Title: Trustee

Date: February 28, 2019

**DILLE FAMILY TRUST**

By: _____

Name: _____

Title: TS

Date: February 28, 2019

5614189-2

# EXHIBIT R

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT ("Agreement") dated as of the 28th day of February, 2019, is by and among the Dille Family Trust ("DFT"), with its principal address at 2100 Wilmington Road, New Castle, PENNSYLVANIA 16105, and the Buck Rogers Company, ("BRC"), a Pennsylvania limited liability company. DFT and BRC may hereafter be referred to as a "Party" and, collectively, as the "Parties."

## W I T N E S S E T H

**WHEREAS,** the Dille Family Trust ("Seller") and the Nowlan Family Trust are parties to a certain litigation captioned *Dille Family Trust v. Nowlan Family Trust*, pending in the United States District Court for the Eastern District of Pennsylvania at Case No. 15-06231 (the "NFT Litigation");

**WHEREAS,** the Nowlan Family Trust and the Seller are parties to certain trademark oppositions pending before the Trademarks Trial and Appeal Board of the United States Patent and Trademark Office ("DFT Oppositions");

**WHEREAS,** in conjunction and furtherance of the Settlement of the NFT Litigation and the DFT Oppositions, the Nowlan Family Trust and the Dille Family Trust wish to assign the BUCK ROGERS Intellectual Property to BRC (as defined below);

**NOW THEREFORE,** in consideration of the promises, covenants, and other consideration described herein, the receipt and sufficiency of which are hereby acknowledged, and in consideration of the foregoing and the undertakings set forth in this Agreement, the Parties intending to be legally bound, agree as follows:

## ARTICLE 1
## TRANSFER OF ASSETS AND PURCHASE PRICE

1.1    Assets.    All right, title and interest of the Seller in and to all property listed on Schedule 1.1(a), attached hereto (collectively, the "Purchased Assets"), but excluding those certain assets specifically listed on Schedule 1.1(b) attached hereto (the "Excluded Assets").

1.2    Consideration.    The consideration to be paid by the Buyer to the Seller for the Assets shall be $300,000.00 (the "Purchase Price").

1

5614177-2

1.3    <u>Delivery of Cash Consideration.</u>    At Closing, Buyer shall pay to Seller the Cash Consideration by wire transfer or certified or cashier's check, as specified by the Seller in written instruction delivered to Buyer. Upon receipt of the Purchase Price, Seller shall place the funds into a trust account of the law firm of Kloss, Stenger & LoTempio for distribution to first settle any and all liens from judgments originating from the Dille Family Trust Bankruptcy and in accordance with any orders from Orphans Court.

1.4    <u>Assignment of Contracts, Leases and Other Assets.</u> This Agreement is solely an asset purchase. Buyer shall not assume nor discharge any of Seller's debts, options, liabilities, obligations, licenses, contracts or other liabilities whatsoever, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise. SELLER SHALL REMAIN LIABLE AND RESPONSIBLE FOR ALL OF SELLER'S DEBTS, OPTIONS, LIABILITIES, OBLIGATIONS, LICENSES, CONTRACTS OR OTHER LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, ABSOLUTE OR CONTINGENT, ACCRUED OR UNACCRUED, DISPUTED OR UNDISPUTED, LIQUIDATED OR UNLIQUIDATED, JOINT OR SEVERAL, DUE OR TO BECOME DUE, VESTED OR UNVESTED, EXECUTORY, DETERMINED, DETERMINABLE OR OTHERWISE.

1.5    <u>Excluded Assets</u>. The Assets to be conveyed by the Seller to the Buyer hereunder shall not include cash and cash equivalents (such as the Seller's interests in any deposits) and any asset, tangible or intangible, listed at Schedule 1.1(b).

**ARTICLE 2**
**CLOSING**

2.1    <u>Closing</u>.    The transfers and deliveries referred to in Article I hereof (the "<u>Closing</u>") shall take place not later than **March 1, 2019** by such other means, including facsimile or email, and at such other time and date as the Seller and the Buyer may in writing designate or such exchange actually occurs (the "<u>Closing Date</u>"). Notwithstanding anything in this Agreement to the contrary, if the Closing is consummated, the effective time of the Closing shall be 12:01 a.m. on the Closing Date.

2.2    <u>Conditions to Closing</u>.

(a)    The obligations of the Buyer and the Seller under this Agreement are subject to the satisfaction or waiver by the Buyer or the Seller, as applicable, of the following conditions precedent on or before the Closing:

2

(i)    The Parties shall have dismissed the NFT Litigation pursuant to the Settlement Agreement attached hereto as Schedule 2;

(ii)    The Court in the NFT Litigation shall have entered a final Order dismissing the NFT Litigation pursuant to the terms of the Settlement Agreement;

(iii)    No court order shall have been entered in any action or proceeding instituted by any person that enjoins, restrains, or prohibits the consummation of the transactions contemplated hereby.

(b)    The obligations of Buyer under this Agreement are subject to the satisfaction, or waiver by Buyer, of the following further condition's precedent on or before Closing:

(i)    The representations and warranties of the Seller contained herein shall be true in all material respects on and as of the Closing;

(ii)    The Seller shall, in all material respects, have performed all of their respective obligations and agreements and complied with all of its respective covenants contained in this Agreement to be performed and complied with by it on or prior to the Closing;

(iii)    Seller shall have delivered to Buyer Seller's deliverables set forth below;

(iv)    An Event of Force Majeure shall not have occurred during the period beginning on the date of the execution of this Agreement. An "Event of Force Majeure" as used in this Section shall mean acts of state or governmental action; orders, legislation or regulations; governmental restrictions, priorities or rationing; riots, disturbance or war (declared or undeclared); strikes, lockouts or delay of subcontractors or vendors; embargo, fire, earthquake, flood, hurricane, typhoon, explosion and accident, and such event or events materially change the Assets or the Business in the reasonable estimate of the Buyer.

(c)    The obligations of Seller under this Agreement are subject to the satisfaction, or waiver by Seller, of the following further conditions precedent on or before Closing:

(i)    The representations and warranties of the Buyer contained herein shall be true in all material respects on and as of the Closing;

3

(ii)    Buyer shall have delivered to Seller Buyer's deliverables set forth below; and

(iii)    The Buyer shall, in all material respects, have performed all of its obligations and agreements and complied with all of its covenants contained in this Agreement to be performed and complied with by it on or prior to the Closing.

2.3    The Seller's Deliverables.    At the Closing, the Seller shall deliver to the Buyer any instruments of transfer reasonably required by the Buyer to evidence the transfer of the Assets to the Buyer, including, without limitation, any assignment documents necessary with respect to any Intellectual Property registered, recorded or filed with any governmental authority, in form suitable for registration, recordation or filing with such governmental authority, in each case duly executed by the Seller.

2.4    The Buyer's Deliverables. At the Closing, the Buyer shall deliver to the Seller the following:

(a)    The Cash Consideration pursuant to Section 1.2.

## ARTICLE 3
## SELLER'S REPRESENTATIONS AND WARRANTIES

The Seller and Buyer represent and warrant to the Buyer as follows:

3.1    Title.  The Seller has authority to convey good and marketable title to all of the Assets.

3.2    Condition and Sufficiency of Assets.    Neither Seller, nor any of its respective directors, officers, employers, agents or representatives has made, or shall be deemed to have made, and no such person shall be liable for, or bound in any manner by, and Buyer has not relied upon and will not rely upon, any express or implied representations, warranties, guaranties, promises or statements pertaining to the Assets, except as specifically set forth in this Article 3. THE SELLER HEREBY EXPRESSLY DISCLAIMS AND NEGATES ANY OTHER REPRESENTATION OR WARRANTY, OF ANY KIND OR NATURE, EXPRESS OR IMPLIED, AS TO THE CONDITION, VALUE OR QUALITY OF THE ASSETS AND RELATING TO THE OPERATIONS OF THE SELLER, AND SPECIFICALLY DISCLAIM ANY    IMPLIED    OR    EXPRESS    REPRESENTATION    OR    WARRANTY    OF

4

MERCHANTABILITY. ALL OF THE ASSETS ARE BEING SOLD "AS IS," "WHERE IS" AND "WITH ALL FAULTS."

3.3    Schedules.    All information set forth in the Schedules is materially true, correct, complete and set forth in a manner that is not misleading as of the date of this Agreement. The information contained in the Schedules shall be deemed to be part of and qualify only those representations and warranties contained in Article 3 or elsewhere in this Agreement that make specified reference to the Schedules. Unless otherwise indicated, all capitalized terms used in the Schedules shall have the same meanings as in this Agreement. At all times prior to and including the Closing Date, Seller shall promptly provide Buyer with written notification of any event, occurrence or other information of any kind whatsoever that materially affects, or may materially affect, the continued truth, correctness or completeness of any representation, warranty or covenant made in this Agreement or the Schedules to this Agreement. All of such written notifications shall specifically identify any and all of the representations, warranties, or covenants materially affected by the event, occurrence or information that necessitated the giving of such notice. No such notification or other disclosure shall be deemed (i) to amend or supplement the Schedules to this Agreement or this Agreement or (ii) to affect Buyer's right not to close the purchase of the Assets contemplated hereby because of a breach of a representation, warranty, or covenant made hereunder by Seller, provided however, if Purchase has received such written notice and nonetheless elects to proceed with the Closing, Buyer shall be deemed to have waived any claim against Seller relating to a breach of such a representation, warranty, or covenant.

3.4    Authority.    The Seller or Seller's designated Affiliate, has all requisite power and authority to enter into this Agreement and to perform its respective obligations hereunder, prior to Closing, the execution, delivery and performance of this Agreement will have been duly and validly authorized and ratified by all necessary corporate and other action on the part of the Seller and no other proceedings on the part of the Seller are necessary to authorize this Agreement and the transactions contemplated hereby.

3.5    Litigation.    There are no actions, suits, claims, investigations, hearings, or proceedings of any type pending at law or in equity that might affect Buyer's ability to close the transactions contemplated hereby.

3.6    Indemnification.    Seller covenants and agrees to indemnify and hold Buyer, the Nowlan Family Trust and its beneficiaries, Diane McDevitt (personally and in any role of a trustee), Armageddon, LLC and Brian McDevitt (personally and in any role of a trustee) and their agents, attorneys, representatives, officers, directors, members and stockholders harmless,

5

5614177-2

on a joint and several basis, against any claims, suits, losses, expenses, damages, obligations, liabilities, royalties, impairment of value, costs and expenses (including costs of investigation and reasonable attorneys' fees) which result from or are related to any subsequent direct or indirect claims the beneficiaries of Seller to the extent and amount of the Purchase Price for the period from the Closing Date until the Seller is dissolved by order of Orphans' Court.

## ARTICLE 4
### BUYER'S REPRESENTATIONS AND WARRANTIES

The Buyer represents and warrants to the Seller as follows:

4.1    Organization. Buyer, or Buyer's designated Affiliate, is a trust duly organized and validly existing under the laws of the Commonwealth of Pennsylvania.

4.2    Authority.    The Buyer, or Buyer's designated Affiliate, has all requisite power and authority to enter into this Agreement and to perform its respective obligations hereunder, prior to Closing, the execution, delivery and performance of this Agreement will have been duly and validly authorized and ratified by all necessary corporate and other action on the part of the Buyer and no other proceedings on the part of the Buyer are necessary to authorize this Agreement and the transactions contemplated hereby.

4.3    Litigation.    There are no actions, suits, claims, investigations, hearings, or proceedings of any type pending at law or in equity, that might affect Buyer's ability to close the transactions contemplated hereby.

## ARTICLE 5
### TAX MATTERS

5.1    Certain Taxes Other Than Federal, State and Local Income Taxes.    Any transfer, documentary, sales, use, stamp, registration, and other such taxes and fees (including penalties and interest) incurred in connection with this Agreement and arising out of the transfer of the Assets to Buyer, but excluding income taxes of Seller, shall be paid by the Buyer when due, and the Buyer shall, at its own expense, file all necessary tax returns and other documentation with respect to all such transfer, documentary, sales, use, stamp, registration and other such taxes and fees, and, if required by applicable law, the Seller shall join in the execution of any such tax returns and other documentation. The parties shall cooperate with one another in the preparation of all tax returns, questionnaires,

6

applications or other documents regarding any taxes or transfer, recording, registration or other fees which become payable in connection with the transactions that are required to be filed on or before the Closing.

## ARTICLE 6
## ADDITIONAL COVENANTS

6.1    Conveyance of Assets.

(a)    At or prior to Closing, Seller shall use its reasonable best efforts to execute any deeds, bills of sale, instruments of conveyance, assignments, assurances or any other actions or things as are reasonably necessary to transfer, vest, perfect or confirm right, title, interest or ownership (of record or otherwise) of the Assets, including the Intellectual Property, as requested by Buyer.

(b)    If at any time after the Closing, Buyer is advised that any additional deeds, bills of sale, instruments of conveyance, assignments, assurances or any other actions or things are reasonably necessary to vest, perfect or confirm Buyer's ownership (of record or otherwise), right, title or interest in, to or under any or all of the Assets or otherwise to carry out the intent of this Agreement, Seller shall use its reasonable best efforts to execute and deliver all deeds, bills of sale, instruments of conveyance, assignments and assurances and take and do all such other actions and things as may be reasonably requested by Buyer in order to vest, perfect or confirm any and all right, title and interest in, to and under such rights, properties or assets in Buyer or otherwise to carry out this Agreement.

6.3    Preservation of Assets and No Material Changes in Assets.    Seller shall preserve the Assets in the ordinary and usual course of business, consistent with prior practices. No action shall be taken by Seller that shall effect the Assets in any material adverse respect, or Buyer's use or operation of the assets after the Closing.

## ARTICLE 7
## TERMINATION

7.1    Termination.    This Agreement may be terminated at any time prior to the Closing Date:

(a)    By mutual written consent of the Buyer and the Seller;

7

Case 2:20-cv-00924-WB    Document 1    Filed 02/18/20    Page 87 of 235

(b)    By the Buyer if the Seller breaches any of its representations and warranties in any material respect herein or fails to perform in any material respect any of its covenants, agreements, or obligations under this Agreement, and any such breach or failure is not cured within (2) days after written notice from the Buyer; or

(c)    By the Seller if the Buyer breaches any of its representations or warranties in any material respect herein or fails to perform in any material respect any of its covenants, agreements, or obligations under this Agreement, and any such breach or failure is not cured within two (2) days after written notice from the Seller.

7.2    Effect of Termination.    In the event of termination of this Agreement by either the Seller or the Buyer as provided in Section 7.1(a), this Agreement shall forthwith become void and have no effect, without any liability or obligation on the part of the Seller or the Buyer, except as set forth hereafter.

## ARTICLE 8
## GENERAL

8.1    Access to Records and Properties; Assistance.    For a period of one (1) year following the Closing, the parties hereto shall afford each other reasonable access to the financial and tax records of the Seller or otherwise related to the Assets to (a) complete any financial statements or audits thereof or tax returns, (b) defend any tax disputes or claims or respond to any requests in connection with any tax audits, (c) comply with any legal request or order, (d) defend any disputes, claims, prosecution or litigation, or (e) for any other reasonable purpose.

8.2    Assignment.    Unless agreed upon by the parties in writing, this Agreement and the rights of the parties hereunder may not be assigned (except by operation of law) and shall be binding upon and shall inure to the benefit of the parties hereto and the successors to the parties hereto, provided, however, that Seller and Buyer may assign their respective rights hereunder to any of their respective direct or indirect wholly owned Subsidiary or subsidiaries.

8.3    Signatures.    Signatures on this Agreement delivered by fax or electronic mail shall be considered original signatures for purposes of effectiveness of this Agreement.

8.4    Counterparts.    This Agreement may be executed simultaneously in two or more counterparts which may be delivered by facsimile or email, each of which shall be

8

deemed an original and all of which together shall constitute but one and the same instrument.

8.5    Fees and Expenses.  Whether or not the transactions herein contemplated shall be consummated, (a) the Seller will pay the fees, expenses and disbursements of the Seller, and its agents, representatives, accountants and counsel incurred in connection with the subject matter of this Agreement and any amendments thereto, and (b) the Buyer will pay the fees, expenses and disbursements of the Buyer and its agents, representatives, accountants and counsel incurred in connection with the subject matter of this Agreement and any amendments hereto.

8.6    Counsel.    Each party hereto warrants and represents that such party has been afforded the opportunity to be represented by counsel of its choice in connection with the execution of this Agreement and has had ample opportunity to read, review and understand the provisions of this Agreement.

8.7    Notices.    Any notice or communication required or permitted hereunder shall be sufficiently given if sent by first class mail, postage prepaid:

     (a)    If to the Seller, addressed to it at:    David Kloss, Esq.
                                   Kloss, Stenger & LoTempio
                                   69 Delaware Ave. Suite 1003
                                   Buffalo, NY 14202
                                   dkloss@klosslaw.com

     (b)    If to the Buyer, addressed to it at:    John J. O'Malley, Esq.
                                     Volpe and Koenig, P.C.
                                   30 South 17th Street
                                   Philadelphia, PA 19103
                                   jomalley@vklaw.com

8.8    Opportunity to Investigate.  All of the parties have had an opportunity to investigate and evaluate the Assets being purchased, have relied on independent professional advice and, therefore, agree that the price to be paid by the Buyer for the Assets is reasonably equivalent value for the Assets.

8.9    Governing Law and Jurisdiction.    THIS AGREEMENT (AND ALL DOCUMENTS, INSTRUMENTS, AND AGREEMENTS EXECUTED AND DELIVERED PURSUANT TO THE TERMS AND PROVISIONS HEREOF (THE "ANCILLARY DOCUMENTS") SHALL BE

5614177-2

GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICTS OF LAW THEREOF. Any future dispute between the Parties relating to this Agreement shall be filed exclusively in the Court of Common Pleas of Montgomery County, Pennsylvania. The Parties hereto, for the purposes of any such legal action or proceeding relating to this Agreement, irrevocably waive, to the fullest extent permitted by law, any objection which they may now or hereafter have to the venue of such court, its personal jurisdiction over the Parties hereto, or the convenience of such court

8.10    Conflicts.    In case any provision in this Agreement shall conflict with any part of the Settlement agreement, the terms of the Settlement agreement shall control and shall be given precedence by the parties hereto over any such conflicting term in this Agreement.

8.11    Captions.    The captions in this Agreement are for convenience only and shall not be considered a part hereof or affect the construction or interpretation of any provisions of this Agreement.

8.12    Severability.    If any provision of this Agreement or the application thereof is held invalid, the invalidity shall not affect other provisions or applications of this Agreement that can be given effect without the invalid provision or application and, to this end, the provisions of this Agreement are declared to be severable.

8.13    Entire Agreement.    This Agreement and the documents delivered pursuant hereto constitute the entire agreement and understanding between the Seller and the Buyer and supersede any prior agreement and understanding relating to the subject matter of this Agreement. This Agreement may be modified or amended only by a written instrument executed by the Seller and the Buyer acting through their duly elected officers.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the day and year first above written.

**THE SELLER.**

Name
Title

10

5614177-2

THE BUYER: - Buck Rogers Company

Name  BRIAN McDEVIT

Title  MEMBER

11

## SCHEDULE 1.1(a)

## ASSETS

(a)     Any and all intellectual property of the Seller, including, without limitation, any and all right, title and interest in the intellectual property rights throughout the world in the character of "BUCK ROGERS" and the "BUCK ROGERS" universe and all works, stories, characters, dialogue, drawings, artwork, scenes, translations and plots contained therein, associates with and/or derived and any and all translations of such, all copyrights, including registrations, applications for registration, renewals and extensions thereof, all trademarks, common law marks, service marks, domain names, trade dress, logos, trade names, business names, social media accounts and other distinctive source identifiers, including registrations and applications for registration thereof, together with all associated goodwill, and all rights to sue for and collect damages for any past, present or subsequent infringement and all books and business records associated with the use, marketing, sale or licensing of the intellectual property.

(b)     All of the intellectual property identified in Schedule 1.1(a)(i)

(c)     All personal property, including but not limited to certain specimens, exemplars, business records and documents associated with or related to the use, marketing, sale or licensing of Seller's intellectual property rights;

(d)     Customer lists, sales and marketing materials, mailing lists, marketing lists, employee lists, and related information;

(e)     All causes of action, choses of action and rights of recovery, and counterclaims and setoff rights;

(f)     All intangible assets and goodwill of the Seller;

(g)     All books and records of the Seller ; and

(h)     All other assets and rights owned by, associated with or used by the Seller or that are not specifically excluded.

## SCHEDULE 1.1(b)

## EXCLUDED ASSETS

(a)    All cash and cash equivalents;

(b)    All licenses and contracts of Seller.

# EXHIBIT S

## CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT

This CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT ("Agreement") is entered by and between the Nowlan Family Trust (hereafter referred to as NFT"), and Buck Rogers Co. (hereinafter referred to as "BRC") (collectively referred to as "NFT-BRC"), parties of the first part AND Dille Family Trust (hereafter referred to as "Recipient"), party of the second part,

WHEREAS, NFT-BRC IS disclosing confidential information regarding the trademarks and copyrights owned by it or its related or affiliated companies and information related to the settlement of its prior litigation with the Dille Family Trust ("the Project); and,

WHEREAS the NFT-BRC possess certain information relating to the Project, as well as other business information, copyrights, trademarks, including, but not limited to, certain intellectual property, that is confidential and proprietary to NFT-BRC (hereinafter collectively referred to as "Confidential Information");

WHEREAS Recipient wishes to receive disclosure of the Confidential Information pursuant to the terms of this Agreement for the purpose of evaluating and discussing the Project; and

WHEREAS the Confidential Information is only being disclosed to Recipient for the purposes stated herein and based upon Recipient's representation that it will abide by the terms of the Agreement.

NOW THEREFORE, in consideration for the mutual undertakings of NFT-BRC and Recipient under this Agreement, the parties agree as follows:

1.    CONFIDENTIALITY

(a)    Recipient agrees to hold the Confidential Information in trust and confidence and agrees that it shall be used only for the contemplated purposes and for the benefit of NFT-BRC, and shall not be used for any other purpose, or disclosed to any third party, and will not be disclosed by Recipient, its agents or affiliates, either directly or indirectly.

(b)    Recipient shall protect such Confidential Information from disclosure by reasonable means, including but not limited to at least the same level of security that the RECIPIENT uses for its most crucial proprietary and trade secret information.

(c)    Recipient agrees not to use the Confidential Information in any way except with the permission of and for the benefit of NFT.

(d)    Recipient agrees to use its best efforts to prevent and protect the Confidential Information, or any part thereof, from disclosure to any person other than Recipient.

(e)     Recipient agrees to take all steps reasonably necessary to protect the secrecy of the Confidential Information, and to prevent the Confidential Information from falling into the public domain or into the possession of unauthorized persons.

(f)     No copies of any materials will be made or retained of any written information regarding the Project or prototypes supplied, without the written permission of NFT-BRC.

2.     Confidential Information shall not be deemed proprietary and the Recipient shall have no obligation with respect to such information where the information:

(a)     was known to Recipient prior to receiving any of the Confidential Information from NFT-BRC;

(b)     has become publicly known through no wrongful act of Recipient;

(c)     was received by Recipient without breach of this Agreement from a third party without restriction as to the use and disclosure of the information; or,

(d)     was independently developed by Recipient without use of the Confidential Information.

3.     In the event that Recipient or anyone to whom it transmits the Confidential Information becomes legally compelled to disclose any of such Confidential Information, Recipient will provide NFT-BRC with prompt prior notice so that NFT-BRC may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Agreement. Recipient will cooperate with NFT-BRC in obtaining any such protective order or other appropriate remedy.

4.     At the conclusion of any discussions, or upon demand by the NFT-BRC, all Confidential Information, including documents, spreadsheets written notes, or memoranda taken shall be promptly returned to the NFT-BRC within ten (10) days.

5.     Confidential Information shall not be disclosed to any employee, agent, consultant or third party unless they agree to execute and be bound by the terms of this Agreement, and have been approved in writing by the NFT-BRC.

6.     Recipient shall maintain all Confidential Information perpetually as confidential, as outlined in this Agreement, until the Confidential Information disclosed to Recipient is no longer confidential.    Otherwise, all provisions and obligations of this Agreement shall survive expiration or termination of the Agreement.

7.     This Agreement and all questions relating to its validity, interpretation, performance and enforcement (including, without limitation, provisions concerning limitations of actions), shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania, notwithstanding any conflict-of-laws doctrines of such state or other jurisdiction to the contrary, and without the aid of any canon, custom or rule of law requiring construction against the draftsman.

8.    This Agreement shall be binding upon, inure to the benefit of, and be enforceable by (a) the NFT, its successors, and assigns; and (b) Recipient, its successors and assigns.

9.    The provisions of this Agreement are independent of and separable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.

10.    This Agreement sets forth all of the covenants, promises, agreements, conditions and understandings between the parties and there are no covenants, promises, agreements or conditions, either oral or written, between them other than herein set forth.    No subsequent alteration, amendment, change or addition to this Agreement shall be binding upon either party unless reduced in writing and signed by them.

IN WITNESS WHEREOF, the parties have executed this agreement effective as of the dates written below.

AGREED AND ACCEPTED BY:

**DILLE FAMILY TRUST**

By: _____
Name:
Title: Trustee
Date: 4/8/19

**NOWLAN FAMILY TRUST**

By: _____
Diane McDevitt, trustee

Date: 4/30/19

**BUCK ROGERS CO.**

By: _____
Diane McDevitt, member

Date: 4/25/19

Page 3 of 3

# EXHIBIT A



# THE DILLE FAMILY TRUST

## (PHOTOCOPY)

Date signed:

August 16, 1979

\* \* \*

To be filed for availability and frequent review.

Original copy is located at:

\* \* \*

**DENNIS W. FOX**
**Attorney-at-Law**

2460 Garden Rd
Monterey, California
(408) 646-9898

## <u>TABLE OF CONTENTS</u>

| <u>ARTICLE</u> | <u>TITLE</u> | <u>PAGE</u> |
|---|---|---|
| I | CONVEYANCE ................................ | 1 |
| II | DECLARATIONS ............................. | 1 |
| | 2.A.  Name | 1 |
| | 2.B.  Statement of Intent and Family | 1 |
| | 2.C.  Successor Trustees | 2 |
| | 2.D.  Trust Fund | 2 |
| | 2.E.  Definitions | 3 |
| | 2.F.  Trust Situs | 4 |
| | 2.G.  Restrictions | 4 |
| | 2.H.  Perpetuity Provision | 4 |
| | 2.I.  No-Contest Provision | 4 |
| | 2.J.  Presumptions | 5 |
| | 2.K.  Special Distribution to Minors | 5 |
| III | TRUSTEESHIP ............................. | 6 |
| | 3.A.  Successor Trustees | 6 |
| | 3.B.  Corporate Trustee | 6 |
| | 3.C.  Vacancy in Trusteeship | 6 |
| | 3.D.  Beneficiary | 6 |
| | 3.E.  Disputes | 6 |
| | 3.F.  Bond | 7 |
| | 3.G.  Liability | 7 |
| | 3.H.  Compensation | 7 |
| | 3.I.  Resignation | 7 |
| | 3.J.  Reports | 7 |
| | 3.K.  Payments to Beneficiaries | 7 |
| | 3.L.  Dividends | 8 |
| | 3.M.  Interest | 8 |
| | 3.N.  Life Insurance | 9 |
| | 3.O.  Division of Trust Fund | 9 |
| | 3.P.  Release of Powers | 9 |
| IV | TRUSTEE'S POWERS ....................... | 9 |
| | 4.A.  Receive Assets | 10 |
| | 4.B.  Retention of Trust Property | 10 |
| | 4.C.  Invest and Reinvest | 10 |
| | 4.D.  Management of Trust Businesses | 10 |
| | 4.E.  Manage and Control | 11 |
| | 4.F.  Loans | 11 |
| | 4.G.  Purchase | 11 |
| | 4.H.  Deal with Fiduciaries | 11 |
| | 4.I.  Securities | 12 |
| | 4.J.  Contracts | 12 |
| | 4.K.  Agreements | 13 |

| ARTICLE | TITLE | PAGE |
|---|---|---|
| | 4.L.   Indebtedness | 13 |
| | 4.M.   Nominee Name | 13 |
| | 4.N.   Professional Assistance | 13 |
| | 4.O.   Divisions and Distributions | 13 |
| | 4.P.   Tax Consequences | 14 |
| | 4.Q.   Bonds:  Premium Amortization | 14 |
| | 4.R.   Bank Accounts | 14 |
| | 4.S.   Principal and Income | 14 |
| | 4.T.   General Powers | 15 |
| V | SETTLOR'S RETAINED POWERS ................ | 15 |
| | 5.A.   Revocation | 15 |
| | 5.B.   Amendment | 15 |
| | 5.C.   Revocation and Amendment by Surviving Settlor | 15 |
| | 5.D.   Powers Personal to Settlors | 16 |
| | 5.E.   Life Insurance | 16 |
| | 5.F.   Tangible Personal Property | 17 |
| | 5.G.   Real Property | 17 |
| | 5.H.   Special Authority to Husband and/or Wife as Co-Trustees | 18 |
| VI | DISPOSITION OF TRUST FUND ................ | 18 |
| | 6.A.   Trustee's Basic Duties | 18 |
| | 6.B.   Disposition During Settlors' Lifetime | 18 |
| | 6.C.   Disposition During Settlors' Incapacity | 18 |
| | 6.D.   Division of Trust Fund Upon Death of First Settlor | 19 |
| | 6.E.   Deferral of Division or Distribution | 20 |
| | 6.F.   Authorized Actions at Settlors' Deaths | 20 |
| | 6.G.   Deceased Spouse's Expenses | 21 |
| | 6.H.   Payments of Income to Surviving Spouse | 22 |
| | 6.I.   Payments of Principal to Surviving Spouse | 22 |
| | 6.J.   Special Withdrawal Rights of Surviving Spouse | 22 |
| | 6.K.   Power of Appointment in Surviving Spouse | 23 |
| | 6.L.   Distribution at Surviving Spouse's Death | 23 |

## THE DILLE FAMILY TRUST

THIS TRUST AGREEMENT is made, executed and entered into by ROBERT C. DILLE, also known as ROBERT CRABTREE DILLE, and VIRGINIA N. DILLE, also known as VIRGINIA NICHOLS DILLE, VIRGINIA LORRAINE DILLE and VIRGINIA LORRAINE NICHOLS, of Carmel, Monterey County, California, as settlors, and ROBERT C. DILLE and VIRGINIA N. DILLE, as trustees (hereinafter referred to in this trust agreement as "trustee").

### ARTICLE I

### CONVEYANCE

Settlors desire to establish a trust of the property described in Schedule A attached hereto and made a part hereof. All such property and any other as hereinafter added shall be known as the "trust fund." Settlors also intend to make the trustee primary and/or contingent beneficiary and/or owner of the rights of certain policies of life insurance on their respective lives.

Trustee acknowledges receipt of the trust fund and shall hold the same in trust, nevertheless, under the following terms, conditions and provisions:

### ARTICLE II

### DECLARATIONS

2.A.  Name.  This trust shall be known as THE DILLE FAMILY TRUST.

2.B.  Intent and Family.  Settlors, ROBERT C. DILLE and VIRGINIA N. DILLE, sometimes hereinafter referred to as husband and wife, are married.  Settlors have two (2) children now living. Their names and dates of birth are:

LORRAINE VIRGINIA DILLE, born January 19, 1949
ROBERT NICHOLS FLINT DILLE, born November 3, 1955

SETTLORS' INITIALS

TRUST: PAGE 1

Trustee may rely upon such dates for all distributions hereunder. By this trust agreement, settlors intend to provide for themselves, their children and their issue.

2.C. <u>Successor Trustees</u>. If ROBERT C. DILLE or VIRGINIA N. DILLE fails to qualify or ceases to act for any reason, during his or her lifetime, the other of said trustees shall act as sole trustee of the trust, unless there has already been named a co-trustee or successor trustee in accordance with the discretionary terms of Paragraph 3.A. After the death of either settlor, the surviving settlor shall become sole trustee of the trust, unless there has already been named a co-trustee or successor trustee in accordance with the discretionary terms of Paragraph 3.A. In the event that both settlors fail to qualify or cease to act for any reason, they shall be succeeded by settlors' children, LORRAINE and FLINT, unless there has already been named a co-trustee or successor trustee in accordance with the discretionary terms of Paragraph 3.A. In the event that settlors' children, LORRAINE and FLINT fails to qualify or ceases to act for any reason, husband's brother, JOHN FLINT DILLE, Jr. shall immediately become trustee, unless there has already been named a co-trustee or successor trustee in accordance with the discretionary terms of Paragraph 3.A. In the event a co-trustee fails to qualify or ceases to act, the remaining trustee or trustees may act alone.

During such time that co-trustees are then acting, said co-trustees may on each one's separate direction alone negotiate securities and bank or savings accounts, and deal with the entire trust fund and its assets, including also but not limited to any real property, without all trustees' signatures being required. Any third party dealing with the trust may rely upon this singular authority without any further evidence.

2.D. <u>Trust Fund</u>.

(1) All property now or hereafter subject to the terms hereof and any reference to a trust shall apply to all trusts created under this instrument unless otherwise provided herein. It is the intention of settlors that all community property transferred to these trusts and the proceeds thereof (called the "community estate") shall continue to retain its character as community property during their joint lifetimes, subject, however, to all the terms and conditions of this trust agreement. Similarly, it is the intention of settlors that all quasi-community property and separate property of either spouse and the proceeds thereof (called the "separate estate") shall retain its character during their joint lifetimes, subject also to all the terms and conditions of this trust agreement. Further, it is the intention of settlors that trustee shall have no more extensive power over any community property transferred to the trust estate than either settlor would have had under California Civil Code sections 5125 and 5127 or other California code sections then in effect which govern the management of community

SETTLORS' INITIALS

property had this trust agreement not been created, and this trust agreement shall be interpreted to achieve this intention.  This limitation shall terminate on the death of either settlor.

(2)  Settlors may add to the principal of the trust by deed, will, or otherwise.  With the written approval of the trustee, other persons may add to the principal of the trust fund. Unless otherwise specifically provided by such other persons adding to the principal of the trust fund, the trustee shall allocate any such addition to each separate trust created by this trust agreement ratably on the basis of the market value of each separate trust at the date of any such additions.

2.E.  <u>Definitions</u>.  In any matter of interpretation of this trust agreement, the following definitions shall apply:

(1) <u>Child or Children</u>.  Any reference to "child" or "children" shall include any other children hereafter born to or adopted by settlors;

(2) <u>Child in Being</u>.  A child in gestation which is later born alive and survives for thirty (30) days shall be considered as a child in being throughout the period of gestation;

(3) <u>Corporate Trustee</u>.  Any reference to a corporate trustee shall include its successor, whether by merger, consolidation, change of name or otherwise;

(4) <u>Headings</u>.  Article headings in this trust agreement are inserted for convenience only, and are not to be considered in the construction of the provisions thereof;

(5) <u>Incapacity</u>.  In the case of a question or dispute, incapacitation shall be evidenced by written certification of three (3) physicians, consisting of one (1) neurologist and two (2) psychiatrists, all of whom are certified by the American Board of Neurology and Psychiatry;

(6) <u>Issue</u>.  The term "issue" shall refer to lineal descendants of all degrees and shall include adopted persons;

(7) <u>Majority</u>.  The term "majority" shall mean more than one-half (1/2), and, in the event of a deadlock, shall be determined in accordance with the provisions of Article 2.5 of the California Probate Code, Section 1138.1 to 1138.13, inclusive, or successor California Probate Code sections relating to inter vivos trusts;

(8) <u>Principal and Income</u>.  The determination by trustee in all matters with respect to what shall constitute principal of the trust, gross income therefrom and net income distributable under the terms of the trust shall be governed by the provisions of the Principal and Income Law of the State of California, as it may from time to time exist, except as to any of

such matters as may otherwise be provided for in this instrument. In the event and to the extent that any of such matters relating to what constitutes principal or income of the trust and in the allocation of receipts and disbursements between these accounts is not provided for either in this trust agreement or in the Principal and Income Law, trustee has full power and authority to determine such matters;

(9) _Pronouns and Gender._  In this trust agreement, the masculine, feminine or neuter gender, and the singular or plural number, shall be deemed to include the others whenever the context so indicates; and,

(10) _Trustee._  Any reference to "trustee" shall be deemed to refer to whichever individual, individuals or corporation (as the case may be) as shall then be acting as trustee.

2.F.  _Trust Situs._  This trust agreement is a California contract and creates a California trust, and all of the terms and provisions hereof shall be interpreted according to the laws of the State of California, except that a majority of the beneficiaries may transfer the trust situs to a more convenient jurisdiction.

2.G.  _Restrictions._  The interest of any beneficiary (whether entitled to current income or possessing only a future interest) in either the income or principal of the trust fund or any part of it shall not be alienated or in any other manner assigned or transferred by such beneficiary; and such interest shall be exempt from execution, attachment, distress for rent, and other legal or equitable process which may be instituted by or on behalf of any creditor or assignee of such beneficiary; nor shall any part of such interest be liable for the debts or obligations (including alimony) of any such beneficiary.

2.H.  _Perpetuity Provision._  Anything herein contained to the contrary notwithstanding, each trust created by this trust agreement, unless sooner terminated in the manner hereinafter provided, shall end immediately prior to the expiration of twenty-one years from and after the death of the last survivor of settlors and settlors' now living issue; and thereupon trustee shall pay over the principal of each such trust, free from this trust, unto the person then entitled to receive the net income from each such trust.

2.I.  _No-Contest Provision._  In the event any beneficiary under this trust shall, singly or in conjunction with any other person or persons, contest in any court the validity of this trust agreement or of a deceased husband's or wife's last Will or shall seek to obtain an adjudication in any proceeding in any court that this trust agreement or any of its provisions or that such Will or any of its provisions is void, or seek otherwise to void, nullify or set aside this trust agreement or any of its provisions, then

the right of that person to take any interest given him or her by
this trust agreement shall be determined as it would have been
determined had the person predeceased the execution of this trust
agreement without surviving issue.

The trustee is hereby authorized to defend, at the expense of
the trust fund, any contest or other attack of any nature on this
trust agreement or any of its provisions.

2.J. **Presumptions.** Any beneficiary who shall not be living
thirty (30) days after husband's or wife's (as the case may be)
death, shall be deemed not to have survived him or her; except
that in the case of husband and wife, if the order of their deaths
cannot be established by proof, the wife shall be deemed to be the
Surviving Spouse (as hereinafter defined in Paragraph 6.D) and the
wife shall also be deemed to be the Surviving Spouse if the wife
survives in fact for any period.

2.K. **Special Distribution to Minors.** If any of the income
and/or principal of any trust hereunder ever vests outright under
the provisions of this trust agreement in persons not yet
twenty-one (21) or persons who, in the opinion of trustee, are
under incapacity or unable to administer distributions properly,
then trustee, in its discretion, in any jurisdiction, without
giving or requiring bond, without intervention of a guardian,
conservator or other representative, and without supervision of
any court, shall hold or distribute such property (subsequently
referred to in this Paragraph 2.K. as the "protected property") in
accordance with the following provisions:

(1) Trustee may hold any protected property in a
separate trust for such beneficiary, exercising as trustee of such
trust all the administrative powers conferred in this trust
agreement. Trustee may accumulate or distribute to or for such
beneficiary in accordance with subparagraph (2), as hereinbelow
described, such amount or amounts of income and/or principal of
the trust as it determines from time to time during the term of
the trust. The trust shall terminate and vest absolutely when the
beneficiary attains age twenty-one (21), dies, overcomes the
disability, or when the trust assets are exhausted by
discretionary distributions, or as otherwise directed by Paragraph
2.H., as hereinabove mentioned, whichever shall first occur. At
such termination, trustee shall distribute the protected property
then on hand in trust to the beneficiary or to the beneficiary's
estate if the trust terminates at the beneficiary's death.

(2) Trustee may distribute any protected property to or
for the benefit of such beneficiary: (a) directly to the
beneficiary; (b) on behalf of the beneficiary for the
beneficiary's exclusive benefit; (c) to any account in a bank or
savings institution either in the name of such beneficiary or in a
form reserving title, management and custody of such account to a
suitable person for the use of such beneficiary; (d) in any form
of an annuity; (e) in all ways provided by laws dealing with gifts
or distributions to or for minors or persons under incapacity;

and, (f) to any suitable person with whom the beneficiary resides or has the care or control of the beneficiary, without obligation to see to the further application of such distribution, and the receipt for distributions by any such persons shall fully discharge trustee.

## ARTICLE III

### TRUSTEESHIP

3.A. Successor Trustees. Husband and wife may, during their joint lifetimes, appoint individuals or corporations as co-trustees or successor trustees, by written instrument delivered to the other trustee(s), if any are then acting; and, upon the death of the first of them, the survivor may appoint, by the same method, individuals or corporations as co-trustees or successor trustees except in so far as a co-trustee or trustee was designated during their joint lifetime to administer the Residual Trust (as hereinafter defined in Paragraph 6.D.). If this power is executed by both a Will and other instrument, the document which bears the latest date should prevail. Any individual trustee may also remove a corporate co-trustee and designate a new one by a written instrument, and may, by the same method, revoke such designation and make a new one.

3.B. Corporate Trustee. Any corporate trustee appointed under any provisions of this trust agreement shall be a bank, corporation or other financial institution duly organized under the laws of any state or of the United States, authorized by law to administer trusts, maintaining a full-time trust department, and having a combined capital and surplus of at least ten million dollars ($10,000,000.00).

3.C. Vacancy in Trusteeship. If a corporate trustee for any reason fails to qualify or ceases to act, or there is no trustee acting hereunder, the trustee then acting, if any, and if not, then a majority of the beneficiaries shall appoint a successor corporate trustee by an instrument in writing, which appointment must be effective upon the date the last trustee fails to qualify or ceases to act.

3.D. Beneficiary. For purposes of ARTICLE III of this trust agreement, the term "beneficiary" or "beneficiaries" shall mean any beneficiary then eligible to receive current income. If any beneficiary is a minor or incapacitated, irrespective of whether legally so adjudicated, then the guardian, conservator or person with whom said beneficiary resides shall act for the beneficiary for all purposes in the ARTICLE III.

3.E. Disputes. If an individual trustee and a corporate trustee are acting, whenever there shall be a dispute, deadlock or difference of opinion between them on a question of joint discretion, the determination of the individual trustee shall be

binding upon the corporate trustee, but the corporate trustee shall bear no liability or accountability for any act or transaction entered into as a result of the enforcement of the individual trustee's privilege if it shall have dissented in writing in advance of such act or transaction. During husband's and/or wife's lifetime, their decisions shall absolutely control on all questions of joint discretion.

3.F. Bond. No bond shall be required of any person named in this trust agreement as trustee. Subsequently named co-trustees or successor trustees may be required to be bonded, in accordance with the terms of appointment.

3.G. Liability. No successor trustee shall be under any obligation to examine the accounts of any prior trustee, and a successor trustee shall be exonerated from all liability arising from any prior trustee's acts or negligence.

3.H. Compensation. Trustee shall be entitled to receive, out of the income and principal of the trust fund, compensation for its services hereunder to be determined from time to time by the application of the current rates then charged by trustee for trusts of a similar size and character, and, in the event that trustee shall be called upon to render any extraordinary services, it shall be entitled to additional compensation therefor. Trustee may impose any trustee fees or other expenses of the trust against the principal or income of the trust fund without any duty to seek reimbursement or contribution from the interest not charged.

3.I. Resignation. Any trustee may resign at any time by giving written notice to settlors, if living, or the survivor of them, and thereafter to the other trustees, if any, and, if not, to all the beneficiaries. Any such notice shall become effective as agreed by settlors or the majority of the beneficiaries, but no later than thirty (30) days after such written notice.

3.J. Reports. The trustee shall render reports at least annually to settlors and to each beneficiary, except as such reporting shall be waived by settlors. The records of the trustee shall be open at all reasonable times to such inspections. The trustee shall not be required to make any reports or accountings to the courts.

3.K. Payments to Beneficiaries.

(1) Trustee shall pay the net income of any trust hereunder, to the beneficiary to whom such income is directed to be paid, at such times as shall be convenient to such beneficiary and agreed to by the trustee;

(2) Any income and/or principal of any trust hereunder to which any beneficiary may be entitled may, without regard to any order or assignment proporting to transfer the same to any other person, be paid or distributed by trustee, in its sole

TRUST:   PAGE 7

discretion, into the hands of such beneficiary, or to the guardian of the person of such beneficiary, or to the person with whom such beneficiary shall reside, or be mailed to such beneficiary's last known address, or deposited to the account of such beneficiary in a bank or trust company of good standing, or be applied for the benefit of such beneficiary and his or her dependents directly by trustee; and the receipt for any payment or distribution or evidence of the application of any income or principal made in conformity with the foregoing shall discharge trustee from any further liability therefor;

(3) Upon the happening of any event terminating the period which the income of any trust hereunder is directed to be paid to a beneficiary, then, any statute or rule of law to the contrary notwithstanding, any accrued or other income not actually collected and available for distribution to such beneficiary prior to the happening of such event shall, when collected, be treated as though it had, in fact, accrued after the happening of such event;

(4) Unless trustee shall have received actual written notice of the occurrence of an event affecting the beneficial interests of this trust agreement, trustee shall not be liable to any beneficiary of this trust agreement for distribution made as though the event had not occured; and,

(5) If at any time or times during the continuance of any trust hereunder, trustee, in its sole discretion, shall consider that the funds payable hereunder unto or for the benefit of any beneficiary of such trust, together with the funds available to such beneficiary from other sources, are insufficient to provide properly for the essential needs -- such as food, clothing, education, shelter and illness expenses -- of such beneficiary and his or her dependents, trustee is authorized and empowered to pay over or apply so much of the principal of any part or the whole of any trust hereunder from which such beneficiary may then be receiving payments or the benefit thereof, in such manner and to such extent as trustee, in its sole discretion, shall deem to be necessary to meet such essential needs of such beneficiary and his or her dependents.

3.L. **Dividends.** Trustee shall collect dividends declared on shares of stock delivered to it if such delivery shall occur prior to the record date for such dividends (regardless of whether trustee shall be the holder of record on such date) and trustee shall treat all such dividends, upon receipt, as income or principal.

3.M. **Interest.** With respect to interest that shall have accrued but shall not have been paid on any interest-bearing property at the time of its delivery to trustee, trustee shall collect and treat such interest, upon receipt, as income or principal as though such interest had accrued after such delivery.

TRUST:  PAGE 8

3.N. Life Insurance. If this trust agreement includes any policies of insurance, then upon receipt of proof of death of the insured, trustee shall use its best efforts to collect any and all sums payable by reason of such death under the policies of life insurance then held hereunder, and for that purpose trustee is expressly empowered to execute and deliver valid receipts and complete discharges to the insurance company or companies issuing said policies, to institute any suit or proceedings, and to do any and all other acts necessary for the purpose of collecting such sums; provided, however, that trustee shall not be under any duty to institute any suit or proceedings unless its expenses, including counsel fees and costs, shall be available in the trust fund or shall have been advanced or guaranteed in an amount and in a manner reasonably satisfactory to it.

3.O. Division of Trust Fund. There need be no physical segregation or division of the various trusts created hereunder except as segregation or division may be required by the termination of any of the trusts, but the trustee shall keep separate accounts for the different undivided interests.

3.P. Release of Powers. Each trustee shall have the power to release or to restrict the scope of any power that such trustee may hold in connection with any trust created under this trust agreement, whether said power is expressly granted in this trust agreement or implied by law. The trustee shall exercise this release in a written instrument specifying the powers to be released or restricted and the nature of any such restriction. Any released power shall pass to and be exercised by the other then-acting trustees.

## ARTICLE IV

### TRUSTEE'S POWERS

Subject to the provisions and limitations set forth expressly herein, trustee shall have, in general, the power to do and perform any and all acts and things in relation to the trust fund in the same manner and to the same extent as an individual might or could do with respect to his or her own property. No enumeration of specific powers made herein shall be construed as a limitation upon the foregoing general powers, nor shall any of the powers conferred herein upon trustee be exhausted by the use thereof, but each shall be continuing.

Trustee shall have all the powers set forth in Subparagraphs (1) through (17) inclusive of Section 1120.2 of the California Probate Code, as of the date of this trust agreement; in addition, trustee is specifically authorized and empowered, in its sole discretion:

TRUST:  PAGE 9

4.A. **Receive Assets.** To receive, take possession of, sue for, recover and preserve the assets of the trust fund, both real and personal, coming to its attention or knowledge, and the rents, issues and profits arising from such assets;

4.B. **Retention of Trust Property.** To retain, without liability for loss or depreciation resulting from such retention, any assets received by trustee or any property that may from time to time be added to the trust fund or any trust created hereunder; or any property in which the funds of any trust may from time to time be invested, for such time as trustee shall deem best, even though such property may not be of the character prescribed by law for the investment of trust funds, or even though to retain such property might violate sound diversification principles, or even though such property may represent a large percentage of the total property of the trust fund. However, the aggregate property allocated to each trust created by this trust agreement shall bear a reasonable rate of return;

4.C. **Invest and Reinvest.** To invest, reinvest, change investments and keep the trust fund invested in any kind of property, real, personal, or mixed, including by way of illustration but not limitation, oil and gas royalties and interests; common and preferred stocks of any corporation, including puts, calls, and options, whether for cash, credit, or margins, whether closely or widely held, whether selling or buying including stock or other securities of or any interest in any corporation or other business venture or any related affiliated or subsidiary corporation or business venture which is acting as trustee hereunder; voting trust certificates, bonds, notes, debentures, mortgages, shares, or interests in investment trusts, mutual funds or common trust funds, including such funds administered by the trustee; market or index funds; interests in partnerships, whether limited or general and as a limited or general partner; and joint stock companies and associations, without regard to the proportions that any such investment or investments of a similar character may bear to the total trust fund or whether or not such investments are in new issues or are in new or foreign enterprises and without being limited to the classes of investments which the trustee is or may be authorized by statute or rules or decisions of court to invest trust funds; intending hereby to authorize trustee to act in such manner as trustee shall believe to be in the best interests of the trust fund and the beneficiaries thereof;

4.D. **Management of Trust Businesses.** To hold and operate at the risk of the trust fund and not at the risk of trustee, any business, partnership interest or capital stock of any corporation, including closely-held corporations, received or acquired by trustee, as long as trustee may deem advisable, the profits and losses to inure or be chargeable to the trust fund and not trustee; and in connection with such operation, to incorporate

such business or operate it as a partnership, limited or general, or in any other form of organization which trustee deems appropriate;

4.E. <u>Manage and Control</u>. To manage, control, sell at public or private sale, convey, exchange, partition, divide, allot, subdivide, improve, repair; to grant options and to sell upon deferred payments; to pledge or encumber by mortgage or deed of trust or any other form of hypothecation; to otherwise dispose of the whole or any part of the trust fund on such terms and for such property or cash or credit, or any combination thereof, as trustee may deem best; to lease for terms within or extending beyond the duration of the trust fund for any purposes, including leases of real property for up to ninety-nine (99) years, for the purpose of exploration for and development of and removal of gas, oil, minerals and other substances; to enter into community leases; to create restrictions, easements, servitudes; to compromise, arbitrate, or otherwise adjust claims in favor of or against the trust fund; to institute, compromise and defend actions and proceedings with respect to the trust fund; and to secure such insurance, at the expense of the trust fund, as trustee may deem advisable;

4.F. <u>Loans</u>. To borrow for the trust fund from any person, corporation or other entity, including trustee or any related, affiliated or subsidiary corporation or business venture of trustee at such rates and upon such terms conditions as such trustees shall deem advisable, and to pledge as security therefor any of the assets of the trust fund for the benefit of which such loan is made; to execute, acknowledge and deliver bonds, mortgages, and deeds of trust, extensions of agreements, participation agreements, assignments of mortgages or deed of trust or other documents incidental thereto; to lend money upon such terms and such conditions as trustee deems to be in the best interests of the trust fund and the beneficiaries thereof, including the lending of money from one trust to another trust created hereunder, and to borrow on behalf of one trust from any other trust created hereunder, and further including the right to lend money to trustee, to any related, affiliated or subsidiary corporation or business venture of trustee, or to husband's and/or wife's probate estates but in such event such loans shall be adequately secured and shall bear the then prevailing rate of interest for loans to such persons or entities for the purposes contemplated;

4.G. <u>Purchase</u>. To purchase property at its fair market value as determined by trustee, in trustee's discretion, from husband's and/or wife's probate estate;

4.H. <u>Deal with Fiduciaries</u>. To buy from, sell to, and generally deal with trustee individually and as a fiduciary, or with partnerships, corporations, and financial or business organizations in which trustee may have an interest;

4.I. <u>Securities</u>.  With respect to any corporation or partnership, the stocks, bonds or other securities of which, or interests in which may form a part of the trust fund:

(1)  To vote in person or in proxy;

(2)  To consent to the merger, consolidation, reorganization or dissolution of any of such corporations, or to the termination of any of such partnerships, or to the modification or amendment of any partnership agreement or corporate organization document;

(3)  To consent to the leasing, mortgaging or sale of any property of such corporation or partnership;

(4)  To surrender, exchange or substitute stocks, bonds, or other securities as an incident to the merger, consolidation, recapitalization or dissolution of any of such corporations;

(5)  To pay all assessments, subscriptions and other sums of money which trustee may deem wise and expedient for the protection and maintenance of the proportionate interest of the trust fund in said corporations or partnerships;

(6)  To enter into agreements making the trust fund liable for a pro rata share of the liabilities of any corporation which has been dissolved and in which stock is held by the trust fund, when in the opinion of trustee such action is necessary to the plan of liquidation of any such corporation;

(7)  To exercise any option or privelege which may be conferred upon the holders of such stocks, bonds, or other securities, either for the exchange or conversion of the same into other securities or for the purchase of additional securities, and to make any and all payments which may be required in connection therewith;

(8)  To join in the creation, modification, cancellation of any voting trust, or any restrictive purchase or retirement agreement relating to any partnership interest or corporate stocks; and,

(9)  To take any other action with respect to such corporation or partnership which trustee, in trustee's discretion, deems necessary and proper to protect and further the interests of the trust fund and the beneficiaries thereof, and in so doing to exercise any and all powers which may otherwise be granted to the legal owner of any such corporate stock or partnership interest;

4.J. <u>Contracts</u>.  To enter into contracts which are reasonably incident to the administration of the trust;

4.K. Agreements. To carry out the terms of any valid agreements which husband and/or wife may have entered into during husband's and/or wife's lifetime regarding property owned by the trust;

4.L. Indebtedness. With respect to any indebtedness owed to the trust, secured or unsecured:

(1) To continue the same upon and after maturity, with or without renewal or extension, upon such terms as trustee deems advisable; and,

(2) To foreclose any security for such indebtedness, to purchase any property securing such indebtedness and to acquire any property by conveyance from the debtor in lieu of foreclosure;

4.M. Nominee Name. To hold any or all of the property comprising the trust fund, including real property, stocks, bonds, or other securities or interests therein, in trustee's or a nominee's name and to take and keep any or all of such stocks, bonds or other securities in unregistered form and retain them or any of them in such condition that ownership shall pass by delivery;

4.N. Professional Assistance. To employ and compensate agents, managers, investment counselors, brokers, attorneys, accountants, and other assistants deemed by trustee to be reasonably necessary for the administration of the trust fund, and trustee shall not be liable for any losses occasioned by the good faith employment of such agents, managers, investment counselors, brokers, attorneys, accountants and other assistants, nor shall trustee be liable for any losses occasioned by any actions taken by trustee in good faith reliance upon any advice or recommendation thereof; to pay all costs, taxes, and charges in connection with the administration of the trust fund; and to be reimbursed for all reasonable expenses, including attorneys' fees, incurred in the management and protection of the trust fund and to pay his agents, managers, investment counselors, brokers, attorneys, accountants and other assistants a reasonable fee prior to court approval thereof. Any such payment by trustee of such fees shall be out of principal or income, as trustee may elect, or partially out of each. The discretion of trustee to pay these expenses from income or principal, or partially from each, may be exercised not only in the interests of the trust fund but for the benefit of any beneficiary thereof; subject, however, to trustee's fiduciary obligation to treat income beneficiaries and remaindermen equitably;

4.O. Divisions and Distributions. In any case in which trustee is required, pursuant to the provisions of any trust created herein, to divide any trust property into parts or shares for the purpose of distribution, or otherwise, to make the division and distribution (pro rata or otherwise) in kind, including undivided interests in any property, or partly in kind

and partly in money, and for this purpose to make such sales of trust property as trustee may deem necessary, and on such terms and conditions as trustee shall deem fit, and to determine the relative value of the securities or other properties so allotted or distributed. Trustee's determination of values and of the property for such distribution shall be conclusive. In making distributions pursuant to this paragraph, trustee should consider the tax bases of the various assets that are being distributed, so that the aggregate tax basis of assets distributed to the various distributees is as equal as possible. The decision of trustee in distributing assets in reliance on this paragraph shall be binding, and shall not be subject to challenge by any beneficiary hereunder;

4.P. <u>Tax Consequences</u>. To prepare and file returns and arrange for payment with respect to all local, state, federal and foreign taxes incident to this agreement; to take any action and to make any election, in trustee's discretion, to minimize the tax liabilities of this trust agreement and its beneficiaries, and trustee shall allocate the benefits among the various beneficiaries, and trustee shall make adjustments in the rights of any beneficiaries, or between the income and principal accounts, to compensate for the consequences of any tax election or any investment or administrative decision that trustee believes has had the effect of directly or indirectly preferring one beneficiary or group of beneficiaries over others;

4.Q. <u>Bonds; Premium Amortization</u>. To purchase any government bonds and to pay such premiums in connection therewith as trustee deems advisable; provided, however, that any such premium shall be repaid to principal out of the interest on the bond and, to the extent necessary, out of the proceeds from the sale or other distribution of such bond;

4.R. <u>Bank Accounts</u>. To open and maintain bank accounts in the name of trustee with any bank, trust company or savings and loan association authorized and doing business in any State of the United States of America. If more than one trustee shall be acting, the trustees may designate one or more of them to conduct banking activities and to make deposits, withdrawals and endorsements upon giving written notice of such designation to the bank, trust company, or savings and loan association in question; and such bank, trust company or savings and loan association shall be protected in relying upon such designation;

4.S. <u>Principal and Income</u>. Except as otherwise provided herein, trustee shall not be required to establish any reserve for depreciation or to make any charge for depreciation against all or any portion of the income of the trust fund, including any income realized through use of any portion of the trust fund principal in the conduct of a business by the trust fund; but trustee shall have the power, exercisable in trustee's discretion, to determine whether to establish such a reserve and, if so, to fund the same by appropriate charges against the income of the trust fund, such

reserve and charges to be established on such assumptions and in such amounts as trustee, in the trustee's discretion, shall determine. In exercising this discretion conferred on trustee, trustee is requested to take into consideration the fact that settlors' intent is to benefit primarily the income beneficiaries of the trust fund; and,

4.T. General Powers. To do any and all other acts necessary, proper or desirable for the benefit of the trust fund and its beneficiaries, and to effectuate the powers conferred upon the trustee hereunder.

## ARTICLE V

### SETTLORS' RETAINED POWERS

5.A. Revocation. During the joint lifetimes of settlors, this trust agreement may be revoked in whole or in part with respect to the community estate by an instrument in writing signed by either settlor and delivered to trustee and the other settlor, and with respect to separate property by an instrument in writing signed by the settlor who contributed that property to the trust, delivered to trustee. In the event of such revocation, the community estate or the revoked portion shall revert to both settlors as their community property, and the separate estate shall revert to the settlor respectively creating it and shall constitute his or her separate or quasi-community property as if this trust agreement had not been created. If this trust agreement is revoked with respect to all or a major portion of the assets subject to the agreement, trustee shall be entitled to retain sufficient assets to reasonably secure payment of the liabilities lawfully incurred by trustee in the administration of the trust, including trustee's fees that have been earned, unless settlors shall indemnify trustee against loss or expense.

5.B. Amendment. Settlors may at any time during their joint lifetimes amend any of the terms of this trust agreement by an instrument in writing signed by both settlors and delivered to trustee. No amendment shall substantially increase the duties or liabilities of trustee or change trustee's compensation without trustee's consent, nor shall trustee be obligated to act under such an amendment unless trustee accepts it. If a trustee is removed, settlor shall pay to trustee any sums due and shall indemnify trustee against liability lawfully incurred by trustee in the administration of the trusts.

5.C. Revocation and Amendment by Surviving Settlor. On the death of the first settlor, the surviving settlor shall have the power to amend, revoke, or terminate the "Marital Trust" (as hereinafter defined in Paragraph 6.D.), but the "Residual Trust" (as hereinafter defined in Paragraph 6.D.) may not be amended, revoked, or terminated.

TRUST:   PAGE 15

On revocation or termination of the Marital Trust, all of its assets shall be delivered to the surviving settlor. Revocation and amendment shall be made in the manner as herein above provided in Paragraphs 5.A. and 5.B.

On the death of the surviving settlor, neither trust may be amended, revoked, or terminated.

5.D. Powers Personal to Settlors. The powers of settlors to revoke or amend this trust agreement are personal to settlors and shall not be exercisable in settlors' behalf by any guardian, conservator, or other person, except that revocation or amendment may be authorized, after notice to trustee, by the court that appointed the guardian or conservator.

5.E. Life Insurance.

(1) All rights, benefits, privileges, and options available to settlors during settlors' lifetimes as the owners of or the insured under any and all insurance policies, if any, within the operation of this trust agreement shall be retained by and for the sole benefit of settlors, regardless of the terms of this agreement and of the fact that trustee is named beneficiary in such policies, and shall not be subject to the trust.

(2) During the lifetime of husband or wife, as the case may be, the duty and responsibility concerning the payment of premiums and other charges, if any, within the operation of the trust shall rest solely upon husband and/or wife unless this responsibility has been expressly delegated to and accepted by trustee, or unless subsequent provisions of this agreement specifically provide to the contrary.

(3) It is the husband's and/or wife's intention to transfer the rights to the trust and to make the trust the beneficiary of certain policies of life insurance insuring the life of husband and/or his wife and owned by the other spouse. Any such policies shall be held in trust during the life of the insured, in the discretion of trustee, and collected upon the respective insured spouse's death. During the lifetime of the insured spouse, however, and while the insured spouse is acting as trustee, the insured spouse shall have no power over such policies as trustee. Any decisions with respect to such policies shall be made by the other trustees then acting. Trustee shall not apply these policies in any manner whatsoever for the insured spouse as beneficiary hereunder. During the lifetime of the owner of the rights, however, it is hereby agreed that the rights will remain such spouse's separate property with the insured spouse having no community or other interest therein.

(4) Upon the death of husband or wife, as the case may be, the trustee shall proceed immediately to collect the net proceeds of policies, if any, on the life of husband or wife, as the case may be, which are then payable to trustee, and shall hold

TRUST:    PAGE 16

```
ERROR: rangecheck
OFFENDING COMMAND: image

OPERAND STACK:
--nostringval--
```

# EXHIBIT B



# A M E N D M E N T

THIS AMENDMENT, made and executed in the City of Monterey, State of California, by and between ROBERT C. DILLE and VIRGINIA N. DILLE (hereinafter referred to as "settlors") and ROBERT C. DILLE and VIRGINIA N. DILLE (hereinafter referred to as "trustee").

# W I T N E S S E T H

WHEREAS, on or about August 16, 1979, the parties hereto made and entered into an agreement wherein and whereby certain trusts were created and known as **THE DILLE FAMILY TRUST**;

WHEREAS, several provisions of said trust agreement require revision in view of the changes in the Federal Estate Tax Law effective January 1, 1982 as a result of "The Economic Recovery Tax Act of 1981"; and,

WHEREAS, pursuant to the power reserved in said original agreement, the settlors now desire to amend said trust agreement in the manner particularly hereinafter set forth,

NOW, THEREFORE, IN CONSIDERATION OF THESE PREMISES AND OTHERS, IT IS AGREED AS FOLLOWS:

1.    That Paragraph 2.C. of Article II of said Agreement shall be, and the same is hereby canceled, annulled and rescinded and in lieu thereof the following shall be, and the same is hereby substituted:

"2.C.    **Successor Trustees.**  If husband or wife fails to qualify or ceases to act for any reason, during his or her lifetime, the other of said trustees shall act as sole trustee of the trust.  After the death of either settlor, the surviving settlor shall act as sole trustee of the Marital Trust (as hereinafter defined in Paragraph 6.D.) and the surviving settlor and settlors' friend and attorney, ARTHUR MARTIN, shall become co-trustees of the Residual Trusts (as hereinafter defined in Paragraph 6.D.).  In the event that said ARTHUR MARTIN fails to qualify or ceases to act for any reason, settlors' attorney, DENNIS W. FOX, shall immediately become co-trustee with the surviving settlor.  If the above-named successor co-trustees are unable to qualify or cease to act for any reason, AMERICAN GUARANTY & TRUST COMPANY, a Delaware corporation, shall immediately become co-trustee with the surviving settlor.  In the event that the surviving settlor fails to qualify or ceases to act for any reason, or at the death of the surviving settlor, the then-acting co-trustee shall act as sole trustee of all trusts created hereunder.  If such trustee thereafter ceases to act for any reason, the designation and order of the successor trustees shall be the same as hereinabove set forth."

2.   That the following shall be, and hereby is added to the beginning of Paragraph 2.G. of Article II:

"Other than the income interest of the surviving settlor in Residual Trust "B" (as hereinafter defined in Paragraph 6.D.),"

3.   That the words "Residual Trust" in Paragraph 3.A. of Article III and subparagraph (2) of Paragraph 5.C. of Article V shall be, and hereby are changed to read "Residual Trusts".

4.   That Paragraph 3.E. of Article III shall be, and hereby is cancelled, annulled and rescinded and in lieu thereof the following shall be, and the same is hereby substituted:

"3.E.   **Disputes.**

(1)   During such time that individual co-trustees are then acting, whenever there shall be a dispute, deadlock or difference of opinion between them on a question of joint discretion, the determination of the majority shall be binding, but the dissenting trustee or trustees shall bear no liability or accountability for any act or transaction entered into as a result of the enforcement of the majority rule if such trustee or trustees shall have dissented in writing in advance of such act or transaction.   Notwithstanding any power of individual signature contained in this trust agreement or hereafter conferred on the trustees, no individual co-trustee shall have the right, power or authority to make any unilateral decision affecting the trust, other than of a purely ministerial nature.

(2)   If an individual trustee and a corporate trustee are acting, whenever there shall be a dispute, deadlock or difference of opinion between them on a question of joint discretion, the determination of the individual trustee shall be binding upon the corporate trustee, but the corporate trustee shall bear no liability or accountability for any act or transaction entered into as a result of the enforcement of the individual trustee's privilege if it shall have dissented in writing in advance of such act or transaction."

5.   That Paragraph 6.D. of Article VI of said Agreement shall be, and the same is hereby canceled, annulled and rescinded and in lieu thereof the following shall be, and the same is hereby substituted:

"6.D.   **Division of Trust Fund Upon Death of First Settlor.** The first settlor to die shall be called the "Deceased Spouse" and the living settlor shall be called the "Surviving Spouse".   On the death of the Deceased Spouse, trustee shall divide the trust fund, including any additions made to the trust by reason of his or her death, such as from the decedent's Will or life insurance policies on the decedent's life, into two separate trusts, designated the "Marital Trust" and the "Residual Trust".

(1)   The Marital Trust shall include the Surviving Spouse's interest in settlors' community property, including the Surviving Spouse's interest in the settlors' quasi-community property, and the Surviving Spouse's separate estate, if any, included in or added to the trust fund in any manner, including any undistributed or accrued income on it.

The Surviving Spouse shall have the power to require trustee to

make all or part of the principal of the Marital Trust productive or to convert promptly any unproductive part of the Marital Trust into productive property. This power shall be exercised by the Surviving Spouse in a written instrument delivered to trustee.

(2) The Residual Trust shall include the Deceased Spouse's interest in settlors' community property, including the Deceased Spouse's interest in the settlors' quasi-community property, and the Deceased Spouse's separate estate, if any, included in or added to the trust fund in any manner, including any undistributed or accrued income on it. The Residual Trust shall be further divided into two (2) separate trusts:

(a) Residual Trust "A" shall consist of the maximum pecuniary (i.e., dollar) amount of the Deceased Spouse's estate not qualifying for the federal estate tax marital deduction which will not cause any more than the minimum possible federal estate tax at the death of the Deceased Spouse, after taking into account (1) all deductions and credits allowable for federal estate tax purposes (including the state death tax credit provided the use of said credit does not require an increase in the amount of state death taxes paid) and (2) the net value of all other property included in the Deceased Spouse's gross estate which passes or has passed under this trust agreement or otherwise to any other person, trust or entity and which does not qualify for the federal estate tax marital or charitable deduction. For purpose of determining the amount of this transfer, final federal estate tax values shall control, and account shall not be taken of any credit that would cause the marital deduction to be disallowed in whole or in part, or of any item not deductible for estate tax purposes because claimed for income tax purposes; but all transfers under this trust agreement or otherwise for which the marital deduction would have been allowed but for disclaimer by the Surviving Spouse or non-election by the trustee shall be treated for this purpose as if that deduction had been allowed. This amount, as finally determined above, may be satisfied in cash or in kind, or partly in each, and shall include any policies of insurance the Deceased Spouse may have owned at his or her death on the life of the Surviving Spouse.

(b) Residual Trust "B" shall consist of the balance of the Residual Trust.

(i) Only assets eligible for the estate tax marital deduction shall be allocated to Residual Trust "B", and assets shall not be allocated to Residual Trust "B" for which a foreign death tax credit is allowable, unless other property of the Residual Trust is insufficient to fully fund Residual Trust "B". It is the settlors' intention to have said Residual Trust "B" qualify for the marital deduction under Section 2056(b)(7) of the Internal Revenue Code and the regulations pertaining to that section or any corresponding or substitute provisions applicable to the trust fund. In no event shall trustee take any action or have any power that will impair the marital deduction, and all provisions regarding said Residual Trust "B" shall be interpreted to conform to this primary objective; provided, however, notwithstanding the foregoing admonition, trustee may choose to elect to not so qualify all or a portion of said Residual Trust "B" for the marital deduction if, in trustee's absolute discretion, such choice would be in the

best interests of the beneficiaries of this trust. In
exercising this discretion conferred on trustee, trustee is
requested to take into consideration the fact that settlors'
intent is to benefit primarily the Surviving Spouse and the
interests of the remaindermen should be considered of
secondary importance.

(ii)  The Surviving Spouse shall have the power to
require trustee to make all or part of the principal of
Residual Trust "B" productive or to convert promptly any
unproductive part of Residual Trust "B" into productive
property. This power shall be exercised by the Surviving
Spouse in a written instrument delivered to trustee.

(iii)  In the event of non-election of a portion or of
all of Residual Trust "B", or in the event of a disclaimer by
the Surviving Spouse in Residual Trust "B", such non-
elected or disclaimed portion shall be added to Residual
Trust "A" and shall, for all purposes under this trust
agreement, be treated as a part thereof.

(iv)  At the death of the Surviving Spouse, any
accrued but unpaid income on Trust "B" shall be added to
the Marital Trust or, if the Marital Trust has been
previously revoked by the Surviving Spouse, to the
Surviving Spouse's estate.

(3)  If the Surviving Spouse required the use of the principal
residence used by settlors during their joint lifetimes, either temporarily
or permanently, such residence may be allocated in whole or in part to
the Marital Trust, or to the Residual Trusts, in which latter case the
Surviving Spouse shall have the use of such property (or portion thereof).
The allocation decision shall be made by trustee in its discretion after
considering all the facts and circumstances then existing. Otherwise,
settlors request, but do not direct that income items be allocated to the
full extent possible to the Marital Trust."

6.  That Paragraphs 6.F., 6.G., 6.H., 6.I. and 6.J. of Article VI of said
Agreement shall be, and the same are hereby canceled, annulled and rescinded and in
lieu thereof the following shall be, and the same are hereby substituted:

"6.F.  **Authorized Actions at Settlors' Deaths.**  At and after
husband's and/or wife's death, trustee is authorized and directed to pay
over unto such settlor's executor, administrator, or personal
representative so much of the trust fund (as hereinafter set forth in
Paragraphs 6.G. and 6.K., and as specifically limited in subparagraph (1)
at the death of the Surviving Spouse) as such executor, administrator, or
personal representative shall state in writing is necessary or desirable to
provide such settlor's estate with funds with which to pay settlor's
funeral expenses, debts, cost of administration of settlor's estate and all
of the taxes of settlor's estate, including transfer, estate and
inheritance taxes which may be imposed upon settlor's estate, upon the
trust fund and/or upon any property or interest in property, legal or
equitable, which is included in settlor's estate for any such taxes, and
any such statement of such settlor's executor, administrator, or personal
representative (regardless of the nature or extent of the assets held in
settlor's estate) shall be binding and conclusive upon trustee and upon all
persons and corporations having any interest in the trust fund.

(1) At the death of the Surviving Spouse, such authorized payments shall be limited to the Marital Trust and shall specifically exclude the payment of any generation-skipping transfer tax; provided, however, that any transfer, estate and inheritance taxes which may be imposed upon Residual Trust "B" shall be paid by trustee from said Residual Trust "B".

(2) If such executor, administrator, or personal representative fails to furnish any such directions or if no such executor, administrator, or personal representative is appointed, trustee may, in its discretion, pay in whole or in part all debts which are due and enforceable against settlor's estate, the expenses of the last illness, funeral, and administration and all death taxes and other governmental charges imposed under the laws of the United States or of any state or country by reason of such death.

(3) If trust assets are utilized to pay any or all of the death taxes imposed under the laws of the United States, and to the extent contained in the trust fund, trustee shall first utilize those obligations of the United States which are redeemable at par when applied for such purposes (commonly referred to as "Flower bonds"). Trustee is specifically authorized to utilize such obligations for payment of that portion of the estate tax attributable to assets which are not contained in the trust fund, but which are included in settlor's estate.

(4) Anything hereinbefore contained to the contrary notwithstanding, trustee shall not pay any of the charges, costs, taxes or other expenses as above specified in this Paragraph 6.F., next specified in Paragraph 6.G., as hereinbelow specified in Paragraph 6.K., or any other obligations of such settlor or such settlor's estate from funds received from qualified retirement plans that are excludable from such settlor's gross estate for federal estate tax purposes or from proceeds of insurance policies on such settlor's life. However, to the extent there are no other assets available for such purposes, or to the extent the trust includes insurance proceeds in excess of the amount of the insurance exemption available under California Law, trustee, in its discretion, may use insurance proceeds that are otherwise taxable in such settlor's estate for federal estate tax purposes for such payments.

6.G. **Deceased Spouse's Expenses.** On the death of the Deceased Spouse, and to the extent authorized by Paragraph 6.F. as hereinabove specified, trustee shall pay out of the trust fund such charges, costs, taxes or other expenses in the following manner:

(1) Any payment for estate or inheritance taxes shall be charged to and paid from Residual Trust "A" without apportionment or charge against any beneficiary of the trust fund.

(2) Payments for last-illness, funeral and other administration costs shall be charged to Residual Trust "A", provided, however, that administration costs allocable to the Surviving Spouse's share of the community property administered in the Deceased Spouses's estate shall be charged to the Marital Trust.

(3) Payment of any decedent's debts shall be charged against Residual Trust "A", provided, however, that to the extent that the Marital Trust includes any interest in the survivor's share of the

community property, debts allocable against community property shall be charged against the Marital Trust and Residual Trust "A" in accordance with California Law in effect at the date of decedent's death, but the charges against the Marital. Trust shall not exceed the value of the survivor's share of the community property allocable to the Marital Trust.

### 6.H.  Payments of Income.

(a)  Trustee shall pay to or apply for the benefit of the Surviving Spouse the net income of the Marital Trust and Residual Trust "B" in quarter-annual or more frequent installments.

(b)  Trustee, in its sole and absolute discretion, shall pay to or for the benefit of the Surviving Spouse and/or the Deceased Spouse's issue, in equal or unequal distributions, such part of the net income of Residual Trust "A" on a yearly or such other basis as deemed advisable for the comfort and maintenance of such beneficiaries.  Such power is to be exercised by the trustee in its sole discretion but with full knowledge that one purpose of said distribution would be to avoid the tax provisions concerning income accumulation by trusts and the resulting tax recomputations required by the trust beneficiaries upon final distribution of any accumulated income.  Any income not so distributed shall be added to principal.

### 6.I.  Payments of Principal to Surviving Spouse.

(1)  If trustee considers the income of said trusts to be insufficient, trustee shall also pay to or apply for the benefit of the Surviving Spouse such sums out of the principal of the Marital Trust as trustee, in trustee's discretion, shall consider necessary for the Surviving Spouse's proper health, support, comfort, enjoyment, and welfare.  In addition, trustee shall pay the Surviving Spouse as much of the principal of the Marital Trust as the Surviving Spouse shall request in writing.

Trustee shall exercise in a liberal manner the power to invade principal of the Marital Trust, and the rights of the remaindermen in the trust shall be considered of secondary importance.

(2)  If trustee (if co-trustees are then acting and the Surviving Spouse is a co-trustee, this power shall be limited to the co-trustee or co-trustees other than the Surviving Spouse) considers the income of the Marital Trust and both Residual Trusts and the principal of the Marital Trust to be insufficient, trustee shall also pay to or apply for the benefit of the Surviving Spouse such sums out of the principal of either Residual Trust as trustee, in trustee's discretion, shall consider necessary for the Surviving Spouse's proper health, support and maintenance.

Payments out of principal to the Surviving Spouse shall be made first out of the Marital Trust until it is exhausted, then out of Residual Trust "B" until it is exhausted and thereafter out of Residual Trust "A".

### 6.J.  Special Withdrawal Rights of Surviving Spouse.  In
addition to any other payments that husband or wife, as Surviving Spouse, may receive, trustee shall pay to him or her during his or her lifetime from the principal of Residual Trust "B" until it is exhausted and thereafter out of Residual Trust "A" (specifically excluding,

Exhibit ⊙ — Page 7 of 7

however, the cash or surrender value of any insurance on the life of the Surviving Spouse), such amounts as such Surviving Spouse may from time to time request in writing, not exceeding in any calendar year the greater of the following amounts:  Five Thousand Dollars ($5,000.00) or five percent (5%) of the value of the principal of said Residual Trust "B" (or five percent (5%) of the value of the principal of said Residual Trust "A" if Residual Trust "B" has been exhausted), determined as of the end of the calendar year.  This right of withdrawal is noncumulative, so that if the Surviving Spouse does not withdraw, during any calendar year, the full amount to which he or she is entitled under this provision, the right to withdraw the amount not withdrawn shall lapse at the end of that calendar year."

7.    Except as the same may be amended hereby, the provisions of said trust agreement dated August 16, 1979, shall be, and the same are hereby ratified and confirmed.

IN WITNESS WHEREOF, this Amendment is executed on this 5th day of January, 1982, at Monterey, California.

ROBERT C. DILLE,
Settlor-Trustee

VIRGINIA N. DILLE,
Settlor-Trustee


STATE OF CALIFORNIA    )
                        ) ss.
COUNTY OF MONTEREY      )

On this 5th day of January, 1982, before me, the undersigned, personally appeared ROBERT C. DILLE and VIRGINIA N. DILLE, known to me to be the persons whose names are subscribed to the within instrument and also known to me to be the persons whose names are subscribed to that certain unrecorded trust agreement dated August 16, 1979, and known as THE DILLE FAMILY TRUST, and acknowledged to me that they executed the same.

WITNESS my hand and official seal.

NOTARY PUBLIC



OFFICIAL SEAL
CHERYLL L SAYERS
NOTARY PUBLIC - CALIFORNIA
MONTEREY COUNTY
My comm. expires APR 5, 1985

# EXHIBIT C

## INSTRUMENT TRANSFERRING
## SITUS OF TRUST

This instrument is being entered into in accordance with that certain Trust Agreement executed by Robert C. Dille and Virginia N. Dille under date of August 16, 1979, as amended on January 5, 1982 (the "Trust Agreement").

Section 2.F. of the Trust Agreement recites that it creates a California trust, but permits a majority of the beneficiaries to transfer the situs of the trust to a more convenient location.

The Trustees and the beneficiaries of the trust have unanimously determined that it would be convenient to transfer the situs of the trust to Illinois.

This instrument is intended to reflect that determination and reflect the movement of the trust situs to Illinois.  This action is not intended to change the provision of Section 2.F. that all of the terms and provisions of the Trust Agreement are to be interpreted according to the laws of the State of California.

Executed as of February 1, 1989.

_Virginia Nichols Dille_
Virginia Nichols Dille

_Lorraine Dille Williams_
Lorraine Dille Williams

_Robert Nichols Flint Dille_
Robert Nichols Flint Dille

Being all of the beneficiaries
of the above-referenced Trust

Accepted and Agreed to:

_Virginia Nichols Dille, Trustee_
Virginia Nichols Dille,
as Trustee

_Arthur Mead Martin, as trustee_
Arthur Mead Martin,
as Trustee

Being all of the trustees
of the trusts created by
the Trust Agreement

# EXHIBIT D

1  David Aronoff (SBN 125694)
      daronoff@foxrothschild.com
2  Ilyssa M. Adler (SBN 285418)
      iadler@foxrothschild.com
3  **FOX ROTHSCHILD LLP**
   1800 Century Park East, Suite 300
4  Los Angeles, CA 90067-1506
   Telephone: 310.598.4150 | Facsimile: 310.556.9828

5
   Attorneys for Defendant
6  LOUISE A. GEER, as Trustee of the DILLE
   FAMILY TRUST

7

8                 UNITED STATES DISTRICT COURT

9                 CENTRAL DISTRICT OF CALIFORNIA

10

11 TEAM ANGRY FILMWORKS, INC.,          Case No.: 2:15-cv-05880-R-JPRx
   a California corporation,
12                                       **NOTICE OF MOTION AND**
                Plaintiff,               **MOTION TO DISMISS**
13                                       **PLAINTIFF'S COMPLAINT**
        vs.                              **PURSUANT TO FED. R. CIV. P.**
14                                       **RULES 12(b)(2) AND 12(b)(6) OF**
   LOUISE A. GEER, as Trustee of the    **DEFENDANT LOUISE A. GEER,**
15 DILLE FAMILY TRUST, and Does 1-      **AS TRUSTEE OF THE DILLE**
   10, inclusive,                        **FAMILY TRUST**
16
                Defendants.              Hearing
17                                       Date: October 19, 2015
                                         Time: 10:00 a.m.
18                                       Ctrm: 8 – 2nd Floor

19                                       Hon. Manuel L. Real

20

21

22

23

24

25

26

27

28

MOTION TO DISMISS                                    CASE NO. 2:15-CV-05880-R-JPRx

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on October 19, 2015 at 10:00 a.m. in Courtroom 8 – 2nd Floor of the above-captioned Court, located at 312 N. Spring Street, Los Angeles, California, 90012-4701, defendant Louise A. Geer, as Trustee of the Dille Family Trust ("Defendant") will and hereby does move this Court for an Order dismissing this case in its entirety pursuant to Fed. R. of Civ. P. Rule 12(b)(2) and Fed. R. of Civ. P. Rule 12(b)(6). This Motion seeks dismissal of the Complaint, and the single cause of action for declaratory relief contained therein, (1) under Rule 12(b)(2), because this Court lacks personal jurisdiction over Defendant; and (2) under Rule 12(b)(6), because the Complaint fails to allege a viable claim for relief against Defendant.

This Motion is being made following the required Local Rule 7-3 conference of counsel, which took place on Thursday, September 10, 2015. Counsel for Defendant attempted to hold the Local Rule 7-3 conference on Tuesday, September 8, 2015, but counsel for Plaintiffs refused to participate until Thursday, September 10, 2015. As a result, the Local Rule 7-3 conference was held 5, rather than 7, days prior to the filing of this Motion through no fault of counsel for Defendant. *See* concurrently-filed Declaration of David Aronoff.

This Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the concurrently filed Declarations of Louise A. Geer and David Aronoff, the [Proposed] Order submitted herewith, all of the pleadings, files, and records in this proceeding, and any argument or evidence that may be presented to or considered by the Court prior to its ruling.

Dated: September 15, 2015                    FOX ROTHSCHILD LLP

By _____
David Aronoff
Ilyssa M. Adler
Attorneys for Defendant LOUISE A. GEER, as Trustee of the DILLE FAMILY TRUST

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ....................................................................... 1

II.   FACTUAL BACKGROUND ........................................................ 2

    A.    Allegations of the Complaint ............................................. 2

    B.    Jurisdictional Facts ........................................................... 3

III.  DEFENDANT IS NOT SUBJECT TO PERSONAL JURISDICTION ......... 4

    A.    No General Jurisdiction Exists Over the Trustee ................................ 5

    B.    No Specific Jurisdiction Exists Over the Trustee. ................................ 6

        1.    The Trustee has not Purposefully Availed Herself of the Benefits and Protections of California Law. ........................... 7

        2.    Plaintiff's Claim for Declaratory Relief Does Not Arise Out of Activity by the Trustee within California. ..................... 8

        3.    The Exercise of Personal Jurisdiction Over the Trustee Would be Inconsistent with Fair Play and Substantial Justice ... 9

IV.   THE COMPLAINT FAILS TO STATE A CLAIM FOR RELIEF ............. 10

V.    CONCLUSION ...................................................................... 12

MOTION TO DISMISS

CASE NO. 2:15-CV-05880-R-JPRx

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*BP Chems. Ltd. v. Union Carbide Corp.*,
    4 F.3d 975 (Fed. Cir. 1993) ............................................................... 11

*Burger King v. Rudzewicz*,
    471 U.S. 462 (1985) ............................................................................ 5

*Campbell Pet Co. v. Miale*,
    542 F.3d 879 (Fed. Cir. 2008) ........................................................ 4, 8

*In re Carthage Trust*,
    2013 WL 589208 (C.D. Cal. Feb. 14, 2013) ................................... 6, 7

*Cat Tech, LLC v. Tubemaster, Inc.*,
    528 F.3d 871 (Fed. Cir. 2008) ..................................................... 10, 11

*CE Distrib., LLC v. New Sensor Corp.*,
    380 F.3d 1107 (9th Cir. 2004) ............................................................ 9

*Douglas Furn. Co. of Calif., Inc. v. Wood Dimensions, Inc.*,
    963 F. Supp. 899 (C.D. Cal. 1997) ..................................................... 8

*Garcia v. Wachovia Mortg. Corp.*,
    676 F. Supp. 2d 895 (C.D. Cal. 2009) .......................................... 2, 12

*Geisha, LLC v. Tuccillo*,
    525 F. Supp. 2d 1002 (N.D. Ill. 2007) .............................................. 11

*The Goodyear Tire & Rubber, Co. v. Releasomers, Inc.*,
    824 F.2d 953 (Fed. Cir. 1987) .......................................................... 11

*Hanson v. Denckla*,
    357 U.S. 235 (1958) ........................................................................ 5, 8

*Int'l Shoe Co. v. Washington*,
    326 U.S. 310 (1945) ........................................................................ 5, 6

*K-Lath v. Davis Wire Corp.*,
    15 F. Supp. 2d 952 (C.D. Cal. 1998) ................................................ 10

MOTION TO DISMISS

CASE NO. 2:15-CV-05880-R-JPRx

1
2
*Kumarelas v. Kumarelas*,
  16 F. Supp. 2d 1249 (D. Nev. 1998) ............................................................ 4

3
4
*MedImmune, Inc. v. Genetech, Inc.*,
  549 U.S. 118 (2007)............................................................................. 10

5
6
*Murphy v. American General Life Ins. Company*,
  2015 WL 4379834 (C.D. Cal. July 15, 2015) ....................................... 5, 6

7
*Panavision Int'l L.P. v. Toeppen*,
  141 F.3d 1316 (9th Cir. 1998) .................................................................. 5

8
9
*Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corp.*,
  80 F. Supp. 2d 815 (N.D. Ill. 1999)........................................................ 11

10
11
*Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc.*,
  148 F.3d 1355 (Fed. Cir. 1998) ................................................................ 6

12
13
*Rio Properties, Inc. v. Rio Int'l Interlink*,
  284 F.3d 1007 (9th Cir. 2002) .................................................................. 4

14
15
*Roth v. Garcia Marquez*,
  942 F.2d 617 (9th Cir. 1991) .................................................................... 5

16
17
*Schwarzenegger v. Fred Martin Motor Co.*,
  374 F.3d 797 (9th Cir. 2004) ............................................................... 6, 7

18
*Sierra Applied Scis., Inc. v. Advanced Energy Indus., Inc.*,
  363 F.3d 1361 (Fed. Cir. 2004) .............................................................. 11

19
20
*Sobini Films v. Tri-Star Pictures, Inc.*,
  2001 WL 1824039 (C.D. Cal. Nov. 21, 2001) .................................... 11, 12

21
22
*Societe de Conditionment en Aluminum v. Hunter Engineering Co.*,
  655 F.2d 938 (9th Cir. 1981) .................................................................. 10

23
24
*Walden v. Fiore*,
  __ U.S. __, 134 S. Ct. 1115, 188 L. Ed. 2d 12 (2014) ............................ 8

25
26
*World-Wide Volkswagen Corp. v. Woodson*,
  444 U.S. 286 (1980)................................................................................. 7

27
28

**California Cases**

*Portico Management Group, LLC v. Harrison,*
    202 Cal. App. 4th 464 (2011) ................................................................................ 5

*Presta v. Tepper,*
    179 Cal. App. 4th 909 (2009) ................................................................................ 5

**Federal Statutes**

Declaratory Judgment Act, 28 U.S.C.
    § 2201 ................................................................................................................ 10

Fed. R. Civ. P. Rule 12(b)(2) .......................................................................................... 1

Fed. R. Civ. P. Rule 12(b)(6) .......................................................................................... 1

MOTION TO DISMISS                                                    CASE NO. 2:15-CV-05880-R-JPRx

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

This action concerning the rights to the popular fictional character "Buck Rogers" constitutes an improper effort by plaintiff Team Angry Filmworks, Inc. ("Plaintiff") to create settlement pressure by seeking declaratory relief in an improper and inconvenient forum under circumstances giving rise to no justiciable case or controversy. The Court should dismiss the Complaint with prejudice in its entirety.

First, Plaintiff's Complaint should be dismissed pursuant to Fed. R. Civ. P. Rule 12(b)(2) because this Court does not have personal jurisdiction over defendant Louise A. Geer, as Trustee of the Dille Family Trust ("the Trustee"). According to Plaintiff, personal jurisdiction exists because the Dille Family Trust ("the Trust") itself was organized in and under the laws of California. However, the situs of the Trust was later transferred to Illinois, and in any event the Trust is not a party to this case – and under California law it even lacks the capacity to sue or be sued. The actual defendant herein, the Trustee, is a resident of Pennsylvania, who does not transact business in California, and does not have substantial (if any) contacts here. Moreover, the single claim for declaratory relief alleged in this action did not arise out of the Trustee's conduct in California. For these reasons alone, the Complaint must be dismissed under Rule 12(b)(2) because there exists no personal jurisdiction over the Trustee.

Second, the declaratory relief claim asserted by Plaintiff fails to allege a justiciable case or controversy, and in fact none exists, because the Complaint fails to allege meaningful preparations by Plaintiff to conduct potentially infringing activity pertaining to "Buck Rogers." Additionally, the dispute alleged by Plaintiff primarily concerns the novella *Armageddon 2419 A.D.* (Cmpt. Ex. A (Dkt. No. 1)), a work in which the character "Buck Rogers" never even appears. As this Court may not adjudicate hypothetical disputes, or render advisory opinions, the claim fails as a matter of law. For this independent reason, the Complaint must be dismissed for failure to state a claim pursuant to Rule 12(b)(6) with prejudice.

## II.   FACTUAL BACKGROUND

### A.   Allegations of the Complaint

Plaintiff alleges in the Complaint that the Trustee has "interfered with the lawful motion picture development of literary material that lies in the public domain." Cmpt., ¶ 2 (Dkt. No. 1).  Plaintiff avers that the Trustee, in managing the assets of the Trust, is the rights holder in and to the "Buck Rogers" character, and actively engages in licensing and managing licenses of "Buck Rogers."  *Id.*, ¶ 4.

Plaintiff further alleges that "Buck Rogers" was created by the author Philip Francis Nowlan and first appeared in the novella *Armaggedon 2419 A.D.* Cmpt., ¶ 7.[1] Plaintiff alleges that *Armaggedon 2419 A.D.* entered the copyright public domain in the U.S. in 1956 and world-wide in 2010.  *Id.*, ¶ 8.  Plaintiff goes on to allege that it purportedly is "currently developing a motion picture project based upon *Armaggedon 2419 A.D.* including [Buck Rogers]" and that in connection therewith, "Buck Rogers" will "necessarily" be portrayed.  *Id.*, ¶ 9.  Plaintiff's purported motion picture project, the Complaint alleges, was announced at Comic-Con in 2015.  *Id.*, ¶ 10.

Plaintiff claims that "in response to such public announcement" the Trustee "threatened in writing to proceed with [contemplated] legal action" since the Trust has not given permission or license to Plaintiff to use "Buck Rogers."  Cmpt., ¶ 11. Plaintiff goes on to claim that this assertion is "wrongful and improper" and seeks a declaration from this Court determining the parties' rights.  *Id.*, ¶¶ 14-19.

---

[1] In reality, "Buck Rogers" does not appear in *Armaggedon 2419 A.D*, which is attached to the Complaint as Ex. A.  The work includes "***Anthony*** Rogers," a character who Plaintiff alleges is "also known as" the character "Buck Rogers," but this conclusory assertion is not based on any alleged facts and is contradicted by the absence of "Buck Rogers" from *Armaggedon 2419 A.D* – which, as an attached exhibit to the Complaint, supersedes Plaintiff's contrary allegations.  *See, e.g., Garcia v. Wachovia Mortg. Corp.*, 676 F. Supp. 2d 895, 906 n.9 (C.D. Cal. 2009) (holding that the court may disregard allegations in the complaint if contradicted by facts established in attached exhibits).  As discussed in Section IV, *infra*, the absence of "Buck Rogers" from *Armaggedon 2419 A.D* further shows that there exists no justiciable case or controversy, further warranting dismissal of the case.

2

Case 2:15-cv-01381-JFC    Document 15    Filed 09/15/15    Page 9 of 18

**B.**    **Jurisdictional Facts**

The Trust was formed and organized approximately 45 years ago in the State of California under California law. *See* Declaration of Louise A. Geer ("Geer Decl."), ¶ 3. However, the situs of the Trust was transferred to Illinois in 1989. *Id.* and Ex. A. The Trustee was appointed to administer and oversee the Trust in 2011, which she has done from Pennsylvania. *Id.* Under California law, trusts lack the capacity to sue or be sued, so personal jurisdiction here hinges on the contacts with California of the Trustee (who is the defendant in this action), not the contacts with California of the Trust itself (which is not a party to this action). *See* Section III, *infra*.

The Trustee's administration of the Trust occurs entirely in Pennsylvania. Geer Decl., ¶ 4. Defendant herself is a resident of New Castle, Pennsylvania. *Id.*, ¶ 4. The Trust is the owner and rights holder of all rights, including intellectual property rights, in and to the character "Buck Rogers." *Id.*, ¶ 4. As such, the Trustee licenses, oversees, administers and manages, amongst other things, the commercial and creative exploitation of "Buck Rogers" out of Pennsylvania. *Id.*, ¶ 4.

The Trustee does not reside in or conduct business in California, and has only visited California about three times in the last decade – and each of these trips lasted no more than four days. Geer Decl., ¶ 5. The Trustee neither owns nor holds real or personal property in California, and the Trust does not own or hold any property in California, either. *Id.*, ¶¶ 5-6. The Trustee does not maintain an office or other facility or place of business in California, nor does the Trust. *Id.* The Trustee does not have any telephone numbers, mailing addresses, bank accounts, or other tangible personal or real property in California, nor does the Trust. *Id.* None of the Trustee's or the Trust's records, files, or documents are located in California. *Id.*

Amazingly, Plaintiff's Complaint alleges as the sole basis for jurisdiction in California a demand letter dated July 28, 2015 written *in Pennsylvania* by the Trustee (Cmpt., ¶ 11), *but the letter was not written to Plaintiff and it did not threaten an infringement action against it*. Geer Decl., ¶ 7 and Ex. C. Rather, the letter was

3

1  written to Richard Thompson, counsel for one of the beneficiaries of the Trust, Flint

2  Dille, and it threatened action against Mr. Dille because he was undertaking acts to the

3  detriment of the Trust and his co-beneficiary. *Id.* The letter was not addressed to or

4  intended for Plaintiff, and demanded no relief against Plaintiff. *Id.* In any event,

5  sending a letter to someone in another state does not suffice to confer jurisdiction.

6  *See, e.g., Campbell Pet Co. v. Miale*, 542 F.3d 879, 885 (Fed. Cir. 2008).

7      The litigation of this matter in California would present a substantial hardship

8  for the Trustee. Geer Decl., ¶ 8. The Trustee's files, records, and accounts, both for

9  herself individually and for the Trust, are all located in Pennsylvania, and she has no

10  independent reasons for spending time in California. *Id.* In addition to serving as

11  Trustee of the Trust, the Trustee is a lawyer who runs a legal practice in Pennsylvania

12  with her husband, who is also a lawyer. *Id.* Thus, travel to California in connection

13  with the case would be disruptive to the Trustee personally and professionally. *Id.*

14      Additionally, none of the activities of the Trustee giving rise to this lawsuit took

15  place in the state of California. Geer Decl., ¶ 9. Likewise, the Trustee's documents

16  and evidence pertaining to this matter are all in Pennsylvania. *Id.*

17      In sum, the Complaint is wholly lacking in allegations that would give rise to

18  the imposition of personal jurisdiction over the Trustee, and must be dismissed.

19  Furthermore, even were this Court to find personal jurisdiction over Defendant (which

20  there is not), the Complaint fails to state a claim as a matter of law, as no case and

21  controversy has been alleged, discussed *infra*. For this separate reason, the Complaint

22  must be dismissed with prejudice.

23  **III.   DEFENDANT IS NOT SUBJECT TO PERSONAL JURISDICTION**

24      Plaintiff bears the burden of establishing personal jurisdiction over the Trustee.

25  *See Rio Properties, Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1019 (9th Cir. 2002); *see*

26  *also Kumarelas v. Kumarelas*, 16 F. Supp. 2d 1249, 1253 (D. Nev. 1998) ("although

27  the defendant is the moving party on a motion to dismiss, plaintiff has the burden of

28  establishing jurisdiction exists because plaintiff is the party invoking the court's

4

1  jurisdiction") (citation omitted).  "The Due Process Clause protects an individual's

2  liberty interest in not being subject to binding judgments of a forum with which he has

3  established no meaningful 'contacts, ties or relations.'" *Burger King v. Rudzewicz*,

4  471 U.S. 462, 471-72 (1985), citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319

5  (1945).  As California's long-arm statute reaches as far as the due process clause, all

6  [the Court] need analyze is whether the exercise of jurisdiction would comply with

7  due process.  *Roth v. Garcia Marquez*, 942 F.2d 617, 620 (9th Cir. 1991).

8           Under California law, a trust is not a legal entity that can sue or be sued; rather,

9  a trust is merely a fiduciary relationship that is not separate from its trustees.  *See, e.g.,*

10  *Portico Management Group, LLC v. Harrison*, 202 Cal. App. 4th 464, 473 (2011)

11  ("[i]n contrast to a corporation, which the law often deems a person, *a trust is not a*

12  *person but rather 'a fiduciary relationship with respect to property.'*") (emphasis

13  added; internal quotes and citations omitted); *Presta v. Tepper*, 179 Cal. App. 4th 909,

14  914 (2009) ("an ordinary express trust *is not an entity separate from its trustees*.")

15  (emphasis added; internal quotes and citations omitted).  Thus, it is only the trustee

16  who is the real party in interest with standing to sue and defend on the trust's behalf.

17  *Id.*  Accordingly, courts look at the "minimum contacts" of the defendant-trustee, not

18  the trust itself, to determine whether there is personal jurisdiction in the forum state.

19  *See Hanson v. Denckla*, 357 U.S. 235, 250-54 (1958) ("the trustee is an indispensable

20  party *over whom the court must acquire jurisdiction* before it is empowered to enter

21  judgment in a proceeding affecting the validity of a trust") (emphasis added).

22           Courts have recognized two types of personal jurisdiction, "general" and

23  "specific." *Panavision Int'l L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998).

24  Here, Plaintiff cannot establish either general or specific jurisdiction over the Trustee,

25  therefore this Court must dismiss this action in its entirety.

26       **A.    No General Jurisdiction Exists Over the Trustee.**

27           "There is general personal jurisdiction over a party who is physically present in

28  the state whether or not such presence is related to the claim asserted." *Murphy v.*

5

1   *American General Life Ins. Company*, 2015 WL 4379834, *7 (C.D. Cal. July 15,

2   2015), citing *Burnham v. Superior Court*, 495 U.S. 604, 617-619 (1990). Put another

3   way, "[a] court has general jurisdiction ***when the defendant engages in 'continuous***

4   ***and systematic general business contacts … that approximate physical presence in***

5   ***the forum state.***'" *In re Carthage Trust*, 2013 WL 589208, *6 (C.D. Cal. Feb. 14,

6   2013) (*citing Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir.

7   2004)) (emphasis added). General jurisdiction "is an ***exacting standard***, as it should

8   be, because a finding of general jurisdiction permits a defendant to be haled into court

9   in the forum state to answer for any of its activities anywhere in the world."

10   *Schwarzenegger*, 374 F.3d at 801 (emphasis added).

11       Here, it is clear that the Trustee entirely lacks the "continuous and systematic"

12   contacts that "appropriate physical presence" in California sufficient for general

13   jurisdiction to exist. The Trustee is a resident of Pennsylvania. Geer Decl., ¶¶ 4-6.

14   Moreover, she handles the administration of the Trust in Pennsylvania, where the

15   Trust maintains all of its files and records. *Id.* The Trustee has no substantial

16   business or personal assets in California, and neither does the Trust. *Id.* Neither the

17   Trustee nor the Trust own property in California, maintain bank accounts in this state,

18   or are otherwise present here.[2] *Id.* As such, general jurisdiction does not exist.

19   **B.**     **No Specific Jurisdiction Exists Over the Trustee.**

20       To exercise "specific" jurisdiction, the defendant must have "certain minimum

21   contacts with [the forum state] such that the maintenance of the suit does not offend

22   traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316

23

24     [2] Plaintiff may argue that the Trust has licensed "Buck Rogers" to third parties that are

    exploiting the character in California, thus warranting personal jurisdiction. Plaintiff

25   would be incorrect. The fact that there may exist unrelated licensing deals with third

    party licensees does not suffice because this case does not arise out of those licenses,

26   and courts have made clear that "the fact that a nonresident has licensed persons doing

    business in the forum state does not itself subject the licensor to personal jurisdiction."

27   *Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc.*, 148 F.3d 1355, 1361 (Fed. Cir.

    1998) (finding that the receipt of royalty income from licensees for sales in forum is

28   insufficient to establish minimum contacts by licensor).

1    (internal quotes omitted). These minimum contacts make personal jurisdiction

2    foreseeable when the non-resident defendant's connection to, and conduct within, the

3    forum state is such that "he should reasonably anticipate being haled into court there."

4    *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

5        The Ninth Circuit has expounded a three-part test for establishing specific

6    personal jurisdiction: (1) the defendant must ***purposefully avail*** itself of the benefits

7    and protections of the forum state; (2) the claim must ***arise out of***, or be related to, the

8    ***defendant's forum-based activity***; and (3) exercise of jurisdiction must comport with

9    ***fair play and substantial justice***. *See In re Carthage Trust*, 2013 WL 589208 at *6,

10   (*citing Schwarzenegger*, 374 F.3d at 802). Plaintiff must satisfy each of the first two

11   prongs in order to shift the burden to the defendant to show that the exercise of

12   jurisdiction would not be reasonable. Here, Plaintiff cannot satisfy either of the first

13   two prongs and, even if it could, the third prong weighs against personnal jurisdiction.

14        1.    **The Trustee has not Purposefully Availed Herself of the**

15            **Benefits and Protections of California Law.**

16        There is no question that the Trustee has not purposefully availed herself of the

17   benefits and protections of California. The Trustee is a resident of Pennsylvania.

18   Geer Decl., ¶¶ 4-6. Moreover, she oversees the administration of the Trust's assets in

19   Pennsylvania, where the Trust maintains all of its files and records. *Id.* The Trustee

20   has no substantial business or personal assets in California, and neither does the Trust.

21   *Id.* Neither the Trustee nor the Trust own property in California, maintain bank

22   accounts in this state, or are otherwise present here. *Id.* The situs of the Trust is in

23   Illinois, not California. *Id.*

24        Plaintiff may argue that jurisdiction is proper because a beneficiary of the Trust

25   is located in California, but this fails to establish that the Trustee purposefully availed

26   herself of this state's benefits and protections. Jurisdiction must arise out of contacts

27   that the ***defendant*** creates within the forum state, not the contacts of third parties who

28   reside there. Indeed, in determining whether jurisdiction exists over a trust, courts

7

1   look at the acts of the trustee, not the beneficiary. *See Hanson*, 357 U.S. at 254.

2       Moreover, "[t]he mere act of sending letters threatening legal action, without

3   more, [does] not constitute 'purposeful availment.'" *Douglas Furn. Co. of Calif., Inc.*

4   *v. Wood Dimensions, Inc.*, 963 F. Supp. 899, 901-02 (C.D. Cal. 1997). In *Douglas*,

5   the court found no personal jurisdiction supporting a declaratory relief action against a

6   Arizona furniture manufacturer that sent cease and desist letters to a rival California

7   company demanding that it stop copying the Arizona manufacturer's designs. *Id.* The

8   same is true of the Trustee here, who has no relevant contact with California aside

9   from the demand letter she sent to Richard Thompson, *not* Plaintiff (*see* Geer Decl., ¶

10  7)), and therefore cannot be said to have purposefully availed itself of the benefits and

11  protections of California law. *See Campbell Pet Co.*, 542 F.3d at 885 (holding that a

12  patentee's act of sending letters to another state claiming infringement and threatening

13  litigation insufficient to confer personal jurisdiction in that state).

14          **2.    Plaintiff's Claim for Declaratory Relief Does Not Arise Out of**

15              **Activity by the Trustee within California.**

16      The Complaint is devoid of any allegations that the Trustee did anything within

17  California. In fact, the only allegations pertaining to the Trustee's "activities" giving

18  rise to the Complaint relate to the Trustee's July 28, 2015 letter to Richard Thompson.

19  Cmpt., ¶ 11. But, this activity occurred in Pennsylvania – not California – where the

20  Trustee resides and wrote her letter, *which was not even written to or intended for*

21  *Plaintiff*. Geer Decl., ¶ 6. As such, Plaintiff cannot establish activity by the Trustee

22  aimed at or affecting Plaintiff within the forum state.

23      In any event, the act of writing a letter does not suffice to impose jurisdiction on

24  a nonresident defendant. *See, e.g., Douglas*, 963 F. Supp. at 901-902. Similarly, the

25  fact that a defendant knows that a plaintiff is a forum resident (and will allegedly

26  suffer injury there) is insufficient to establish jurisdiction based on the activity of a

27  nonresident defendant. *See Walden v. Fiore*, __ U.S. __, 134 S. Ct. 1115, 1122, 188

28  L. Ed. 2d 12 (2014).

8

3. **The Exercise of Personal Jurisdiction Over the Trustee Would be Inconsistent with Fair Play and Substantial Justice.**

The Court should dismiss Plaintiff's action against the Trustee even if it satisfied the first two prongs of the personal jurisdiction test (it did not). It would be absolutely unjust to force Defendant to litigate the action in this Court.

The Ninth Circuit has identified seven factors in deciding whether the exercise of jurisdiction comports with notions of fair play and substantial justice: "(1) the extent of purposeful interjection; (2) the burden on the defendant to defend in the chosen forum; (3) the extent of the conflict with the sovereignty of defendant's state; (4) the forum state's interest in the dispute; (5) the most efficient forum for judicial resolution of the dispute; (6) the importance of the chosen forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum." *CE Distrib., LLC v. New Sensor Corp.*, 380 F.3d 1107, 1112 (9th Cir. 2004).

Here, each of these factors weighs *against* jurisdiction over the Trustee. First, as is made clear above, the Trustee has not interjected herself into the forum state. In fact, quite the opposite is true. *See* Geer Decl., ¶¶ 4-8. As the Trustee is located in Pennsylvania, and maintains no offices, bank accounts, property, or other holdings in California, this first factor weighs against the imposition of jurisdiction.

Second, it would be an unfairly heavy burden for the Trustee to defend herself in California. The Trustee and all of the Trust's property, files, records and other materials are located in Pennsylvania. *See* Geer Decl., ¶¶ 4-8. Therefore, this second factor weighs against the imposition of jurisdiction as well.

Third, the sovereignty of Pennsylvania will be negatively affected if the Trustee is hauled into court in California for conduct occurring entirely in Pennsylvania. In contrast, California cannot have a strong interest in this dispute – which involves a fictional character that is owned in and licensed from Pennsylvania and a Trust that has its situs in Illinois. *See* Geer Decl., ¶¶ 4-8. Thus, the third and fourth factors thus also weigh in the Trustee's favor.

1    Fifth, it is clear that California is not the most efficient forum for judicial

2  resolution of this dispute, as the Trustee and all witnesses, evidence, and documents

3  related to the Trust are located in Pennsylvania. *See* Geer Decl., ¶¶ 4-8. So too, then,

4  does this factor weigh in Defendant's favor.

5    Sixth, there is no particular importance of California to Plaintiff's interest in

6  convenient and effective relief. *See* Geer Decl., ¶¶ 4-8. The same convenience and

7  effectiveness may be had in federal court in Pennsylvania, where it is convenient and

8  appropriate for the Trustee to defend itself.

9    Finally, an alternative forum – Pennsylvania – exists and thus makes clear that

10  it would be unjust for Defendant to be forced to litigate this action in California. For

11  all of these reasons, and to the extent this Court even reaches this third element of the

12  specific jurisdiction analysis, personal jurisdiction does not exist in California and this

13  Court must dismiss the Complaint accordingly.

14  **IV.    THE COMPLAINT FAILS TO STATE A CLAIM FOR RELIEF**

15    The Declaratory Judgment Act, 28 U.S.C. §2201, provides that only "[i]n a case

16  of actual controversy" a federal court "may declare the rights and other legal relations

17  of any interested party…" *K-Lath v. Davis Wire Corp.*, 15 F. Supp. 2d 952, 957 (C.D.

18  Cal. 1998). This "actual controversy" requirement is identical to the jurisdictional

19  "case or controversy requirement of Article III of the United States Constitution."

20  *Societe de Conditionnment en Aluminum v. Hunter Engineering Co.*, 655 F.2d 938,

21  942 (9th Cir. 1981) (citation omitted); *see also K-Lath*, 15 F. Supp. 2d at 957-958.

22    To satisfy the essential requirement of a case or controversy, "the facts alleged,

23  under all circumstances, [must] show that there is a substantial controversy, between

24  parties having adverse legal interests, of sufficient immediacy and reality to warrant

25  the issuance of a declaratory judgment." *MedImmune, Inc. v. Genetech, Inc.*, 549 U.S.

26  118, 126-127 (2007). Among other factors, courts look to whether there has been

27  "meaningful preparation" by the declaratory plaintiff to "conduct potentially

28  infringing activity." *Cat Tech, LLC v. Tubemaster, Inc.*, 528 F.3d 871, 879 (Fed. Cir.

MOTION TO DISMISS                                              CASE NO. 2:15-CV-05880-R-JPRx

1   2008).  While a party need not engage in actual infringement to request a declaration

2   of non-infringement, the party must show a "present activity which could constitute

3   infringement or concrete steps taken with the intent to conduct such activity." *BP*

4   *Chems. Ltd. v. Union Carbide Corp.*, 4 F.3d 975, 978 (Fed. Cir. 1993); *The Goodyear*

5   *Tire & Rubber, Co. v. Releasomers, Inc.*, 824 F.2d 953, 955-56 (Fed. Cir. 1987).  The

6   more elusive the potentially infringing activity, the more likely that the case lacks the

7   requisite immediacy.  *Sierra Applied Scis., Inc. v. Advanced Energy Indus., Inc.*, 363

8   F.3d 1361, 1379 (Fed. Cir. 2004).

9        Mere "preliminary steps … lacking much in the way of specific details that

10  might indicate concrete action" are insufficient to meet this standard.  *Geisha, LLC v.*

11  *Tuccillo*, 525 F. Supp. 2d 1002, 1016 (N.D. Ill. 2007); *Planet Hollywood (Region IV),*

12  *Inc. v. Hollywood Casino Corp.*, 80 F. Supp. 2d 815, 874-76 (N.D. Ill. 1999); *Sobini*

13  *Films v. Tri-Star Pictures, Inc.*, 2001 WL 1824039, at *5 (C.D. Cal. Nov. 21, 2001)

14  (finding no justiciable case or controversy in declaratory relief action regarding the

15  fictional character "Zorro" because the plaintiff had not consummated any preliminary

16  agreements regarding the proposed film, had not "obtained commitments from 'key

17  talent' such as a director and lead actors," had not contracted with a writer to create

18  the screenplay, and therefore was not "immediately prepared" to produce the film).

19       Here, Plaintiff's allegations purporting to imply that a "case or controversy"

20  exists fall far short of establishing present activity that could constitute infringement

21  warranting a declaration by this Court.  Plaintiff's Complaint alleges that "[a]n actual

22  controversy exists between Plaintiff and Defendant as to whether the development of a

23  motion picture project … will infringe rights asserted by Defendant."  Cmpt., ¶ 16.

24  These allegations fail to aver that Plaintiff is making "meaningful preparation … to

25  conduct potentially infringing activity."  *Cat Tech*, 528 F.3d at 879.  Much like in

26  *Sobini Films*, *supra*, the Complaint here contains no concrete allegations whatsoever

27  that a "Buck Rogers" script has been written and approved for production, that film

28  financing has been secured, that actors, a director and other talent have been retained,

1  or that cameras will be ready to roll – by the date of *Armaggedon 2419 A.D.* or at any

2  other time.  Just as in *Sobini Films*, Plaintiff is merely seeking an advisory opinion

3  regarding a hypothetical dispute, probably in a failing effort to secure a favorable

4  settlement, and thus has failed to plead a justiciable case or controversy.

5       Further, the Complaint's allegations of a dispute concerning *Armaggedon 2419*

6  *A.D.*, fail to even put "Buck Rogers" at issue.  *See* Cmpt., Ex. A.  Specifically, the

7  Complaint alleges that *Armaggedon 2419 A.D.*, including the character "Anthony

8  Rogers," is in the public domain.  Cmpt., ¶¶ 8-9.  Critically, *Armaggedon 2419 A.D.*

9  does not contain any reference to "Buck Rogers."  *Id.*  While Plaintiff conclusorily

10  purports to aver in the text of its Complaint that "Buck Rogers" is "also known as" the

11  character "Anthony Rogers" – this claim is contradicted and thus superseded by the

12  text of *Armaggedon 2419 A.D.*  *See* Cmpt., Ex. A; *Garcia*, 676 F. Supp. 2d at 906 n.9.

13  As the Complaint only seeks a declaration that the *Armaggedon 2419 A.D.* is in the

14  public domain, Plaintiff has failed to allege sufficient facts putting "Buck Rogers" at

15  issue.  For this additional reason, there exists no justiciable case or controversy.

16  **V.    CONCLUSION**

17       For all of the foregoing reasons, the Trustee respectfully requests that the Court

18  to dismiss the Complaint in its entirety and with prejudice.

19

20  Dated:  September 15, 2015            FOX ROTHSCHILD LLP

21

22                           By  _____

23                               David Aronoff
                                 Ilyssa M. Adler
24                               Attorneys for Defendant LOUISE A. GEER,
                                 as Trustee of t he DILLE FAMILY TRUST

25

26

27

28

MOTION TO DISMISS                               CASE NO. 2:15-CV-05880-R-JPRx

# EXHIBIT E

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:                         )
                               )
DILLE FAMILY TRUST,            )      Bankruptcy No. 17-24771-JAD
                               )
           Debtor.             )      Chapter 11
_____ X

## MEMORANDUM OPINION

It is clear and convincing that the above captioned Chapter 11 case is not making any meaningful progress towards a successful reorganization. In fact, the undisputed record of this case is that while the debtor has been a debtor-in-possession, it

1. Has no business operations;

2. Has no meaningful income;

3. Is liquidating as opposed to reorganizing;

4. Has incurred administrative expenses in the form of professional fees and yet has no liquid assets available to satisfy them;

5. Has incurred administrative expenses in the form of professional fees, yet does not identify them in its monthly financial reports (as the line item for professional fees incurred reflects nothing in each report on file);

6. Has invoked the automatic stay for the primary purpose of

avoiding a trial regarding the debtor's alleged interest in various intellectual property;

7. Has replaced the non-bankruptcy forum litigation costs with the costs associated with the litigation that has consumed this bankruptcy case (namely, whether the debtor is eligible for bankruptcy relief; whether this case was filed in good faith; whether the debtor may sell the disputed assets; and whether the automatic stay should be lifted as to the entities having a competing interest in the disputed property);

8. Has obfuscated lawful discovery requests propounded by litigants who have challenged the debtor's eligibility to be a debtor in bankruptcy, who have challenged the good faith basis of the debtor's commencement of this case (i.e., have contended that the bankruptcy is nothing but a litigation tactic), and who have challenged the debtor's ability to sell the disputed property interests;

9. Has provided affidavits which are evasive or incomplete or misleading in support of defective answers to discovery;

10. Has ignored and/or obfuscated directives of this Court to produce documents responsive to lawful discovery requests and has provided no convincing arguments excusing such failures;

11. Has improperly and without appropriate excuse withheld documents responsive to discovery requests;

12. Cavalierly claimed that its woefully inadequate responses to discovery were "un-important" or "no big deal" or something to that effect, despite the fact that the debtor is a fiduciary, has a duty to answer discovery and despite the

-2-

fact that the debtor bears the burden of proving that its bankruptcy case is one that has been filed and prosecuted in good faith;

13. Is unable to pay a monetary sanction as a result of its failure to answer lawful discovery as the debtor has no liquid assets;

14. Has not demonstrated to the Court and has not convinced the Court that the debtor's contumacious failure to respond to discovery requests will cease;

15. Despite the fact that it acknowledged the existence of the ownership dispute(s) as to intellectual property rights at issue in this case, has improperly sought to pursue a "free and clear" sale of the disputed or alleged rights only to be "corrected" once the Court and certain parties-in-interest questioned the legitimacy of such efforts;

16. Has listed on the internet various assets for sale without first obtaining prior approval of this Court;

17. Has consulted or utilized the services of counsel (Mr. Herrman) who has not been retained by an order of this Court, and who may have a conflict of interest (as his firm is an alleged pre-petition creditor and his spouse is both an alleged trustee of the Dille Family Trust and owner of a related entity that is alleged to have entered into a licensing agreement with the debtor); and

18. Admitted that the beneficiaries of the debtor-trust are deadlocked, and one 50% beneficiary received no notice and did not consent to the filing of the instant bankruptcy.

In light of all of the circumstances of this case, the record is clear

-3-

and convincing that "cause" supports the appointment of a Chapter 11 Trustee in this case pursuant to 11 U.S.C. §§ 1104(a)(1) and (a)(2).

Such appointment is not only appropriate given the aforementioned items of "cause," it is also appropriate given the acrimony and pervasive litigation that has consumed this case. See e.g. In re Marvel Entertainment Group, Inc., 140 F.3d 463 (3d Cir. 1998)(appointment appropriate given high level of acrimony).

In rendering its decision directing the appointment of a Chapter 11 Trustee, the Court duly considered the debtor's suggestion that an examiner be appointed in lieu of the appointment of a trustee.

However, it is unlikely that the costs associated with the appointment of an examiner would be any less than that of a trustee. In addition, an examiner's investigation will do nothing but further add an element of delay to this case. Moreover, an examiner lacks the requisite powers and duties of management, which is necessary to move this case forward in a Chapter 11.

Finally, the primary litigants in this case support the appointment of a Chapter 11 Trustee, even noting that such

appointment could have the salutary effect of promoting the possibility of settlement for the benefit of all constituencies.

For all of these reasons, an Order shall be entered that directs the Office of the U.S. Trustee to immediately appoint a Chapter 11 Trustee.

SO ORDERED this _25th_ day of July, 2018.

_____  sjk

Jeffery A. Deller
Chief U.S. Bankruptcy Judge

cc:   Michael Kaminski, Esq.
      Aurelious Robleto, Esq.
      Edgardo Santillan, Esq.
      Office of the U.S. Trustee

FILED
7/25/18 7:48 am
CLERK
U.S. BANKRUPTCY
COURT - WDPA

-5-

# EXHIBIT F

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

In Re:                                    Bankruptcy No.   17-24771 JAD
The Dille Family Trust, a Trust           Chapter 11

                                          Document No.

## DISCLOSURE STATEMENT
## TO ACCOMPANY PLAN DATED NOVEMBER 1, 2018

Chapter 11 Small Business (Check box only if debtor has elected to be considered a small business under 11 U.S.C. §1121(e))

Debtor furnishes this disclosure statement to creditors in the above-captioned matter pursuant to Bankruptcy Code §1125 to assist them in evaluating debtor's proposed Chapter 11 plan, a copy of which is attached hereto. Creditors may vote for or against the plan of reorganization. Creditors who wish to vote must complete their ballots and return them to the following address before the deadline noted in the order approving the disclosure statement and fixing time. The Court will schedule a hearing on the plan pursuant to 11 U.S.C. §1129.

Address for return of ballots:

**Louise Geer**
**2100 Wilmington Road**
**New Castle, PA 16105**

I.    Background

1.    Name of Debtor
      Dille Family Trust, a California Business Trust

2.    Type of Debtor (individual, partnership, corporation)
      Business Trust

3.    Debtor's Business or Employment
      Licensing of Intellectual Property associated with the fictional character "Buck Rogers."

4.    Date of Chapter 11 Petition
      **November 28, 2017**

5.  Events that Caused the Filing:
In order to defend its intellectual property rights the Debtor became involved in two litigation matters.  One in the United States District Court for the Eastern District of Pennsylvania styled The Dille Family Trust v. The Nowlan Fmaily Trust at case No. 2:15-cv-06231-WB, and one in the United States District Court for the Western District of Pennsylvania styled Team Angry Filmworks, Inc. v. Louise A. Geer, Trustee of the Dille Family Trust at case No. 2:15 CV 01381-JFC.  The cost of prosecuting the actions exceeded the funds generated by the Dille Family Trust for licensing its intellectual property.  Initially, the cost of the litigation was funded through loans from Lorraine Dille Williams, one of the Beneficiaries of the Dille Family Trust.  Ultimately Ms. Williams determined that she could no loner fund the litigation costs.  Expecting that litigation to conclusion would cost approximately $500,000 to $750,000 and with no source of funds to pay such litigation costs, the Trustee of the Dille Family Trust, Louise A. Geer determined that the best way to preserve the value of the Estate's assets for the benefit of all creditors was to file a Chapter 11 Petition for the Debtor, and sell all of the assets. Debtors source of revenue was suddenly withdrawn.

6.  Anticipated Future of the Company & Source of this Information and Opinion:
All assets of the Debtor will be transferred to BR25C, LLC, and the proceeds from the plan will be distributed to creditors in accordance with the priorities established by the Bankruptcy Code.

7.  Summarize all Significant Features of the Plan Including When and How Each Class of Creditor Will Be Paid and What, If Any, Liens Will Be Retained By Secured Creditors or Granted to Any Creditor Under the Plan:

Class 1 Administrative creditors will be paid in full on the Effective Date or the ordinary course of business, or as otherwise agreed by the parties.

Class 2 After payment in full of Class 1, Class 2 General Unsecured Creditors will be paid from BR25C, LLC on a pro rata basis, until their claims are paid in full.

Class 3 Consists of the Beneficiary Interests held by the Beneficiaries of the Debtor.  All Beneficiary Interests of the Debtor shall be canceled, annulled and voided on the Effective Date, and holders thereof shall be entitled to no distribution whatsoever under this Plan or in the Bankruptcy Case on account of such Beneficiary Interests.

8.  Are All Monthly Operating Statements Current and on File With The Clerk of Court?
Yes __X__    No _____

If Not, Explain:

9.      Does the plan provided for releases of nondebtor parties?   Specify which parties and
        terms of release.   NO

10.     Identify all executory contracts that are to be assumed or assumed and assigned.
        IMGlobal Contract will be assumed. This limited to a right to make a television show and
        series.

11.     Has a bar date been set: Yes.

12.

13.     Specify property that will be transferred subject to 11 U.S.C. §1146(c).

All Assets of the Debtor are being transferred to BR25C, LLC.

II.   Creditors

A.   Secured Claims

SECURED CLAIMS

| Creditor | Total Amount Owed | Arrearages | Type of Collateral Priority of Lien (1, 2, 3) | Disputed (D) Liquidated (L) Unliquidated (U) | Will Liens Be Retained Under the Plan? (Y) or (N) |
|---|---|---|---|---|---|
| None | | | | | |
| TOTAL | $ | $ | | | |

B.    Priority Claims

## PRIORITY CLAIMS

| Creditor | Total Amount Owed | Type of Collateral | (D) (L) (U) * |
|---|---|---|---|
| None | | | |
| **TOTAL** | $ | | |

\* Disputed (D), Liquidated (L), or Unliquidated (U)

C.    Unsecured Claims

| | | |
|---|---|---|
| 1. | Amount Debtor Scheduled (Disputed and Undisputed) | $   787,299.59 |
| 2. | Amount of Unscheduled Unsecured Claims[1] | $   4,680,715.02 |
| 3. | Total Claims Scheduled or Filed | $   5,468,014.61 |
| 4. | Amount Debtor Disputes | $ $4,500,000 |
| 5. | Estimated Allowable Unsecured Claims | $ 900,000 |

D.    Other Classes of Creditors

| | | |
|---|---|---|
| 1. | Amount Debtor Scheduled (Disputed and Undisputed) | $ |
| 2. | Amount of Unscheduled Claims[1] | $ |
| 3. | Total Claims Scheduled or Filed | $ |
| 4. | Amount Debtor Disputes | $ |
| 5. | Estimated Allowable Claims | $ |

---

[1] Includes (a.) unsecured claims filed by unscheduled creditors; (b.) that portion of any unsecured claim filed by a scheduled creditor that exceeds the amount debtor scheduled; and (c.) any unsecured portion of any secured debt not previously scheduled.

E.    Other Classes of Interest Holders

    1.    Amount Debtor Scheduled (Disputed and Undisputed)    $

    2.    Amount of Unscheduled Claims[1]    $

    3.    Total Claims Scheduled or Filed    $

    4.    Amount Debtor Disputes    $

    5.    Estimated Allowable Claims    $

III.    Assets

## ASSETS

| Assets | Value | Basis for Value Priority of Lien | Name of Lien Holder (if any) (Fair Market Value/ Book Value) | Amount of Debtor's Equity (Value Minus Liens) |
|---|---|---|---|---|
| Cash | $1,472.88 | Bank Balance | None | $1,472.88 |
| Furniture | $525.00 | Debtor's estimate | None | $525.00 |
| Inventory | $18,500 | Debtor's estimate | None | $18,500 |
| Intellectual Property | $1,200,000 | P. Greenwood opn | None | $1,200,000 |
| TOTAL | $1,220,497.88 | | | $1,220,497.88 TOTAL |

1.    Are any assets which appear on Schedule A or B of the bankruptcy petition not listed above?

If so, identify asset and explain why asset is not in estate:  After discovered real property

2.    Are any assets listed above claimed as exempt?  If so attach a copy of Schedule C and any amendments.  N/A

**IV.** SUMMARY OF PLAN

1. Effective Date of Plan: June 2018

2. Will cramdown be sought? _X_ Yes _____ No
   If Yes, state bar date: _____

3. Treatment of Secured **Non-Tax** Claims

SECURED NON-TAX CLAIMS

| Name of Creditor | Class | Amount Owed | Summary of Proposed Treatment |
|---|---|---|---|
| None | | | |
| TOTAL | | $ | |

4.    Treatment of Secured Tax Claims

SECURED TAX CLAIMS

| Name of Creditor | Class | Amount Owed | Summary of Proposed Treatment |
|---|---|---|---|
| TOTAL | | $ | |

5.    Treatment of Administrative Non-Tax Claims[2]

ADMINISTRATIVE NON-TAX CLAIMS

| Name of Creditor* | Amount Owed | Type of Debt** | Summary of Proposed Treatment and Date of First Payment |
|---|---|---|---|
| Calaiaro Valencik | $75,000.00 | Attorney For | To be paid in full on the Plan Effective Date Subject to Court Approval |
| United States Trustee | | Court Costs | To be paid in full on the Plan Effective Date subject to Court Approval |
| Judith K. Fitzgerald, | $6,898.45 | Mediator | To be paid in full on the Plan Effective Date subject to Court Approval |
| Robert Bernstein | $50,000 | Trustee | To be paid in full on the Plan Effective Date subject to Court Approval |
| Berstein and Burkley | $75,000 | Counsel | To be paid in full on the Plan Effective Date subject to Court Approval |

[2] Include all §503(b) administrative claims.

6.    Treatment of Administrative Tax Claims

**ADMINISTRATIVE TAX CLAIMS**

| Name of Creditor* | Amount Owed | Type of Debt** | Summary of Proposed Treatment and Date of First Payment |
|---|---|---|---|
| None | | | |

\* Identify and Use Separate Line for Each Professional and Estimated Amount of Payment

\*\* Type of Debt (P=Professional, TD=Trade, TX=Taxes)

7.    Treatment of Priority Non-Tax Claims

PRIORITY NON-TAX CLAIMS

| Name of Creditor | Class | Amount Owed | Date of Assessment | Summary of Proposed Treatment |
|---|---|---|---|---|
| None | | | | |

8.    Treatment of Priority Tax Claims[1]

PRIORITY TAX CLAIMS

| Name of Creditor | Class | Amount Owed | Date of Assessment | Summary of Proposed Treatment |
|---|---|---|---|---|
| None | | | | |

[1] Include dates when any §507(a)(7) taxes were assessed.

9.    Treatment of General Unsecured Non-Tax Claims

## GENERAL UNSECURED NON-TAX CLAIMS

| Creditor | Class | Total Amount Owed | Percent of Dividend |
|---|---|---|---|
| Becker & Co. | 2 | $450.00 | Allowed Claims will be paid 100% on a pro rata basis as funds are available |
| David Gettings, CPA | 2 | $500.00 | Allowed Claims will be paid 100% on a pro rata basis as funds are available |
| Fox Rothchild | 2 | $49,174.00 | Allowed Claims will be paid 100% on a pro rata basis as funds are available |
| Geer and Herman, P.C. | 2 | $143,500.00 | Allowed Claims will be paid 100% on a pro rata basis as funds are available |
| Jeff Rovin | 2 | $1,000.00 | Allowed Claims will be paid 100% on a pro rata basis as funds are available |
| Jerry Wind – **CONTESTED** | 2 | $500.00 | Allowed Claims will be paid 100% on a pro rata basis as funds are available |
| Kloss Stenger | 2 | $129,830.61 | Allowed Claims will be paid 100% on a pro rata basis as funds are available |

| | | | |
|---|---|---|---|
| Leech Tishman | 2 | $50,753.00 | Allowed Claims will be paid 100% on a pro rata basis as funds are available |
| Lorraine Williams | 2 | $363,409.57 | Allowed Claims will be paid 100% on a pro rata basis as funds are available |
| Louise Geer | 2 | $22,458.33 | Allowed Claims will be paid 100% on a pro rata basis as funds are available |
| Matthew Fladell | 2 | $5,000.00 | Allowed Claims will be paid 100% on a pro rata basis as funds are available |
| Michael S. Ramage | 2 | $919.17 | Allowed Claims will be paid 100% on a pro rata basis as funds are available |
| NBC Universal Television | 2 | $546.00 | Allowed Claims will be paid 100% on a pro rata basis as funds are available |
| Pietragallo Gordon CONTESTED | 2 | $17,733.00 | Allowed Claims will be paid 100% on a pro rata basis as funds are available |
| Precision Sample LLC | 2 | $2,705.00 | Allowed Claims will be paid 100% on a pro rata basis as funds are available |
| Richard Spreng | 2 | $6,200.00 | Allowed Claims will be paid 100% on a pro rata basis as funds are available |
| Thomas Andre | 2 | $5,000.00 | Allowed Claims will be paid 100% on a pro rata basis as funds are available |
| Veritext Corp. Mid-Atlantic | 2 | $5,784.41 | Allowed Claims will be paid 100% on a pro rata basis as funds are available |

| | | | |
|---|---|---|---|
| Wind Associates   **CONTESTED** | 2 | $500.00 | Allowed Claims will be paid 100% on a pro rata basis as funds are available |
| Nowlan Family Trust **CONTESTED** | | $537,721.00 | Allowed Claims will be paid 100% on a pro rata basis as funds are available |
| Robert Nichols Flint Dille   **CONTESTED** | | $3,950,000.00 | Allowed Claims will be paid 100% on a pro rata basis as funds are available |
| Team Angry Filmworks, Inc.   **CONTESTED** | | 166,491.70 | Allowed Claims will be paid 100% on a pro rata basis as funds are available |
| **TOTAL** | | $ 805,963.09 | Allowed Claims will be paid 100% on a pro rata basis as funds are available |

10. Treatment of General Unsecured Tax Claims

## GENERAL UNSECURED TAX CLAIMS

| Creditor | Class | Total Amount Owed | Percent of Dividend |
|----------|-------|-------------------|---------------------|
| None | | | |
| TOTAL | | $ | |

11.    Will periodic payments be made to unsecured creditors?

Yes ___**X**___    No _____          First payment to begin: June 1, 2019

If so:

As described above with regard to each Class of unsecured creditors, periodic payments will be made to unsecured creditors as funds become available from the revenue stream due to the Estate on account of its interest in BR25C, LLC and from the net proceeds of recovery actions.

State source of funds for planned payments, including funds necessary for capital replacement, repairs, or improvements:   IMGlobal contract; licensing of intellectual property; or public auction of all of the Debtor's assets.

Other significant features of the plan: Peter Greenwood opines that he can secure licensing revenue of $1,000,000 within 12 months of confirmation, without regard to the outcome of any litigation.

Include any other information necessary to explain this plan:

**V.**    Comparison of Plan with Chapter 7 Liquidation

If debtor's proposed plan is not confirmed, the potential alternatives would include proposal of a different plan, dismissal of the case or conversion of the case to Chapter 7.  If this case is converted to Chapter 7, a trustee will be appointed to liquidate the debtor's non-exempt assets. In this event, all secured claims and priority claims, including all expenses of administration, must be paid in full before any distribution is made to unsecured claimants.

| | |
|---|---|
| Total value of Chapter 7 estate (See Section III) | **$1,220,497.88** |
| 1. Less secured claims (See Section II A) | $ 0 |
| 2. Less administrative claims (See Section IV-5-6 and include approximate Chapter 7 expenses) | $ 207,548.45 |
| 3. Less other priority claims (See Section II B) | $    1,736.82 |
| Total Amount Available for Distribution to Unsecured Creditors | **$ 1,011,212.61** |
| Divided by total allowable unsecured claims of (See Section II C) | $ 805,000.00 |
| Percentage of Dividend to Unsecured Creditors: | 100% |

Will the creditors fare better under the plan than they would in a Chapter 7 liquidation?

Yes X    No _____

Explain: In a Chapter 7 a Trustee will immediately liquidate all assets and the recovery will be dramatically less because it will not have the time to develop revenue from licensing the trademarks and copyrights.

VI.    Feasibility N/A

Estimated amount to be paid on effective date of plan, including administrative expenses.

$30,000.00

Show how this amount was calculated.

| | |
|---|---|
| $ 29,350 | Administrative Class |
| $0 | Taxes |
| $0 | Unsecured Creditors |
| $ 650 | UST Fees |
| $30,000 | TOTAL |

What assumptions are made to justify the increase in cash available for the funding of the plan?

BR25C, LLC will receive sufficient revenue from licensing of intellectual property within 12 months to pay everyone in full.

Will funds be available in the full amount for administrative expenses on the effective date of the plan? No.   BR25C, LLC will receive sufficient revenue from licensing of intellectual property within 12 months to pay everyone in full.

Cash on hand: <u>unknown:</u>    (Current).  Attach current bank statement.

Cash on hand: $30,000 (Estimated amount available on date of confirmation)

If this amount is less than the amount necessary at confirmation, how will debtor make up the shortfall?  BR25C, LLC will receive sufficient revenue from licensing of intellectual property within 12 months to pay everyone in full.

VII.    Management Salaries

MANAGEMENT SALARIES

| Position/Name of Person Holding Position | Salary at Time of Filing | Proposed Salary (Post-Confirmation) |
|---|---|---|
| Louise A. Geer | N/a | Per BR25C, LLC |
|  |  |  |

VIII.    Identify the Effect on Plan Payments and Specify Each of the Following:

1.    What, if any, litigation is pending?

Actions with Team Angry Filmworks, Inc.; The Nowlan Family Trust, and Robert Nichols Flint Dille, Beneficiary.  After the approval of the Plan, **BR25C, LLC** will be substituted as the party in interest.

2.     What, if any, litigation is proposed or contemplated?
       1. Objections to Claims;
       2. Actions to enforce the Plan
       3. Investigation and recovery of real estate in California that is owned by Dille Family
Trust.

IX.    Additional Information and Comments

X.     Certification

The undersigned hereby certifies that the information herein is true and correct to the best of my knowledge and belief formed after reasonable inquiry.

If Debtor is a corporation, attach a copy of corporate resolution authorizing the filing of this Disclosure Statement and Plan.

If Debtor is a general partnership, attach a copy of the consent agreement of all general partners to the filing of the bankruptcy.

Date: November 1, 2018              By: /s/ Daniel I. Herman, Esquire
                                        Debtor's Counsel

                                        Daniel@geerandherman.com
                                        Geer and Herman, P.C.
                                        2100 Wilmington Road
                                        New Castle, PA 16105
                                        (724) 652-0511

                                        Pa. I.D. No.: 38960

EXHIBIT G

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE:<br><br>**DILLE FAMILY TRUST,**<br><br>Debtor. | Bankruptcy Case No. 17-24771-JAD<br><br>Chapter 11 |

## FIRST AMENDED DISCLOSURE STATEMENT
## TO ACCOMPANY FIRST AMENDED CHAPTER 11 PLAN
## <u>DATED DECEMBER 4, 2018</u>

☐  Chapter 11 Small Business (Check box only if debtor has elected to be considered a small business under 11 U.S.C. § 101(51D))

Debtor furnishes this disclosure statement to creditors in the above-captioned matter pursuant to Bankruptcy Code §1125 to assist them in evaluating debtor's proposed Chapter 11 plan, a copy of which is attached hereto.  Creditors may vote for or against the plan of reorganization.  Creditors who wish to vote must complete their ballots and return them to the following address before the deadline noted in the order approving the disclosure statement and fixing time.  The Court will schedule a hearing on the plan pursuant to 11 U.S.C. §1129.

ANY CAPITALIZED TERMS NOT DEFINED HEREIN SHALL HAVE THE MEANING SET FORTH IN THE ACCOMPANYING CHAPTER 11 PLAN.

Address for return of ballots:

DILLE FAMILY TRUST, BALLOT RETURN
c/o Bernstein-Burkley, PC
Attn: Robert S. Bernstein, Esq.
707 Grant Street, Suite 2200
Pittsburgh, PA 15219

## I.    <u>Background</u>

1.    Name of Debtor:    Dille Family Trust ("DFT")

2.    Type of Debtor (individual, partnership, corporation, etc.):  Business Trust

3.    Debtor's Business or Employment: Business trust for licensing intellectual property established for benefit of named beneficiaries.

4.    Date of Chapter 11 Petition:  11/28/2017

5.  Events that Caused the Filing:  The Debtor's only significant asset(s) are certain intellectual property rights, including but not necessarily limited to copyright and trademark rights, generally described as related to and arising from the character "Buck Rogers.  The ownership and rights of third parties to use said intellectual property rights are the subject of various disputes pending in multiple courts.  The Debtor filed this Chapter 11 case in order to facilitate the resolution of said disputes and to maximize the value of the intellectual property rights for the benefit of all interested parties.

6.  Anticipated Future of the Debtor & Source of this Information and Opinion:  DFT intellectual property rights will be transferred to a new entity ("Newco") to be controlled by plan proponents Nowlan Family Trust and Louise Geer, in exchange for cash consideration totaling $500,000.00.  The cash consideration will be used to fund the payments under the Plan.  The source of the information for the Plan and Disclosure Statement is records of the Debtor, as well as input from other parties in interest.

7.  Summarize all Significant Features of the Plan Including When and How Each Class of Creditor Will Be Paid and What, If Any, Liens Will Be Retained By Secured Creditors or Granted to Any Creditor Under the Plan:

A.  *Background*

On November 28, 2017 ("Petition Date"), Dille Family Trust ("Debtor") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, at Case Number 17-24771-JAD in the United States Bankruptcy Court for the Western District of Pennsylvania.  The Debtor trust was established on August 16, 1979.  The Debtor's only significant asset(s) are certain intellectual property rights, including but not necessarily limited to copyrights, trademarks, common law marks, associated goodwill, books and records, generally described as related to and arising from the character "Buck Rogers" (the "Intellectual Property Rights").

As more fully addressed in this Plan, the ownership and rights of use of said Intellectual Property Rights are the subject of various disputes pending in multiple courts. In particular, certain rights in the Intellectual Property Rights are the subject of litigation pending in the United States District for the Eastern District of Pennsylvania between the Debtor and the Nowlan Family Trust, captioned The Dille Family Trust v. The Nowlan Family Trust at Case No. 15-06231 (the "NFT Litigation"), and certain proceedings pending between the Debtor and NFT before the U.S. Patent and Trademark Office (the "Patent Office Proceedings") (hereafter, reference to the "NFT Litigation" shall include the Patent Office Proceedings).

The NFT Litigation is an appeal brought by Debtor of a September 25, 2015 decision by the Trademark Trial and Appeal Board of the United States Patent and Trademarks Office dismissing the Debtor's opposition, which was filed in 2011, to NFT's trademark application for BUCK ROGERS, which was filed in 2009. The Eastern District Action is no longer subject to the automatic stay and is listed for trial on February 25, 2019 and Debtor's Pretrial Memoranda is due to be filed on February 11, 2019. Currently, Debtor does not have trial counsel in the Eastern District Action.

The Patent Office Proceedings are certain trademark oppositions filed by NFT and Debtor against other trademarks related to the character "Buck Rogers." The Patent Office Proceedings are currently stayed pending the outcome of the Eastern District Action.

Pursuant to the Plan, the NFT Litigation will be terminated, and fully and finally resolved and settled.

Also, the use of the Intellectual Property Rights is the subject of certain litigation between the Debtor and Team Angry Filmworks, Inc. ("TAF") (see Case No., 15-1381 in the District Court for Western District of Pennsylvania, captioned: Team Angry Filmworks, Inc. v. Louise A. Geer, Trustee of the Dille Family Trust, (the "TAF Litigation")). The TAF Litigation involves a dispute as to TAF's assertion and claim that character of Anthony Rogers which appears in the novella *Armageddon 2419, A.D.* entered the public domain and therefore the character of "Buck Rogers" has entered the public domain because TAF claims that "Anthony Rogers" is also known as "Buck Rogers." Currently, the current status of the TAF litigation is closed with no dates scheduled for further action. However, the case is not considered dismissed or disposed of and any party may reopen the case subject to the pending automatic stay in this bankruptcy proceeding. Pursuant to the Plan, Newco will be substituted as Defendant in the TAF Litigation.

The disputes regarding the Intellectual Property Rights were the catalyst for the filing of the instant Bankruptcy case. On July 30, 2018, the Trustee was appointed by the Court pursuant to Section 1104 of the Bankruptcy Code.

B. *Key Plan Terms*

The Trustee, NFT and Geer have entered into a Letter of Intent pursuant to which the terms of this Plan shall be implemented (the "LOI"). The LOI primarily provides for resolution of any and all disputes between NFT and the Debtor, including termination of the NFT Litigation, which will resolve any and all disputes as to the ownership interests in the Intellectual Property Rights. The Intellectual Property Rights, with the exception of the U.S. common law rights and U.S. trademark application rights in the "Buck Rogers"

mark, along with all tangible goods of the Estate, including but not limited to, specimens, exemplars, business records and documents associated with or related to the use, marketing, sale or licensing of the Intellectual Property Rights, will be conveyed to a new entity to be owned and controlled by NFT and Geer ("NFT Newco"). The U.S. common law rights and U.S. Trademark application rights in the "Buck Rogers" mark, and any associated goodwill, will be assigned by the Debtor to NFT.

In exchange for the transfer of the Intellectual Property Rights and related Tangible Goods to NFT Newco and resolution of the NFT Litigation, NFT Newco and/or Geer shall pay $500,000.00 to the estate (the "Plan Funding"), which funds shall be used to fund the Plan. The Plan Funding shall be paid in two installments, the first being a $100,000.00 deposit (the "Deposit") that has already been received by the Trustee and is being held by the Estate, and the second being a $400,000.00 payment that shall be paid on or before the date of Plan confirmation. The Deposit is non-refundable, except in the event that the Trustee withdraws his support of this Plan, withdraws from the LOI or the Plan is not approved by the Bankruptcy Court.

Furthermore, in accordance with confirmation of the plan, NFT, Geer and Herman, P.C. and Louise Geer shall waive, withdraw and fully surrender any and all claims, including any proof of claim filed in the proceedings, that each has, may have or ever shall have against the Estate.

The Debtor shall retain all rights to object to any Claims and pursue any Recovery Actions, including but not limited to preference Claims or Causes of Action, fraudulent conveyance Claims or Causes of Action, rights of setoff and other Claims and Causes of Action under sections 510, 542, 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and other applicable bankruptcy and non-bankruptcy law. Any and all such rights shall be administered by Robert S. Bernstein, as Plan Administrator.

C. *Claim Treatment*

Allowed administrative claims against the estate shall be paid in full on a pro rata basis on the Effective Date of the Plan.

Class 1 consists of all Allowed Priority Claims. After Administrative Claims are paid in full, Priority Claims will be paid in full on the Effective Date of the Plan.

Class 2 consists of Allowed General Unsecured Claims. Unless the Plan Administrator and the holder of any such Claim agree to a different treatment, each holder of an Allowed Class 2 Claim will be paid on a pro rata basis from the Plan Funding amount,

**PAWB Local Form 13 (08/17)**

after payment in full of Administrative Claims and Priority Claims. The Trustee estimates that Class 2 Claims will be paid 40-45% of their allowed claim amounts.

Class 3 consists of the Beneficiary Interests held by the Beneficiaries of the Debtor. All Beneficiary Interests of the Debtor shall be canceled, annulled and voided on the Effective Date, and holders thereof shall be entitled to no distribution whatsoever under this Plan or in the Bankruptcy Case on account of such Beneficiary Interests.

Additionally, Net Recoveries on any Recovery Action or Cause of Action, received by the Debtor (or the Plan Administrator, after the Effective Date), shall be used first to fund expenses of the Plan Administrator, then for additional distributions pursuant to the priority scheme provided herein and by the Bankruptcy Code.

8.    Are All Monthly Operating Statements Current and on File With The Clerk of Court?
              Yes ____X____    No _____

9.    Does the plan provide for releases of nondebtor parties? Specify which parties and terms of release.

The Trustee and/or Plan Administrator and their respective members, partners, officers, directors, employees and agents (including any attorneys, financial advisors, investment bankers and other professionals retained by such persons) shall have no liability to any person for any act or omission in connection with, or arising out of, (i) the Disclosure Statement, (ii) the Plan, (ii) the solicitation of votes for, and pursuit of confirmation of, the Plan, (iv) the formulation, preparation, implementation or consummation of the Plan, (v) the administration of the Plan or the property to be distributed under the Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, or (vi) any other act taken or omitted to be taken in connection with the Case, except for willful misconduct or gross negligence as determined by a Final Order after exhaustion of all rights of appeal, reconsideration or rehearing and, in all respects, shall be entitled to rely upon the advice of counsel with respect to its duties and responsibilities under the Plan and the Case.

In addition, relative primarily to the NFT Litigation and proposed voluntary dismissal and final resolution of said litigation, the Plan proposes mutual releases by and amongst the following parties: The Trustee, the Estate, beneficiaries and heirs of the Estate, Geer and Herman P.C., Daniel Herman, Esq., Louise A. Geer, Esq. (individually and as trustee of the Estate), Hermes Press, Calaiaro and Valencik, Kloss, Stenger and LoTempio, Diane McDevitt (individually and as trustee of NFT), Armageddon, LLC, John J. O'Malley, Esq., Volpe and Koenig, P.C. and Brian McDevitt (individually and as trustee

**PAWB Local Form 13 (08/17)**

of NFT), . Pursuant to the LOI, the LOI and NFT and Geer's obligations pursuant to the Plan are subject only to the Bankruptcy Court's approval of the releases granted to NFT and Louise Geer.

10.   Identify all executory contracts that are to be assumed or assumed and assigned.

Except as set forth hereafter, any and all executory contracts and/or unexpired leases to which the Debtor is a party shall be rejected upon Plan confirmation. Notwithstanding the foregoing, no later than fifteen (15) days before the date established for hearing on confirmation of the Plan, a schedule of any executory contracts proposed to be assumed and/or assumed and assigned shall be filed with the Court and immediately served on any applicable contract counter-party.

11.   Has a bar date been set?   Yes __X__   No _____
(If not, a motion to set the bar date has been filed simultaneously with the filing of this disclosure statement.)

12.   Specify property that will be transferred subject to 11 U.S.C. §1146(a).

None.

## II.   Creditors

A.   Secured Claims

### SECURED CLAIMS

| Claim Number | Creditor Name | Secured Claim Amount | D, L, U* |
|---|---|---|---|
| | None | $ | |

B.   Priority Claims

### PRIORITY CLAIMS

| Claim Number | Creditor Name | Priority Claim Amount | D, L, U |
|---|---|---|---|
| | PA DEPT. OF REVENUE | $1,736.82 | |

* Disputed (D), Liquidated (L), or Unliquidated (U)

C.   Unsecured Claims

1.   Amount Debtor Scheduled (Disputed and Undisputed)          $ 787,299.59

**PAWB Local Form 13 (08/17)**

| | | |
|---|---|---|
| 2. | Amount of Unscheduled Unsecured Claims[1] | $ 4,680,715.02 |
| 3. | Total Claims Scheduled or Filed | $ 5,468,014.61 |
| 4. | Amount Debtor Disputes or to be Withdrawn | $ 4,950,000.00 |
| 5. | Estimated Allowable Unsecured Claims | $    500,000.00 |

## III.   Assets

The Debtor's primary material assets are the Intellectual Property Rights, which are, without limitation, certain intellectual property rights, including but not necessarily limited to copyrights, trademarks, common law marks, associated goodwill, books and records, generally described as related to and arising from the character "Buck Rogers", and potential Recovery Actions, if any, which potential actions are of an unknown value.

Debtor also owns miscellaneous exemplars and office equipment valued at less than $5,000. The exemplars are to be transferred to Newco under the Settlement Agreement. The office equipment is of nominal value and will be sold or abandoned by the Plan Administrator.

1.    Are any assets which appear on Schedule A or B of the bankruptcy petition not listed above? If so, identify asset and explain why asset is not in estate:

No.

2.    Are any assets listed above claimed as exempt? If so attach a copy of Schedule C and any amendments.

No.

## IV.   SUMMARY OF PLAN

1.    Effective Date of Plan: Upon Final Order of Confirmation and occurrence of the conditions precedent identified in Section 12.2 of the Plan.

2.    Will cramdown be sought?  _X_ Yes      ___ No
If Yes, state bar date: May 8, 2018

To the extent that any party in interest objects to or challenges any proposed cramdown, any such party may submit a competing offer pursuant to Section 8.1.2 of the Plan that would materially improve the proposed treatment of creditors and interest holders under the Plan.

---

[1] Includes (a.) unsecured claims filed by unscheduled creditors; (b.) that portion of any unsecured claim filed by a scheduled creditor that exceeds the amount debtor scheduled; and (c.) any unsecured portion of any secured debt not previously scheduled.

**PAWB Local Form 13 (08/17)**

3.    Treatment of Secured **Non-Tax** Claims

## SECURED NON-TAX CLAIMS

| Claim Number | Creditor Name | Secured Claim Amount | Treatment |
|---|---|---|---|
| | None | | |

4.    Treatment of Secured Tax Claims (Included in Class 2)

## SECURED TAX CLAIMS

| Claim Number | Creditor Name | Secured Claim Amount | Treatment |
|---|---|---|---|
| | None | | |

5.    Treatment of Administrative **Non-Tax** Claims[2]

## ADMINISTRATIVE NON-TAX CLAIMS

| Claimant | Administrative Claim Amount | Treatment |
|---|---|---|
| Robert S. Bernstein, Trustee | $ 50,000.00 | Paid in full on Effective Date. |
| Bernstein-Burkley, PC, Counsel for the Trustee | $ 125,000.00 | |
| Calaiaro, Valencik, Counsel for the Debtor | $ 65,000.00 | |
| Judith Fitzgerald, Mediator | $ 6,921.45 | Same |

6.    Treatment of Administrative Tax Claims

## ADMINISTRATIVE TAX CLAIMS

(None)

---

[2] Includes all §503(b) administrative claims.

**PAWB Local Form 13 (08/17)**

7.  Treatment of Priority Non-Tax Claims

## PRIORITY NON-TAX CLAIMS

| Claim Number | Creditor Name | Priority Claim Amount | Treatment |
|---|---|---|---|
| | None | | |

8.  Treatment of Priority Tax Claims[3]

## PRIORITY TAX CLAIMS

| Claim Number | Creditor Name | Priority Claim Amount | Treatment |
|---|---|---|---|
| 12 | PA Dept of Revenue | $ 1,763.82 | Paid in full on Effective Date. |
| | | | |
| | | | |

9.  Treatment of General Unsecured Non-Tax Claims

## GENERAL UNSECURED NON-TAX CLAIMS

### GENERAL UNSECURED CLASS 2 CLAIMS

Class 2 consists of Allowed General Unsecured Claims. Each holder of an Allowed Class 2 Claim will receive an estimated 40-45% of the allowed amount of their claims, on a pro rata basis on the Plan Effective Date. Any additional net recoveries obtained from Recovery Actions, shall similarly be distributed on a pro-rata basis within a reasonable time following the Trustee's receipt of any such recoveries and payment of any related Trustee expenses.

| Creditor Name | Scheduled Unsecured Amount | Proof of Claim Amount (if any) | Claim Number |
|---|---|---|---|
| Becker and Company | $ 450.00 | | |
| David Gettings, CPA | $ 500.00 | | |
| Fox Rothschild LLP | $ 24,576.50 | $49,174.00 | 2 |
| Geer and Herman, P.C. | $ 143,500.00 | | |
| IM Global | $ 0 | | |
| Jeff Rovin | $ 1,000.00 | | |
| Jerry Wind, Wind Associates, Inc. | $ 500.00 | | |
| Kloss Stenger & LoTiempo | $ 129,830.61 | $129,830.61 | 4 |

---

[3] Include dates when any §507(a)(7) taxes were assessed.

**PAWB Local Form 13 (08/17)**

| | | | |
|---|---|---|---|
| Leech Tishman | $ 56,647.00 | | |
| Lorraine Dille Williams | $ 363,409.57 | | |
| Louise A. Geer | $ 22,458.33 | | |
| Matthew Fladell, Esq. | $ 5,000.00 | | |
| Michael S. Ramage | $ 919.17 | | |
| NBC Universal Television Distribution | $ 546.00 | | |
| Nowlan Family Trust | | $537,721.00 | 6 |
| Pietragallo Gordon Alfano Bosick & Raspanti | $ 17,773.00 | $17,773 | 3 |
| Precision Sample LLC | $ 2,705.00 | | |
| Robert Nichols Flint Dille | | $3,950,000.00 | 7 |
| Richard Spreng | $ 6,200.00 | | |
| Team Angry Filmworks, Inc. | | $166,491.70 | 5 |
| Thomas Andrae | $ 5,000.00 | | |
| Vertex Corp. | $ 5,784.41 | | |
| Wind Associates | $ 500.00 | | |

10.    Treatment of General Unsecured Tax Claims

GENERAL UNSECURED TAX CLAIMS

None

11.    Will periodic payments be made to unsecured creditors?

Yes_____    No___X____

However, additional payments may be made to unsecured creditors if funds become available from the Net Proceeds of Recovery Actions.

**V.    Comparison of Plan with Chapter 7 Liquidation**

If debtor's proposed plan is not confirmed, the potential alternatives would include proposal of a different plan, dismissal of the case, or conversion of the case to Chapter 7.  If this case is converted to Chapter 7, a trustee will be appointed to liquidate the debtor's non-exempt assets.  In this event, all secured claims and priority claims, including all expenses of administration, must be paid in full before any distribution is made to unsecured claimants.

Total value of Chapter 7 estate (See Section III)              $ 300,000.00
1. Less secured claims (See Section II A)                      $         0.00
2. Less administrative claims (See Section IV-5-6

**PAWB Local Form 13 (08/17)**

5406221-1

|  |  |
|---|---|
| and include approximate Chapter 7 expenses) | $ 247,000.00 |
| 3. Less other priority claims (See Section II B) | $ 1,763.82 |

Total Amount Available for Distribution to Unsecured Creditors **$ 51,000**

Divided by total allowable unsecured claims of (See Section II C)  $ 500,000

Percentage of Dividend to Unsecured Creditors:  10.0%

Will the creditors fare better under the plan than they would in a Chapter 7 liquidation?

Yes __X__    No _____

Explain: Under the Plan, the value of the Estate will be maximized as a result of resolution of the NFT Litigation, which uncertainty, cost and expense otherwise substantially hampers the value the Estate. Accordingly, in a liquidation scenario without resolution of the NFT Litigation, the value of the Estate assets would be significantly diminished.

To the extent that any party in interest believes that distribution to creditors and interest holders would be materially different in a liquidation scenario, any such party may submit a competing offer pursuant to Section 8.1.2 of the Plan that would materially improve the proposed treatment of creditors and interest holders under the Plan.

## VI.    Feasibility

Estimated amount to be paid on effective date of plan, including administrative expenses.

$500,000.00

Show how this amount was calculated.

| $ | 247,000 | Administrative Class |
|---|---|---|
| $ | 1,763.82 | Taxes |
| $ | 1,000.00 | UST Fees |
| $ | 250,000.00 | TOTAL |

What assumptions are made to justify the increase in cash available for the funding of the plan?

None. The Plan will be funded on the Effective Date via the Plan Funding payment.

Will funds be available in the full amount for administrative expenses on the effective date of the plan? From what source? If not available, why not and when will payments be made?

Yes. Administrative Expenses will be paid in full from the Plan Funding payment.

**PAWB Local Form 13 (08/17)**

Cash on hand $ 100,0000.00 ___     (Current – held in Escrow).

Cash on hand $ 500,000.00 ___     (Estimated amount available on date of
confirmation)

**VII.    Management Salaries**

None.

**VIII.    Identify the Effect on Plan Payments and Specify Each of the Following:**

1.    What, if any, litigation is pending?

Dille Family Trust v. Nowlan Family Trust – Eastern District of PA

-this litigation will be dismissed and fully resolved.

TAF v. Dille Family Trust - Western District of PA

-Newco will be substituted as Defendant in this action.

2.    What, if any, litigation is proposed or contemplated?

The Debtor and Plan Administrator reserve all rights to object to any Claims and pursue any Recovery Actions, including but not limited to preference Claims or Causes of Action, fraudulent conveyance Claims or Causes of Action, rights of setoff and other Claims and Causes of Action under sections 510, 542, 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and other applicable bankruptcy and non-bankruptcy law.

**IX.    Additional Information and Comments**

None.

**X.    Certification**

The undersigned hereby certifies that the information herein is true and correct to the best of my knowledge and belief formed after reasonable inquiry.

/s/ Robert S. Bernstein _____     December 04, 2018
Chapter 11 Trustee                        Date

**PAWB Local Form 13 (08/17)**

# EXHIBIT H

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

In re:

    DILLE FAMILY TRUST, (putatively, a California Business Trust),

         Debtor.

---------------------------------------------

TEAM ANGRY FILMWORKS, INC.,

         Movant,

      Vs.

DILLE FAMILY TRUST, (putatively, a California Business Trust),

         Respondent.

Bankruptcy No. 17-24771 JAD

Chapter 11

Hearing Date:

DECLARATION OF LORRAINE DILLE WILLIAMS IN SUPPORT OF MOTION TO DISMISS CHAPTER 11 PETITION

**ELECTRONICALLY FILED**

## <u>DECLARATION OF LORRAINE DILLE WILLIAMS</u>

I, LORRAINE DILLE WILLIAMS, hereby declare as follows:

1. I am an individual over 18 years of age, and I submit this declaration in support of Team Angry Filmworks, Inc.'s Motion to Dismiss. The matters set forth herein are true and correct and of my own personal knowledge, and if called upon to testify to these matters, I could and would do so competently.

2. I am also one of two sole beneficiaries of the Dille Family Trust, my brother Robert Nichols Flint Dille being the other. A true and correct copy the Dille Family Trust Agreement and a subsequent instrument transferring situs of trust is attached hereto as Exhibit "A." The Dille Family Trust is obviously not a business trust as is plainly evident by its name and was an estate planning device utilized by our parents. After the death of my father in 1983 and my mother in 2009, and the resignation of a previous Trustee, we

Case 2:20-cv-00924-WB    Document 1    Filed 02/18/20    Page 190 of 235

Case 17-24771-JAD    Doc 453-3    Filed 12/11/18    Entered 12/11/18 22:15:33    Desc
Exhibit A - Declaration of Lorraine Dille Williams    Page 2 of 38

appointed a lawyer, Louise Geer, as the successor Trustee. She and her husband Dan Herman are partners in the Geer and Herman P.C. law firm.

3.      Notwithstanding, Ms. Geer and Mr. Herman have since engaged in what appears to be endless litigation, and I am informed that they have been paying themselves and others in self dealing manner and in an apparent breach of their fiduciary duties. Not only have I subsequently received little or no benefit as a beneficiary, but I believe they are responsible for having run the Dille Family Trust deep into debt well prior to the filing of this action and seriously damaging what value remains in the property by intimidating and suing people as a means of persuasion. I have been informed that my brother previously made requests for accountings from the Dille Family Trust as was required under Ex. "A" but none were provided to him in response to his requests.

4.      Moreover, it has come to my attention that on behalf of the Dille Family Trust, Geer without my knowledge or approval entered into a deal memo with IM Global Television, LLC providing for executive producer fees and credits to be accorded to designates by DFT through Geer as Trustee. Neither I nor my brother were specifically identified as designated executive producers in the deal memo. Clearly, such a transaction should have disclosed to me and monies received there-from accounted for. It is my belief that if a television series would have resulted, that Ms. Geer would have accorded she and her husband Dan Herman as designated executive producers such that both would reap executive producer fees and credits.

5.      This bankruptcy case was filed without notice to me as one of two beneficiaries of The Dille Family Trust, and without my knowing authorization or approval prior to its filing. Subsequently, Ms. Geer continued to act for The Dille Family Trust under a conflict of interest. In my opinion, the Dille Family Trust's refusal to come to a commercially reasonable settlement agreement with Team Angry Filmworks, Inc. which would include the licensing of the property, such that a major motion picture could be produced based thereon by a party with the expertise to successfully exploit the project is adverse to The Dille Family Trust interests and mine as a beneficiary. It is also prejudicial to the joint economic benefits that would otherwise inure to both my brother and I as the only two beneficiaries of The Dille Family Trust.

6.      I have also with my brother earlier this year informed Louise Geer of her removal as the Trustee of the Trust of which I am a beneficiary.

7.     As a beneficiary of the Dille Family Trust, I am of the firm belief that this bankruptcy case should never have been filed without my knowledge or approval, and I do not believe that Ms. Geer has ever had the best interests of the Dille Family Trust in mind. I like my brother are of the firm opinion that this case was improperly initiated by Ms. Geer with a conflict of interest for her and her husband's benefit and without properly taking the best interests of me or my brother as the sole beneficiaries of the Dille Family Trust into account. It is properly dismissed in order that we can move forward with Team Angry Filmworks, Inc. and its efforts to produce a "Buck Rogers" motion picture that will actually inure to our benefit as the sole beneficiaries of the Dille Family Trust.

8.     The court appointed Trustee, Robert Bernstein, has reneged at the 11th hour on the prior "Newco" settlement and plan with Team Angry Filmworks, Inc. that had been negotiated for months and which both I and my brother had supported. That Geer and Herman have oddly teamed up with the Nowlan Family Trust (whom their law firm purportedly sued on the Dille Family Trust's behalf) in an attempt to now buy the assets of the Dille Family Trust, only compounds the fraud on my brother, me, the Dille Family Trust and this Court and in no way ameliorates it.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed in Lake Forest Illinois

Dated: December 11, 2018

_____
LORRAINE DILLE WILLIAMS

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

In re:

    DILLE FAMILY TRUST, (putatively, a
California Business Trust),

        Debtor.

------------------------------------------------------------

DON MURPHY, LORRAINE DILLE
WILLIAMS, ROBERT NICHOLS
FLINT DILLE, and TEAM ANGRY
FILMWORKS, INC.,

        Movants,

    v.

ROBERT S. BERNSTEIN, Chapter 11
Trustee, LOUISE A. GEER, Esquire,
NOWLAN FAMILY TRUST, and
DILLE FAMILY TRUST, (putatively, a
California Business Trust),

        Respondents.

Bankruptcy No. 17-24771 JAD

Chapter 11

## DECLARATION OF ROBERT NICHOLS FLINT DILLE

    I, ROBERT NICHOLS FLINT DILLE, hereby declare as follows:

    1.    I am an individual over 18 years of age, and I submit this declaration in support of Team Angry Filmworks, Inc.'s Motion to Dismiss. The matters set forth herein are true and correct and of my own personal knowledge, and if called upon to testify to these matters, I could and would do so competently.

    2.    I am a screenwriter, game designer and visiting scholar at the University of Southern California, and am also a resident of Los Angeles, California. I am one of the screenwriters currently adapting Philip Nowlan's novella entitled *Armageddon 2419 A.D.* for a motion picture project which is being developed by Plaintiff Team Angry Filmworks, Inc. in Los Angeles, California who has retained my services.

1

3.    I am also one of the only two beneficiaries of the Dille Family Trust, my sister Lorraine Dille Williams being the other. A true and correct copy the Dille Family Trust Agreement and a subsequent instrument transferring situs of trust is attached hereto as Exhibit "A." After the death of my father in 1983 and my mother in 2009, and the resignation of a previous Trustee, we appointed a lawyer, Defendant Louise Geer, as the successor Trustee. She and her husband Dan Herman are partners in the Geer and Herman P.C. law firm. Upon Ms. Geer's succeeding as trustee, I was asked to sign a Waiver of Conflict of Interest for the Geer and Herman law firm so that they may do some legal work that we needed done.

4.    Notwithstanding, Ms. Geer and Mr. Herman have since engaged in what appears to be endless litigation, and I am informed that they have been paying themselves and others in apparent breach of their fiduciary duties. Not only have I received no benefit as a beneficiary, but I believe they are responsible for having run the Dille Family Trust deep into debt prior to the filing of this action and seriously damaging what value remains in the property by intimidating and suing people as a means of persuasion. I have previously made requests for accountings from the Dille Family Trust but none have been provided in response to my requests and I have no knowledge of any purported loans to the Dille Family Trust by sister. A representative sample of one of my unmet requests for an accounting is attached hereto as Exhibit "B."

5.    Team Angry Filmworks, Inc. (commonly known as "Angry Films") publicly announced its development of the motion picture project based upon deceased author Philip Francis Nowlan's *Armageddon 2419 A.D.* at Comic-Con in San Diego, California in July 2015.

6.    In response to this public announcement and a Deadline Hollywood article to the same effect appearing on July 10, 2015, on the same day I received a voicemail in California from Dan Herman as counsel for The Dille Family Trust, threatening to sue Don Murphy, president of Team Angry Filmworks, Inc. (commonly known as "Angry Films") and its affiliates in connection with the *Armageddon 2419 A.D.* project in "every court in the land." Mr. Herman informed me that he was in San Diego, California for Comic-Con but would be leaving the convention early "to sue them."

7.    Thereafter, my lawyer Richard Thompson who is based in Los Angeles, California told me that Dan Herman together with the Trust's licensing representative Jane MacGregor called him in California as well. Mr. Thompson informed me that on such call they both emphatically instructed us and Team Angry Filmworks, Inc. (commonly known as "Angry Films") as well to cease and desist from developing the motion picture project based upon Philip Nowlan's novella

entitled *Armageddon 2419 A.D.* along with similar threats to sue if such demands were not complied with. I understand that Jane MacGregor was and may still be the licensing agent for The Dille Family Trust responsible for negotiating all film and television deals on its behalf, including deals for character licensing, and is based in Thousand Oaks, California.

      8.    On such call, I am informed that Mr. Herman asserted that The Dille Family Trust had not given Team Angry Filmworks, Inc. (commonly known as "Angry Films") or anyone affiliated with it permission to license or use any elements under the "Buck Rogers Universe," including myself, and that the copyright in "Armageddon 2419 A.D." was owned by The Dille Family Trust. I understand that Mr. Herman concluded this call by indicating that unless the demand to "cease and desist" was complied with, immediate legal action seeking injunctive relief under copyright and trademark would be initiated against Team Angry Filmworks, Inc.'s (commonly known as "Angry Films") president Don Murphy, and their affiliates, including myself.

      9.    Mr. Herman and his wife, Trustee Louise Geer (who are both lawyers) then threatened the legal license of Mr. Thompson, which was particularly outrageous given the fact that Mr. Thompson had also been the Dille Family Trust's lawyer for over a decade in California representing the Trust on a number of deals involving "Buck Rogers," both before and during Louise Geer's appointment as successor Trustee. After forcing Mr. Thompson to resign as their attorney, I understand that Ms. Geer and Ms. MacGregor did an about-face and asked him to separately represent them on a "Buck Rogers" television deal, which ultimately fell through.

      10.    On or about July 28, 2015, I reviewed a letter Mr. Thompson received a letter as my counsel in California signed by Defendant Louise Geer on behalf of the Dille Family Trust. Again Ms. Geer asserted that the Dille Family Trust had not given permission or license for the use of "Buck Rogers" or any of the elements of the Buck Rogers Universe to myself or to Team Angry Filmworks, Inc. (Angry Films' Don Murphy). The letter also accused me of acting to damage the interests of The Dille Family Trust and the interests of my co-beneficiaries, asserting that I may be liable to the Trust and other beneficiaries for any damages caused, and threatening to proceed with legal action if a satisfactory response was not received within ten days.

      11.    I was further surprised by the aggressive position taken by Louise Geer. Lorraine Dille Williams and I were both told multiple times years ago by our father Robert Dille that he allowed *Armageddon 2419* to lapse in the public domain for strategic reasons, due to an ongoing dispute with the heirs of the author Mr. Nowlan. Thus, Ms. Geer is fully aware that the original

Case 2:20-cv-00924-WB    Document 1    Filed 02/18/20    Page 195 of 235

Case 17-24771-JAD    Doc 453-4    Filed 12/11/18    Entered 12/11/18 22:15:33    Desc
Exhibit B - Declaration of Robert Nichols Flint Dille    Page 4 of 44

novella including the character of "Anthony Rogers" a/k/a "Buck Rogers" has entered the public domain but nonetheless appeared intent on litigating a meritless claim.

12.    From speaking with Mr. Murphy, I was informed and understand that thereafter, Mr. Murphy on behalf of Angry Films had the opportunity to speak with both Mr. Herman and his wife, Louis Geer, by phone while Mr. Murphy was in California. I have also read a series of letters sent by Mr. Herman to Mr. Murphy reiterating the above cease and desist demands and threatening imminent litigation if such demands were not complied with.

13.    I have subsequently rescinded my conflict of interest waiver with the Geer and Herman law firm. I have also requested the resignation of Louise Geer as the Trustee of the Trust of which I am a beneficiary. Instead of resigning or withdrawing due to direct conflict of interest, Ms. Geer (the Trustee of the Trust to which I am a beneficiary) responded by filing a "Writ of Summons" dated August 31, 2015 notifying me that an action has been filed against me on an unspecified claim in a Pennsylvania Court and reflecting that Ms. Geer is the attorney on behalf of the plaintiff. The action was entitled <u>The Dille Family Trust, Louise Geer Trustee v. Robert Nichols Flint Dille Beneficiary</u>, Commonwealth of Pennsylvania, County of Lawrence, File No. 2015-10848.

14.    This bankruptcy case was filed without notice to me as one of two beneficiaries of The Dille Family Trust, and without my knowing authorization prior to its filing. Ms. Geer has continued to act as the Trustee for The Dille Family Trust under a conflict of interest. The Dille Family Trust's refusal to come to a commercially reasonable settlement agreement with Team Angry which would include the licensing of the property, such that a major motion picture could be produced based thereon, is adverse to The Dille Family Trust interests in my opinion. It is also prejudicial to the economic benefits that would otherwise inure to jointly to both my sister and me as the only two beneficiaries of The Dille Family Trust.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed in Los Angeles, California.

Dated: December 11, 2018

/s/ Robert Nichols Flint Dille
ROBERT NICHOLS FLINT DILLE

EXHIBIT B

From: **flint dille** flintdille@gmail.com
Subject: FOUND: I ask Louise why we are in expensive and stupid battles
Date: December 1, 2018 at 8:44 AM
To: Don Murphy donmurphy@donmurphy.net, flint dille flintdille@gmail.com



---------- Forwarded message ----------
From: **flint dille** <flintdille@gmail.com>
Date: Sun, Jun 4, 2017 at 9:39 AM
Subject: Trust Report and Public Domain
To: Louise Geer <louise.geer@gmail.com>, louise <louise@hermespress.com>

Dear Louise

My records do not show any reporting from the Dille Family Trust since 2012. It seems that I write this every year and get no response. So I am writing again to request an updated accounting of the proceeds of the Dille Family Trust for 2016. Now that the Tax Man has come and gone I am certain that you have the accounting .

Further, I had a conversation with Don Murphy. He believes that he is one step away from having Buck Rogers declared public domain. I told you at the beginning this was not a fight the Trust should undertake and you persisted. If he is successful this is a disaster for the Trust.

Also, I discovered that The Trust is burning money on expensive attorneys. I want to see the accounting of moneys the Trust has paid and owes to David Aronoff thus far on the ongoing litigations. I have not approved any expenditures and need to understand how this is being financed, ostensibly on my behalf.

I look forward to the accountings and would like some explanation of why we seem to constantly be in unnecessary and expensive battles that I have advised against for years.

Flint

From: **flint dille** flintdille@gmail.com
Subject: I Demand Meeting Minutes
Date: December 1, 2018 at 8:46 AM
To: Don Murphy donmurphy@donmurphy.net, flint dille flintdille@gmail.com

--------- Forwarded message ---------
From: **flint dille** <flintdille@gmail.com>
Date: Tue, Mar 29, 2016 at 5:52 AM
Subject: DFT MINUTES
To: Louise Geer <louise.geer@gmail.com>, Louise Geer <louise@hermespress.com>

March 29, 2016

Dear Louise,

As Trustee of the Dille Family Trust of which I am a main beneficiary, you held a

meeting that was not approved by me in your city ninety days ago.

Demand is hereby made for the minutes of this meeting to be delivered via email to

me immediately.  I find it unconscionable that I should have to ask for the minutes of

the meeting of my own trust to be delivered to me.   Why do you feel it is okay to

violate your duties as a Trustee to me repeatedly?

The preceding is not intended as a full recitation of the facts and all rights and

remedies are hereby expressly reserved.

Flint

From: **flint dille** flintdille@gmail.com
Subject: Found: Hermans blow me off on secret meeting
Date: December 1, 2018 at 8:36 AM
To: Don Murphy donmurphy@donmurphy.net, flint dille flintdille@gmail.com

Here's another one.

---------- Forwarded message ----------
From: **flint dille** <flintdille@gmail.com>
Date: Fri, Jul 20, 2018 at 7:19 AM
Subject: Fwd: I waited until noon
To: Don Murphy <donmurphy@donmurphy.net>

This is the meeting, right?

---------- Forwarded message ----------
From: **flint dille** <flintdille@gmail.com>
Date: Sat, Dec 19, 2015 at 12:20 PM
Subject: I waited until noon
To: Louise Geer <louise.geer@gmail.com>, Louise Geer <louise@hermespress.com>, <lori@geerandherman.com>

Louise,

I've waited until 11:30 AM and there is no call, no Skype request, no G+ Request, no email. In short, there has been no attempt to include me in the meeting.

There wasn't even the courtesy of responding to my email from last night. I asked two reasonable questions: Are you going to Skype me in and what is the legal basis for my needing to sign an NDA for a meeting of my own family trust?

Isn't it true that, in the normal world, when somebody actually wants to set a meeting, they set mutually agreed upon dates and times, clearly state the business of the meeting and provide attendees with documentation that allows them to 'meaningfully participate' in the discussion?

Would you say that this meeting fit that criteria? Is sending your beneficiary (aka the person you are responsible to) a demand for a meeting across the country, a week earlier, on a non-business day with no consideration for transportation, lodging, meals, etc. a normal way of doing business?

Is it normal to expect people to make a 'meaningful contribution' to a meeting when they have no information heading into the meeting when it is likely to be about complex matters?

Aren't meetings conducted every day via Skype, Google Hang-outs even phone conference? Is there some reason this meeting could not have been held that way? Is it normal for meetings to be held for the benefit of the trustees and not the beneficiaries?

Don't you think that any objective person who looked at this would be struck with the possibility that the invitation was insincere?

And more to the point, don't you think that anybody reading the Trustees letters to the Beneficiary might conflude that the invite to the meeting was, at best disingenuous or at worst some kind of an ambush? And after we factor in that the Trustee and/or her partner threatened the law license of the Beneficiary's representative causing him to drop out of Buck Rogers representation,also lead one to believe that the Beneficiaries best interests aren't at the top of the Trustee's mind? Or maybe the Trustee being overheard openly discussing the Beneficiaries' financial condition with the other beneficiary at a public venue in Malibu make one wonder what their intentions were?

And wouldn't it seem odd to you if you were the Beneficiary who'd been kept out of the loop for years that the Trustee was suddenly wanting you to 'meaningfully participate' in the meeting? Wouldn't you maybe be

wondering what the real purpose of the meeting was?

Wouldn't a reasonable person question that perhaps the Trustee wasn't acting in good faith with the beneficiary?

I look forward to receiving the reports demanded and the notes from the meeting that the Dille Family Trust presumably is either paying for, or stiffing somebody for (at last communication in September, Kirk Passagarde had also not been paid)...

R.N. Flint Dille

# EXHIBIT I

# IN THE COURT OF COMMON PLEAS OF LAWRENCE COUNTY,

## PENNSYLVANIA

## ORPHANS COURT

LOUISE A. GEER, TRUSTEE        :
DILLE FAMILY TRUST,

                :

           Plaintiff

       : No. _18_ of 2019, O.C. √SO

    VS.

                :

FLINT DILLE and LORRAINE
WILLIAMS,

                :

         Defendants

           : TYPE OF PLEADING:

           : Complaint in Declaratory Judgment

           FILED ON BEHALF:

           Plaintiff

           COUNSEL OF RECORD FOR
           THIS PARTY:

           GEER AND HERMAN, P.C.

           Daniel I. Herman, Esquire
           Pa. I.D. No. 38960

           2100 Wilmington Road
           New Castle, PA 16105
           (724) 652-0511

FILED/ORIGINAL

2019 FEB 20  PM 12: 57

JODI KLABON-ESOLDO
PRO AND CLERK

Feb. 26, 2019 11:10AM    LAWRENCE COUNTY PROTHONOTARY                    No. 2876    P. 2

IN THE COURT OF COMMON PLEAS OF LAWRENCE COUNTY,

PENNSYLVANIA

ORPHANS COURT

LOUISE A. GEER, TRUSTEE       :
DILLE FAMILY TRUST,

           :

          **Plaintiff**

      : No. _18_ of 2019, O.C.

        **VS**

          :

FLINT DILLE and LORRAINE
WILLIAMS,

           :

         **Defendants**

## NOTICE TO DEFEND

      You have been sued in Court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this Complaint and Notice are served, by entering a written appearance personally or by attorney and filing in writing with the Court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so, the case may proceed without you and a judgment may be entered against you by the Court without further notice for any money complained in in the Complaint or for any other claim or relief requested by the Plaintiff. You may lose money or property or other rights important to you.

      YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

Lawrence County Lawyer Referral Service
Lawrence County Government Center
430 Court Street
New Castle, PA 16101
Telephone No.: (724) 658-2541

FILED/ORIGINAL

2019 FEB 20  PM 12: 57

JODI KLABON-ESOLD?
\PRO AND CLERK\,

Feb. 26. 2019 11:10AM    LAWRENCE COUNTY PROTHONOTARY                    No. 2876    P. 3

GEER AND HERMAN, P.C.

By: _____
Daniel I. Herman, Esquire
Attorney for the Plaintiffs

SERVE ALL PAPERS ON:

GEER AND HERMAN, P.C.
2100 Wilmington Road
New Castle, PA 16105
Telephone No.: (724) 652-0511/652-9240

FILED/ORIGINAL

2019 FEB 20  PH 12: 58

JODI KLABON-ESQIRO
PRO AND CLERK

**IN THE COURT OF COMMON PLEAS OF LAWRENCE COUNTY,**

**PENNSYLVANIA**

**ORPHANS COURT**

| | |
|---|---|
| **LOUISE A. GEER, TRUSTEE DILLE FAMILY TRUST,** | : |
| | : |
| **Plaintiff** | : |
| | : No. _18_ of 2019, O.C. |
| **VS** | : |
| | : |
| **FLINT DILLE and LORRAINE WILLIAMS,** | |
| | : |
| **Defendants** | |
| | : |

FILED/ORIGINAL

2019 FEB 20  PM 12: 58

JODI KLABON-ESOLDO
PRO AND CLERK

<u>**COMPLAINT IN DECLARATORY JUDGMENT**</u>

AND NOW comes the Plaintiff, Louise A. Geer, Trustee, Family Dille Trust, by and through her attorneys Daniel I. Herman, Esquire, and the law firm of Geer and Herman, P.C., and in support of the instant Complaint avers and files the following:

1. Louise A. Geer, is currently the Trustee of the Dille Family Trust pursuant to her appointment.

2. The Trust has two Beneficiaries: Lorraine Williams and Robert Nichols Flint Dille.

3. A copy of the Trust and Amended Trust are attached hereto as Exhibit "A" and incorporated by reference herein.

4. The situs of the Dille Family Trust is New Castle, Lawrence County, Pennsylvania, and as such the Trust has been registered with the Secretary of

State, Department of Corporations. A copy of the said registrations are attached hereto as Exhibit "B" and incorporated by reference herein.

5. The instant Trust was the subject of a Bankruptcy in the United States Bankruptcy Court for the Western District of Pennsylvania at No. 17-24771 JAD. A United States Bankruptcy Trustee was appointed by the Honorable Judge Deller. The core jurisdiction of the Bankruptcy Court does not involve the administration of the Trust outside of a Bankruptcy action. This Court has sole jurisdiction outside of issues involving bankruptcy and are the province of the Lawrence County Orphan's Court.

6. On February 20, 2019, the said Bankruptcy was dismissed. At the time of that dismissal, Louise A. Geer reassumed her role as Trustee as the Bankruptcy Court's core jurisdiction would not involve that issue.

7. Robert Nichols Flint Dille has on an ongoing basis attempted to attack the validity of the intellectual property of the Dille Family Trust, leaving the Trust in a position where it would essentially have not assets.

8. Lorraine Williams has on an ongoing basis attempted to attack the validity of the intellectual property of the Dille Family Trust, leaving the Trust in a position where it would essentially have not assets.

9. Robert Nichols Flint Dille and Lorraine Williams in combination with third parties has attempted to take a position that Buck Rogers, the primary intellectual property asset of the Trust is in the public domain and therefore the Dille Family Trust would not be able to engage in business licensing of Buck Rogers. As a business trust the manner in which the Trust receives income is through the

utilization of products, licenses, and utilizing Buck Rogers. The Trust owns registered trademarks in Japan, Germany, France and Canada as well as significant copyrights post copyright term extension act (CTEA).

10. Mr. Dille and Mrs. Williams are fiduciaries to the Trust and has utilized what are in essence trade secrets divulging information to third parties which is confidential and damaging to the Trust in an ongoing campaign to undermine the ability of the Trust to monetize its intellectual property.

## COUNT I – DECLARATORY JUDGMENT

11. The Plaintiff incorporates paragraphs one (1) through ten (10) herein by reference in toto.

12. The actions of Flint Dille on an ongoing basis have created significant difficulties in the licensing of Buck Rogers intellectual property with the Trust's current assets.

13. The Trustee is desirous of establishing this fact as it has been of great detriment to the Trust and threatens the existence of the Trust.

14. The Plaintiff is desirous of having the Court declare as a matter of law that Flint Dille and Lorraine Williams are (a) are beneficiaries of the Dille Family Trust; (b) they have a fiduciary duty to the Trust not to undermine the intellectual property and assets of the Trust; (c) that on an ongoing basis, which continues to the present, and is on a continuing basis, has attempted through the media, through third parties, through communications with other parties, and generally to undermine the intellectual property and assets of the Trust by taking a position that the said assets are not owned by the Trust when in fact they are.

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court enter a declaratory judgment as follows:   is (a) Flint Dille and Lorraine Williams are beneficiaries of the Dille Family Trust; (b) that they have a fiduciary duty to the Trust not to undermine the intellectual property and assets of the Trust; (c) that on an ongoing basis, which continues to the present, and is on a continuing basis, has attempted through the media, through third parties, through communications with other parties, and generally to undermine the intellectual property and assets of the Trust by taking a position that the said assets are not owned by the Trust when in fact they are, and whatever other remedies the Court may deem appropriate plus attorneys fees and costs of suit and any other relief the Court deems appropriate.

Respectfully Submitted:

GEER AND HERMAN, P.C.

By: _____
    Daniel I. Herman, Esquire

    2100 Wilmington Road
    New Castle, PA  16105
    Supreme Court No.: 38960

    (724) 652-0511

FILED/ORIGINAL

2019 FEB 20  PH 12: 58

JODI KLABON-ESOLDO
PRO AND CLERK.

# EXHIBIT J

IN RE: DILLE FAMILY TRUST          :    IN THE COURT OF COMMON PLEAS
                                   :
                                   :    LAWRENCE COUNTY, PENNSYLVANIA
                                   :
                                   :    DOCKET NO. 43 OF 2019, O.C.

## ORDER OF COURT

**AND NOW,** this **17th** day of **DECEMBER**, **2019**, this Court, having previously Ordered the Dillie Family Trust and Attorney Louise Geer as the claimed Trustee of the Dillie Family Trust to, through counsel, provide the Court all settlement agreements, asset purchase agreements, releases, assignments, nondisclosure agreements and agreements between Louise Geer and the Dillie Family Trust and Nowlan Family Trust, this Court issues the following **ORDER**:

1.    Pursuant to this Court's previous Order, counsel for the Dillie Family Trust has provided to the Court for in camera inspection, the following documents:

a.    Settlement Agreement dated February 28, 2019 between the Dillie Family Trust and the Nowlan Family Trust;

b.    The Asset Purchase Agreement dated February 28, 2019 between the Dillie Family Trust, and Buck Rogers Company;

c.    The Release Agreement between the Dillie Family Trust, the Nowlan Family Trust, et al;

d.    Various trademark assignments from the Dillie Family Trust to Buck Rogers Company with attached schedules;

e.    A Copyright Assignment dated February 28, 2019 from the Dillie Family Trust to Buck Rogers Company, with attached schedules;

f.    A Confidentiality and Non-Disclosure Agreement between the Nowlan Family Trust, the Buck Rogers Company and the Dillie Family Trust.

2.    The Court having reviewed the documents, **ORDERS** that counsel for the Trustee shall provide copies of the above named documents to counsel for the

2019 DEC 18 AM 9:06

53RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

beneficiaries, without redaction.

3.     The Prothonotary shall be responsible for properly serving a copy of this Order upon counsel of record; and if a party has no counsel, then upon said party at their last known address as contained in the Court's file, in accordance with Pa.R.C.P. 236 and Rule L236.

BY THE COURT:

David H. Acker, Judge                      J.

cle

FILED/ORIGINAL     2

2019 DEC 18   AM 9: 06

# EXHIBIT K

IN RE: DILLE FAMILY TRUST

: IN THE COURT OF COMMON PLEAS
:
: LAWRENCE COUNTY, PENNSYLVANIA
:
: DOCKET NO. 43 OF 2019, O.C.

## ORDER OF COURT

**AND NOW,** this **7th** day of **FEBRUARY, 2020,** this Court issues the following **ORDER**:

1.    A hearing to determine whether or not Attorney Louise Geer is the legitimate and lawful Trustee of the Dille Family Trust is scheduled for the _1st_ day of _april_, 2020 at _8:30_ o'clock _A_.m. in Courtroom Number 4 of the Lawrence County Government Center. One (1) full day reserved.

2.    The Prothonotary shall be responsible for properly serving a copy of this Order upon counsel of record; and if a party has no counsel, then upon said party at their last known address as contained in the Court's file, in accordance with Pa.R.C.P. 236 and Rule L236.

**BY THE COURT:**

_____ J.

**David H. Acker, Judge**

cle

53RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

FILED/ORIGINAL

2020 FEB 10 PM 1: 35

# EXHIBIT L

IN THE COURT OF COMMON PLEAS OF LAWRENCE COUNTY,
PENNSYLVANIA
ORPHANS' COURT

IN RE:  DILLE FAMILY TRUST            No.:  43-19 OC

**RESPONSES TO FIRST REQUESTS
FOR ADMISSIONS PROPOUNDED
UPON LOUISE A. GEER**

SERVED ON BEHALF OF:

Louise A. Geer, Trustee Dille Family Trust

COUNSEL OF RECORD:

Henry M. Sneath, Esquire
PA I.D. No. 40559
sneathhm@hh-law.com
(412) 288-4013

HOUSTON HARBAUGH, P.C.
401 Liberty Avenue, 22nd Floor
Pittsburgh, PA  15222
*Counsel for Louise A. Geer, Trustee Dille
Family Trust*

IN THE COURT OF COMMON PLEAS OF LAWRENCE COUNTY,
PENNSYLVANIA
ORPHANS' COURT

IN RE:  DILLE FAMILY TRUST      )
                              )    No.: 43-19 OC
                              )

### RESPONSES TO FIRST REQUESTS FOR ADMISSIONS
### PROPOUNDED UPON LOUISE A. GEER

Louise A. Geer, Trustee Dille Family Trust ("Trustee" or "Geer"), by and through

undersigned counsel, Henry M. Sneath, Esquire, and the law firm of Houston Harbaugh, P.C.,

hereby responds to the First Requests For Admissions Propounded upon Louise A. Geer by the

beneficiaries of the Dille Family Trust, Robert Nichols Flint Dille and Lorraine Dille Williams

("Beneficiaries") as follows:

### GENERAL STATEMENT

Trustee provides the responses herein without in any way waiving, or intending to waive,

but on the contrary, intending to preserve and preserving:

1.      The right to raise all questions of authenticity, relevancy, materiality, privilege

and admissibility as evidence of any information or documents produced in response to these

Requests for Admissions in any subsequent proceeding or the trial of this or any other action;

2.      The right to object on any grounds to the use of any information or documents

produced in response to these Requests for Admissions in any proceeding, including the trial of

this action;

3.      The right to object at any time to other Requests for Admissions or discovery

involving the information or documents produced in response to these Requests for Admissions

and/or the subject matter thereof; and

4.      The right to supplement its answers or production if subsequent inspection of Trustee's files or further discovery uncovers additional documents and/or information called for by these Requests for Admissions as investigation of the facts and the evidence pertinent to this action is ongoing.

## GENERAL OBJECTIONS

1.      Trustee objects to the definitions and instructions accompanying the Beneficiaries' Requests for Admissions to the extent that they impose obligations beyond those set forth in the Pennsylvania Rules of Civil Procedure or Pennsylvania Orphans' Court Rules.

2.      Trustee objects to all of the Beneficiaries' Requests for Admissions to the extent that they seek information, documents or communications that are the work product of Trustee's lawyers or legal representatives, because such are protected from disclosure. Trustee also objects to all of the Beneficiaries' Requests for Admissions to the extent that they seek production of information and/or documents in the possession of a third party.

3.      Trustee objects to all of the Beneficiaries' Requests for Admissions to the extent that they seek the disclosure of information, documents or communications protected from discovery by the attorney/client privilege, the work product doctrine, the consulting expert exemption from discovery, the witness statement exemption from discovery, the party communications exemption from discovery, the investigative privilege and/or any other applicable constitutional, statutory or common law privilege. No privileged information, communication or document will be provided in response to the Beneficiaries' Requests for Admissions. By responding to any particular Request for Admission, Trustee does not intend to waive, nor does she waive, any applicable privilege that she may have, and Trustee specifically intends to assert the same. The inadvertent production of any information, communication or

document shall neither constitute a waiver of any privilege nor a waiver of any rights Trustee may have to object to the use of any of the documents or information in any subsequent proceedings or at trial. Trustee reserves the right to redact such privileged information, communications and/or work product from any materials produced.

      4.     Trustee objects to all of the Beneficiaries' Requests for Admissions to the extent that they seek to discover trade secrets and/or any other sensitive, confidential, proprietary and/or commercial information, the disclosure of which could be damaging to the business or property of Trustee, the Dille Family Trust or other related business entities.

      5.     Trustee objects to all of the Beneficiaries' Requests for Admissions to the extent that they are overbroad in that they seek the production of information that is neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence.

      6.     Trustee objects to all of the Beneficiaries' Requests for Admissions to the extent that they are vague and ambiguous in that the manner in which specific Requests for Admissions are phrased creates confusion or mischaracterizations given the issues involved in this action.

      7.     Trustee objects to all of the Beneficiaries' Requests for Admissions to the extent that they are burdensome and oppressive in that compliance with specific Requests for Admissions would be unreasonably difficult and/or prohibitively expensive.

      8.     Trustee objects to all of the Beneficiaries' Requests for Admissions to the extent that they seek information, communications or documents regarding entities that are not parties to this action.

9.    Each of the General Objections set forth above are incorporated into all of Trustee's specific responses to the Beneficiaries' Requests for Admissions below as though set forth in full, even where certain enumerated General Objections are specifically incorporated.

## RESPONSES TO REQUESTS FOR ADMISSIONS

1.    Admit that Geer is not the trustee of the DFT.

_____ ADMITTED                    _____ DENIED

**RESPONSE:** Denied.

2.    Admit that no court in California has appointed Geer as trustee of the DFT.

_____ ADMITTED                    _____ DENIED

**RESPONSE:** Trustee objects to this request to the extent it implies that court appointment as trustee is required by law or otherwise. Subject to and without waiving the forgoing objection, admitted.

3.    Admit that no court in Illinois has appointed Geer as trustee of the DFT.

_____ ADMITTED                    _____ DENIED

**RESPONSE:** Trustee objects to this request to the extent it implies that court appointment as trustee is required by law or otherwise. Subject to and without waiving the forgoing objection, admitted.

4.    Admit that no court in Pennsylvania has appointed Geer as trustee of the DFT.

_____ ADMITTED                    _____ DENIED

**RESPONSE:** Trustee objects to this request to the extent it implies that court appointment as trustee is required by law or otherwise. Subject to and without waiving the forgoing objection, admitted.

5.    Admit that Geer received no waiver(s) of conflicts of interest from Robert Nichols Flint Dille on or before June 6, 2011.

_____ ADMITTED                    _____ DENIED

**RESPONSE:** Trustee objects to this request as seeking information that is not relevant to the

4

subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the forgoing objection, it is admitted that Geer did not receive a waiver of conflicts of interest from Robert Nichols Flint Dille on or before June 6, 2011. By way of further response, it is denied that conflicts of interest existed on or before June 6, 2011 or thereafter that required a waiver from Robert Nichols Flint Dille. To the extent that Trustee obtained any waivers of conflict agreements from Robert Nichols Flint Dille following June 6, 2011, such waivers would have been applicable to any perceived, potential or actual (which are denied) conflicts that existed prior to or subsequent to June 6, 2011.

6.    Admit that Geer received no waiver(s) of conflicts of interest from Lorraine Dille Williams on or before June 6, 2011.

_____ ADMITTED          _____ DENIED

RESPONSE: Trustee objects to this request as seeking information that is not relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the forgoing objection, it is admitted that Geer did not receive a waiver of conflicts of interest from Lorraine Dille Williams on or before June 6, 2011. By way of further response, it is denied that conflicts of interest existed on or before June 6, 2011 or thereafter that required a waiver from Lorraine Dillie Williams. To the extent that Trustee obtained any waivers of conflict agreements from Lorraine Dille Williams following June 6, 2011, such waivers would have been applicable to any perceived, potential or actual (which are denied) conflicts that existed prior to or subsequent to June 6, 2011.

7.    Admit that, during the Accounting Period, Geer commingled funds belonging to her law firm, Herman and Geer, P.C., in the Free Small Business Checking Account that she had created for the DFT.

_____ ADMITTED          _____ DENIED

RESPONSE: Trustee objects to this request as seeking information that is not relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence. Trustee further objects to this request as it is seeking a legal conclusion. Trustee also objects to the term "commingled funds" as pejorative, vague, ambiguous, and undefined. Trustee further objects on grounds that "Herman and Geer, P.C." as incorrectly named herein, is not Geer's law firm nor is it an existing legal entity. By way of further response, subject to and without waiving the foregoing objections, denied.

8.    Admit that, during the Accounting Period, Geer caused the Free Small Business Checking Account that she had created for the DFT to become overdrawn.

5

_____ ADMITTED            _____ DENIED

**RESPONSE:** Trustee objects to this request as seeking information that is not relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence. Trustee also objects to the term "caused" as vague, ambiguous, and undefined. Subject to and without waiving the foregoing objections, it is admitted only that the referenced Free Small Business Checking Account became overdrawn on one occasion and that such overdraft was quickly cured. It is denied that Geer "caused" the referenced account to become overdrawn.

   9.    Admit that Geer has a contingent or non-contingent, direct or indirect interest in

BRC.

_____ ADMITTED            _____ DENIED

**RESPONSE:** Trustee objects to this request as seeking information that is not relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the forgoing objection, denied.

   10.    Admit that Daniel I. Herman, Esq. has a contingent or non-contingent, direct or

indirect interest in BRC.

_____ ADMITTED            _____ DENIED

**RESPONSE:** Trustee objects to this request as seeking information that is not relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the forgoing objection, denied.

   11.    Admit that Henry M. Sneath, Esq. has a contingent or non-contingent, direct or

indirect interest in BRC.

_____ ADMITTED            _____ DENIED

**RESPONSE:** Trustee objects to this request as seeking information that is not relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the forgoing objection, denied.

   12.    Admit that John O'Malley, Esq. has a contingent or non-contingent, direct or

indirect interest in BRC.

_____ ADMITTED         _____ DENIED

**RESPONSE:** Trustee objects to this request as seeking information that is not relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the forgoing objection, after reasonable inquiry, the information known or readily obtainable by Trustee is insufficient to enable Trustee to admit or deny this request.

13.    Admit that Geer did not use her own personal funds to pay legal fees to Henry M. Sneath, Esq., or his law firm, Houston Harbaugh, P.C.

_____ ADMITTED         _____ DENIED

**RESPONSE:** Trustee objects to this request as seeking information that is not relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence. Trustee also objects to the term "personal funds" as vague, ambiguous, and undefined. Trustee further objects to this request on grounds that it seeks information protected by the attorney-client privilege and/or the work product doctrine.

14.    Admit that Geer is an officer, director, board member, executive, principal or agent of BRC.

_____ ADMITTED         _____ DENIED

**RESPONSE:** Trustee objects to this request as seeking information that is not relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the forgoing objection, denied.

15.    Admit that Daniel I. Herman, Esq. is an officer, director, board member, executive, principal or agent of BRC.

_____ ADMITTED         _____ DENIED

**RESPONSE:** Trustee objects to this request as seeking information that is not relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the forgoing objection, denied.

16.    Admit that Henry M. Sneath, Esq. is an officer, director, board member, executive, principal or agent of BRC.

_____ ADMITTED                    _____ DENIED

**RESPONSE:** Trustee objects to this request as seeking information that is not relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the forgoing objection, denied.

17.    Admit that John O'Malley, Esq. is an officer, director, board member, executive,

principal or agent of BRC.

_____ ADMITTED                    _____ DENIED

**RESPONSE:** Trustee objects to this request as seeking information that is not relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the forgoing objection, after reasonable inquiry, the information known or readily obtainable by Trustee is insufficient to enable Trustee to admit or deny this request.

Dated:  January 14, 2020

Respectfully submitted,

By:    _Henry M Sneath_
       Henry M. Sneath, Esquire
       PA I.D. No. 40559

       HOUSTON HARBAUGH, P.C.
       401 Liberty Avenue, 22nd Floor
       Pittsburgh, PA  15222
       Phone:  (412) 288-4013
       sneathhm@hh-law.com
       *Counsel for Louise A. Geer, Trustee*
       *Dille Family Trust*

8

## V E R I F I C A T I O N

I, Louise A. Geer, do hereby declare that I have read the foregoing ***RESPONSES TO FIRST REQUESTS FOR ADMISSIONS PROPOUNDED UPON LOUISE A. GEER*** and that the statements and facts contained therein are true and correct to the best of my personal knowledge or information and belief.

This statement and verification are made subject to the penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsification to authorities, which provides that if I make knowingly false averments, I may be subject to criminal penalties.

_____
Louise A. Geer

Dated: _____

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the within **RESPONSES TO FIRST REQUESTS FOR ADMISSIONS PROPOUNDED UPON LOUISE A. GEER** was served on all counsel of record as listed below this 14th day of January, 2020 via email and U.S. Mail, first class, postage prepaid as follows:

Aurelius P. Robleto, Esquire
Robleto Kuruce, PLLC
6101 Penn Avenue, Suite 201
Pittsburgh, PA 15206
apr@robletolaw.com
*(Counsel for Robert Nichols Flint Dille and Lorraine Dille Williams)*

HOUSTON HARBAUGH, P.C.

By: _Henry M Sneath_
        Henry M. Sneath, Esquire

# EXHIBIT M

**From:** Lorraine Wiliams <ldille123@aol.com>
**Date:** August 26, 2018 at 1:22:06 PM CDT
**To:** louise.geer@gmail.com
**Subject: Termination of Trustee**

Dear Louise--

Based on numerous factors, by unanimous agreement of the beneficiaries, we have removed you as the Trustee for the Dille Family Trust (DFT) effective immediately. You are to cease all involvement with the DFT and to provide any trustee with all DFT property and records

All our rights are, of course, respectfully reserved.

Thank you for your attention to this matter.

Sincerely,

Lorraine Dille Williams
Beneficiary

**From:** flint dille <flintdille@gmail.com>
**Date:** August 26, 2018 at 11:57:54 AM GMT-10
**To:** louise <louise@hermespress.com>, Louise Geer <louise.geer@gmail.com>
**Subject: Termination of Trustee**

Dear Louise--

Based on numerous factors, by unanimous agreement of the beneficiaries, we have removed you as the Trustee for the Dille Family Trust (DFT) effective immediately.  You are to cease all involvement with the DFT and to provide any trustee with all DFT property and records.

All our rights are, of course, respectfully reserved.

Thank you for your attention to this matter.

Sincerely,

Robert Nichols Flint Dille
Beneficiary

# EXHIBIT N

INSTRUMENT CONFIRMING REQUEST FOR MANDATORY DISTRIBUTION AND
REMOVAL OF ENTIRETY OF SHARES OF PRINCIPAL IN TRUST ESTATE OF
THE DILLE FAMILY TRUST

This instrument is being entered into in accordance with with that certain Trust Agreement executed by Robert C. Dille and Virginia N. Dille under date of August 16, 1979, as amended on January 5, 1982 (the "Trust Agreement").

WHEREAS, Robert C. Dille and Virginia N. Dille, settlors under the Trust Agreement are both deceased;

WHEREAS, FLINT DILLE and LORRAINE DILLE WILLIAMS are the sole children of Robert C. Dille and Virginia N. Dille, and now both are over the age of 35;

Under Section 6.L. of the Trust Agreement both FLINT DILLE and LORRAINE DILLE WILLIAMS now request in writing the entirety of all of their respective shares per stirpes (50%/50% each) of the entirety of the principal in the Dille Family Trust immediately, which shall be distributed upon such written request.

Executed as of February 20, 2019

_____

FLINT DILLE, Beneficiary

LORRAINE DILLE WILLIAMS, Beneficiary



<u>INSTRUMENT CONFIRMING REQUEST FOR MANDATORY DISTRIBUTION AND
REMOVAL OF ENTIRETY OF SHARES OF PRINCIPAL IN TRUST ESTATE OF
THE DILLE FAMILY TRUST</u>

This instrument is being entered into in accordance with with that certain Trust Agreement executed by Robert C. Dille and Virginia N. Dille under date of August 16, 1979, as amended on January 5, 1982 (the "Trust Agreement").

WHEREAS, Robert C. Dille and Virginia N. Dille, settlors under the Trust Agreement are both deceased;

WHEREAS, FLINT DILLE and LORRAINE DILLE WILLIAMS are the sole children of Robert C. Dille and Virginia N. Dille, and now both are over the age of 35;

Under Section 6.L. of the Trust Agreement both FLINT DILLE and LORRAINE DILLE WILLIAMS now request in writing the entirety of all of their respective shares per stirpes (50%/50% each) of the entirety of the principal in the Dille Family Trust immediately, which shall be distributed upon such written request.

Executed as of February 20, 2019

FLINT DILLE, Beneficiary

LORRAINE DILLE WILLIAM, Beneficiary

# EXHIBIT O

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

The Dille Family Trust,          .    Docket #CV-15-6231 (WB)
                                 .
          Plaintiff,             .
                                 .    United States Courthouse
          vs.                    .    Philadelphia, PA
                                 .    February 28, 2019
The Nowlan Family Trust,         .    3:39 p.m.
                                 .
          Defendant.             .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

TRANSCRIPT OF SETTLEMENT HEARING
BEFORE THE HONORABLE WENDY BEETLESTONE
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For The Plaintiff:          David Kloss, Esq.
                            Kloss Stenger & Lotempio
(Via telephone)             9545 Main Street
                            Clarence, NY 14031

For The Defendant:          John J. O'Malley, Esq.
                            Volpe & Koenig, PC
                            United Plaza-ste. 1600
                            30 South 17th Street
                            Philadelphia, PA 19103

Audio Operator              M. Mani

Transcribing Firm:          Writer's Cramp, Inc.
                            63 Dakota Drive
                            Hamilton, NJ 08619
                            609-588-8043

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

2

1          THE CLERK:  All rise.  Court is now in session, the

2    Honorable Wendy Beetlestone presiding.

3          THE COURT:  Have a seat.  Who have I got on the

4    line?

5          MR. KLOSS:  David Kloss, Your Honor, for the Dille

6    Family Trust --

7          THE COURT:  Okay, I've got Mr. Kloss.

8          MR. KLOSS:  -- (indiscern.).

9          THE COURT:  Okay.  And in the courtroom, I've got?

10         MR. O'MALLEY:  John O'Malley, Your Honor for the

11   Nowlan Family Trust and our law clerk, Laura Lipschutz.

12         THE COURT:  Okay.  And this is the matter of 15-

13   6231, <u>Dille Family Trust versus Nowlan Family Trust</u>.

14         MR. O'MALLEY:  Correct, Your Honor.

15         MR. KLOSS:  Correct.

16         THE COURT:  And I understand you've reached a

17   settlement.

18         MR. O'MALLEY:  That's correct, Your Honor.

19         MR. KLOSS:  We have.

20         THE COURT:  Okay.  Well, and I understand also you

21   want to put it on the record.

22         MR. O'MALLEY:  In last 24 hours, we've been able to

23   memorialize the settlement, Your Honor.

24         THE COURT:  Okay.

25         MR. O'MALLEY:  I don't know if I can -- we have a

3

1    proposed stipulation order of dismissal.

2            THE COURT:  Well, you don't need to file the

3    settlement.  I just need to have a 41(b) order and I can sign

4    it.  I'm assuming that this involves no continued jurisdiction

5    of the Court.

6            MR. O'MALLEY:  That's correct.

7            THE COURT:  Good.  Then I think all you need to do

8    is you need to sign it and then I can sign an order dismissing

9    it.

10           MR. O'MALLEY:  Well, we would like to get the order,

11   I guess since there's been so much back and forth we would

12   like to put it on the record.  It's not a confidential

13   settlement.  Would be better to submit it for the Court --

14           THE COURT:  I didn't file it.

15           MR. O'MALLEY:  File it, okay.

16           THE COURT:  Just file it and then file with it an

17   order of dismissal and I will -- well, let me take a look at

18   it because I hear that there's no further engagement of the

19   Court, but I want to make sure because --

20           MR. O'MALLEY:  Sure.

21           THE COURT:  -- I do not want to be involved any

22   further with this litigation.  I just want to see the Buck

23   Rogers movie, that's it.

24       (Laughter)

25           MR. O'MALLEY:  I understand.